# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

PLANNED PARENTHOOD FEDERATION
OF AMERICA, INC.; and PLANNED
PARENTHOOD OF NORTHERN NEW
ENGLAND, INC.,

        Plaintiffs,

    v.

ALEX M. AZAR II, in his official capacity as
Secretary, United States Department of
Health and Human Services; UNITED
STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES; ROGER
SEVERINO, in his official capacity as
Director, Office for Civil Rights, United
States Department of Health and Human
Services; and OFFICE FOR CIVIL RIGHTS,
United States Department of Health and
Human Services,

      Defendants.

Civil Action No. _____

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

Plaintiffs Planned Parenthood Federation of America, Inc. ("PPFA") and Planned

Parenthood of Northern New England, Inc. ("PPNNE") (collectively, "Planned Parenthood")

complain and allege as follows:

## I.     INTRODUCTION

1.     Planned Parenthood brings this action under the Administrative Procedure Act

("APA"), 5 U.S.C. § 701 *et seq*., to set aside and enjoin a final rule issued by the Department of

Health and Human Services ("HHS" or the "Department") that will authorize and embolden

people to discriminate in the delivery of health care and, as a result, significantly restrict the

ability of millions of individuals in this country to access vital and potentially life-saving medical

services. The rule, entitled Protecting Statutory Conscience Rights in Health Care, 84 Fed. Reg.

23,170 (May 21, 2019) (to be codified at 45 C.F.R. pt. 88) (the "Refusal of Care Rule" or the

"Rule"), attached as Exhibit A, represents a radical departure from HHS's stated mission "to enhance the health and well-being of all Americans"[1] and the agency's long history of combating discrimination, protecting patient access to care, and eliminating health disparities.

2.       The Refusal of Care Rule would dramatically and unlawfully broaden existing federal law far beyond what Congress intended. The Rule would allow almost any health care provider—including hospitals or individual workers in the health care setting, even those only tangentially involved in the delivery of patient care—to refuse to provide, assist with, or refer for virtually any health service, based solely on a personal objection. The Rule even permits the withholding of *information* from patients about all their health care options—and without any notice to patients, making patients' informed consent impossible. In many circumstances, the failure to provide this information amounts to a denial of care because, without that information, patients do not know that option exists, and thus cannot seek care at a different medical facility.

3.       The Rule appropriates language from civil rights laws that were intended to combat discrimination and improve access to health care and distorts it in a manner that will instead *encourage* discrimination and *decrease* access to health care. The Rule's expansive definitions and confusing parameters will invite workers to discriminate against individuals seeking care. For example, a receptionist could interpret the Rule to allow him to refuse to schedule a transgender patient for transition-related care, an annual physical examination, or screening for cervical cancer. Particularly in rural areas with limited health care provider options, one individual's decision to refuse care could effectively make health services unavailable to patients in need.

---

[1] HHS Mission Statement, https://www.hhs.gov/about/strategic-plan/introduction/index.html (last visited June 10, 2019).

4.      The Rule abandons longstanding protections for patients in the face of providers' objections to providing or assisting in the provision of care. For example, the Rule does not include exceptions for emergencies—indeed, in finalizing the Rule, the Department specifically declined to clarify that protections for patients in emergency situations under the federal Emergency Medical Treatment and Active Labor Act ("EMTALA") still apply. The result is that a patient in distress could be denied care from a hospital emergency room or denied information about life-saving treatment because a single doctor, clinician, or technician asserts a religious or moral objection. Indeed, Defendants acknowledge that an ambulance driver could refuse to take a patient suffering from an ectopic pregnancy to the hospital because of objections to the care she will receive when she gets there.

5.      The Rule jeopardizes access to the full array of health services offered by Planned Parenthood and is antithetical to its mission to provide comprehensive and non-judgmental health care and information to all who seek care at any of its more than 600 health centers across the country. The Rule imposes onerous restrictions on health care providers, such as Planned Parenthood, that receive certain federal funding from the Department (i.e., "covered entities") and are required to comply and certify compliance with the Rule.

6.      In particular, the Rule abandons the long-standing balancing framework that Title VII of the Civil Rights Act of 1964 sets forth, which requires religious accommodations only when they do not impose undue hardship on the employer's operations. Instead, the Rule appears to require covered entities like Planned Parenthood to offer absolute accommodations to employees, trainees, volunteers, and contractors who object to providing or assisting with a health service, such as abortion and sterilization—notwithstanding the harm these accommodations may cause to patients or to Planned Parenthood's ability to perform operations

core to its mission. The Rule goes even further and prevents covered entities from even *inquiring* during the hiring or recruitment process whether an individual has an objection to providing or assisting with such health services. In essence, the Rule prevents Planned Parenthood from ensuring that an individual will do his or her job prior to finalizing the employment relationship with that person.

7.     Thus, Planned Parenthood could be forced to hire people who are opposed to its core mission and the care it provides, and it may be constrained from taking any action to remove those people once hired. This not only prevents Planned Parenthood from ensuring that its patients receive the care they need, but also threatens the security of Planned Parenthood, its patients and staff. If a Planned Parenthood affiliate runs afoul of the broad and vague restrictions in the Rule, under the Rule's strict enforcement mechanisms, it stands to lose *all* of its federal funding that it uses to provide a wide range of health care services to patients across the country.

8.     The devastating burden to patients and their families who will be denied health care will be disproportionately borne by those who already face significant barriers to health care—women, people of color, patients living in rural areas, lesbian, gay, bisexual, transgender, and queer individuals, people with low incomes, immigrants, and people living with disabilities. Patients seeking reproductive health care will lose critical care under the Rule: rape survivors could be denied emergency contraception, people with unintended pregnancies could be denied information and counseling on all of their options, and people suffering ectopic pregnancies or miscarriages could be denied critical and time-sensitive care. The Refusal of Care Rule would, in effect, subordinate the health and safety of patients to the personal beliefs of health care providers who wish to deny them care.

9.    A broad coalition of the nation's trusted medical associations submitted comments opposing the Rule, including the American Medical Association, the American Academy of Family Physicians, the American Nurses Association, the American College of Obstetricians and Gynecologists, the American College of Emergency Physicians, the American Academy of Pediatrics, the American Hospital Association, and the Association of American Medical Colleges. As the Association of American Medical Colleges explained in urging HHS to withdraw the Rule, "[t]hose who choose the profession of medicine are taught repeatedly . . . that, in the end, their duty to care for the patient must come first, before self. . . . Conscience is a burden that belongs to that individual professional; patients should not have to shoulder it."[2] The Rule nonetheless upends fundamental medical ethics by elevating an individual's personal beliefs above a patient's health. In promulgating the Rule, the Department explicitly chose to ignore these concerns and the foreseeable negative consequences for patient health.

10.    By the Departments' own estimates, the Refusal of Care Rule would impact over 613,000 hospitals, health clinics, doctors' offices, and nonprofits, which includes facilities operated by PPFA's affiliates (such as Plaintiff PPNNE), and cost over $1 billion to implement. But the Rule's true costs are substantially greater than the Department estimates, as the Department entirely abdicates its responsibility to weigh the substantial costs to patients and their families that will inevitably result from the above-described denials of health care that the Rule would cause, and fails to realistically account for the costs to health care providers who must comply with the Rule's vague and onerous requirements.

11.    The Department has decided to impose these costs even though federal law already provides protections for health care providers who object to providing certain health care

[2] Comment of Ass'n of Am. Med. Colls. (Mar. 26, 2018), https://www.regulations.gov/document?D=HHS-OCR-2018-0002-67592 (last visited June 10, 2019).

services, and the Department has failed to show that additional protections are necessary. Yet the Department forged ahead with this harmful Rule, unlawfully expanding the reach of existing federal refusal laws and imposing new, burdensome restrictions on health care employers like Planned Parenthood that *do* want to ensure patients receive the care they need.

12.     The Refusal of Care Rule must be held unlawful and set aside. Among other reasons, the Rule's radical expansion of the underlying federal laws is contrary to clear statutory language and congressional intent; the Rule conflicts with other federal laws, including EMTALA, Title X of the Public Health Service Act ("Title X"), and Section 1554 of the Patient Protection and Affordable Care Act ("ACA"); and the Rule violates the First and Fifth Amendments of the Constitution. Moreover, the Rule is arbitrary and capricious because the Department completely failed to address important aspects of the problem (most notably the Rule's effects on patients seeking care), reconcile the Rule with other federal laws, clarify vague terms and contradictory requirements, provide a reasoned explanation for the Rule's dramatic reversal in policy, conduct an adequate regulatory impact analysis, and respond to significant comments. The Rule was also promulgated without procedures required by law as the Department failed to provide an opportunity to comment on key aspects of the final Rule.

13.     The Rule is scheduled to take effect on July 22, 2019. Unless enjoined and set aside, the Refusal of Care Rule will irreparably harm Planned Parenthood, its patients, and, indeed, the nation's public health. Planned Parenthood, therefore, seeks a declaration that the Refusal of Care Rule is unlawful, and preliminary and permanent injunctive relief preventing its enforcement.

## II.     THE PARTIES

14.     Plaintiff PPFA is a not-for-profit corporation with its principal place of business in New York City (Manhattan) and organized under New York's laws. PPFA is the leading

national organization dedicated to public education and advocacy in the field of reproductive health care. PPFA's core mission is to ensure the provision of high-quality, non-judgmental comprehensive reproductive health care services, to provide educational programs relating to reproductive and sexual health, and to advocate for public policies to ensure access to health services—including and especially for individuals with low incomes or from underserved communities. PPFA also engages in public education about, and advocacy in favor of, the right to access safe and legal abortions.

15.     PPFA is a membership organization composed of 53 affiliate organizations, with a Board of Directors. The member-affiliates are responsible for setting the long-range goals and priorities of PPFA and for electing the PPFA Board of Directors. Through their participation and voting, PPFA's member-affiliates control the mission and direction of PPFA. Under PPFA's bylaws, PPFA's member-affiliates are also required to contribute financially to PPFA, and affiliate dues contribute to PPFA's financial support. Although PPFA member-affiliates are independent organizations, as an affiliate of PPFA each has the right to use the Planned Parenthood name and service mark.

16.     Cumulatively, PPFA's member-affiliates operate more than 600 health centers that provide a wide range of reproductive health care services and education. Among them are contraception (including long-acting reversible contraceptives ("LARCs")), contraceptive counseling, physical exams, clinical breast exams, screening for cervical cancer, testing and treatment for sexually transmitted infections ("STIs"), pregnancy testing and counseling, gender-affirming care including hormone therapy for transgender patients, some sterilization services (including vasectomies), colposcopies, abortion, and health education services. PPFA affiliates also provide referrals for these services if they are unable to provide them at their health centers.

17.     In 2018, Planned Parenthood affiliates provided more than 9.8 million services to approximately 2.4 million patients during the course of approximately four million visits. Planned Parenthood provided reversible contraceptives to more than 1.8 million patients and administered more than 560,000 cancer screenings and preventive services such as breast exams and cervical screens (Pap tests). An estimated one out of every three women nationally has received care from a PPFA affiliate at least once in her life.

18.     In the past several years, the occurrence of gonorrhea, chlamydia, and syphilis has dramatically spiked in communities nationwide, and particularly in the communities that Planned Parenthood serves. Accordingly, STI testing and treatment has become a larger portion of Planned Parenthood's service mix. In 2018, PPFA's affiliates administered more than 4.9 million STI tests, as compared to approximately 4.7 million STI tests in 2017 and approximately 4.4 million STI tests in 2016.

19.     Fifty-six percent of Planned Parenthood health centers are in health professional shortage areas, rural areas, or medically underserved areas, as designated by the Health Resources and Services Administration within HHS.

20.     Seventy-three percent of Planned Parenthood patients have incomes at or below 150% of the federal poverty level, which equates to $18,735[3] for a single person household.

21.     Planned Parenthood health centers also play a critical role in serving communities of color. Approximately 26% of Planned Parenthood's patients are Latinx, 18% are Black, and 11% are Native American, Asian, or Multiracial.

---

[3] Calculations based on *Poverty Guidelines*, U.S. Dep't of Health & Human Servs., https://aspe.hhs.gov/poverty-guidelines (last visited June 10, 2019).

22.     Virtually all PPFA member-affiliates receive HHS funds and, therefore, are subject to the Refusal of Care Rule. For example, in 2017, Planned Parenthood affiliates collectively received over $67 million in grants under Title X of the Public Health Service Act. In addition, nearly every Planned Parenthood affiliate participates in the Medicaid program and receives reimbursement (collectively in the hundreds of millions of dollars) for providing health services to Medicaid patients. In addition, PPFA affiliates receive other HHS funds that subject them to the Refusal of Care Rule, including under the Social Services Block Grant ("SSBG" or "Title XX") program, 42 U.S.C. § 1397 *et seq*.; the Ryan White AIDS program; the National Breast and Cervical Cancer Early Detection Program ("NBCCEDP"), 42 U.S.C. § 300k *et seq*.; the Infertility Prevention Program ("IPP"), 42 U.S.C. § 247c-1; and the Maternal and Child Health Services Block Grant ("Title V") program, 42 U.S.C. § 701 *et seq*. Some PPFA member-affiliates delegate HHS funds to sub-recipients. In addition, some PPFA member-affiliates receive grants from and/or participate in research projects funded by the National Institute of Health.

23.     Planned Parenthood is also a major employer. Combined, Planned Parenthood affiliates employ more than 10,000 individuals nationwide, including almost 9,000 full-time employees. In addition, Planned Parenthood has more than 30,000 volunteers annually. Planned Parenthood affiliates must make hiring decisions for approximately 2,000 employee vacancies per year. If allowed to take effect, the Rule will unlawfully and drastically alter Planned Parenthood's hiring practices, potentially forcing it to hire individuals who have objections to core health services it provides, such as abortion, and raise serious questions about how it conducts its employment practices.

24.     PPFA sues on its own behalf, on behalf of its member-affiliates that receive federal funds that subject them to the Refusal of Care Rule and on behalf of their patients nationwide. PPFA has standing to sue on behalf of its member-affiliates because (1) its member-affiliates would have standing to sue in their own right; (2) the interests PPFA seeks to protect are germane to its purposes; and (3) neither the claims asserted, nor the relief requested, require the participation in this lawsuit of each individual PPFA member-affiliate.

25.     Plaintiff PPNNE is a not-for-profit Vermont corporation and a member-affiliate of PPFA. It provides clinical, educational, and counseling services at 21 health care centers in Vermont, New Hampshire, and Maine. PPNNE is the largest reproductive health care and sexuality education provider in northern New England, serving more than 45,000 people annually. PPNNE provides a wide range of reproductive health services at its health care centers, including birth control, such as emergency contraception and LARCs; testing and treatment for STIs; testing for HIV and HPV; pregnancy testing; and breast and cervical cancer screenings. PPNNE also provides medication abortions through 11 weeks after the first day of a patient's last menstrual period and aspiration abortions through 19 weeks 0 days. In addition, all PPNNE health centers offer post-exposure prophylaxis (PEP) and pre-exposure prophylaxis (PrEP) for HIV prevention; gender-affirming care, including hormone therapy, for transgender patients; prenatal screenings and referrals; and referrals for sterilizations (e.g., vasectomies).

26.     PPNNE participates in many federal programs administered by HHS that subject it to the Refusal of Care Rule, including the Title X program, the SSBG program, and Medicaid.

27.     PPFA member-affiliates, including PPNNE, reasonably fear that the Rule frustrates their ability to carry out their mission to provide comprehensive reproductive health services to the patients they serve. They fear that they will be forced to hire and accommodate

individuals to work in their health centers despite that they object to providing or assisting with certain core services, including individuals who are only tangentially involved in the provision of patient care. One person's objection could effectively result in the refusal of care for an affiliate's patients, inhibiting their access to medical treatment. The Rule also imposes vague and unworkable requirements, putting a PPFA member-affiliate at risk of losing all of its federal funding, which is used to provide necessary health services to millions of individuals. They also reasonably fear that the Refusal of Care Rule exposes Planned Parenthood to security risks and threatens the safety of its staff and patients, as it hampers Planned Parenthood's ability to screen during the hiring process for individuals who have a dangerous opposition to the services Planned Parenthood provides.

28.     PPFA, PPNNE, and all of PPFA's other member-affiliates are collectively referred to here as "Planned Parenthood."

29.     Defendant Alex M. Azar II is the Secretary of HHS, the agency that promulgated the Refusal of Care Rule. Defendant Azar is sued in his official capacity, as are his successors.

30.     Defendant HHS is an agency of the United States government, located at 200 Independence Avenue, S.W., Washington, D.C. 20201.

31.     Defendant Roger Severino is the Director of the Office of Civil Rights at HHS. Defendant Severino is sued in his official capacity, as are his successors.

32.     Defendant Office for Civil Rights ("OCR") is the office within HHS to which HHS has delegated its claimed responsibility for enforcing the Refusal of Care Rule. OCR thus claims authority to initiate compliance reviews, conduct investigations, supervise and coordinate compliance by HHS and its components, and use other enforcement tools to address alleged violations and resolve complaints.

### III.     JURISDICTION AND VENUE

33.     Jurisdiction is conferred on this Court by 28 U.S.C. § 1331.

34.     This action, including Planned Parenthood's claims for injunctive and declaratory relief, is authorized by the APA, 5 U.S.C. §§ 702, 704–706; the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202; Rules 57 and 65 of the Federal Rules of Civil Procedure; and the equitable powers of this Court.

35.     Defendants' issuance of the final Rule on May 21, 2019, constitutes final agency action that is judicially reviewable under the APA, 5 U.S.C. §§ 704, 706.

36.     Venue is appropriate under 28 U.S.C. § 1391(e)(1)(C) because PPFA's headquarters is located in this judicial district, and no real property is involved in this action.

### IV.     FACTUAL ALLEGATIONS

#### A.     Statutory and Regulatory Background

##### 1.     The Underlying Refusal Statutes

37.     The Refusal of Care Rule purports to "implement[] and enforce[]" more than 20 federal laws, the vast majority of which have never previously been the subject of agency rulemaking. Of particular relevance here, the Rule purports to implement, among other laws, the Church Amendments, 42 U.S.C. § 300a-7; the Coats-Snowe Amendment, 42 U.S.C. § 238n; and the Weldon Amendment, Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 2019, Div. B, § 507(d), Pub. L. No. 115-245, 132 Stat. 2981, 3118 (2018) (collectively the "federal refusal laws" or "federal refusal statutes").

##### a)     The Church Amendments (1973–1979)

38.     Originally sponsored by Senator Frank Church of Idaho, the Church Amendments refer to a series of laws passed in the 1970s.

### (i)      Church (b) and (c)(1)

39.     Church (b) and (c)(1) were passed shortly after the Supreme Court's decision in *Roe v. Wade*, 410 U.S. 113 (1973), and following a district court decision that enjoined a Catholic hospital from preventing a physician from performing a voluntary sterilization procedure on the grounds that the hospital's receipt of certain federal funds meant it was acting under the color of state law, *see* H.R. Rep. 93-227 (1973), at 1473 (citing *Taylor v. St. Vincent's Hospital*, 369 F. Supp. 948, 950 (D. Mont. 1973)).

40.     In response to those decisions, Congress passed a law stating that receiving federal funding does not, in and of itself, obligate individuals or entities to provide abortion or sterilization services. *See*, *e.g.*, 119 Cong. Rec. 9599 (Mar. 27, 1973) (statement of Sen. Church). However, the Senators who originally debated the Church Amendments made clear that they intended the law to have a very limited impact on patient access to abortion and sterilization services. Senator Church noted that in his home state of Idaho "[t]here is no great difficulty for those who wish to obtain a sterilization or an abortion operation to go to the publicly owned hospitals where such procedures are available." 119 Cong. Rec. 9601 (Mar. 27, 1973). Senator Stevenson believed the law would not prevent anyone at all from obtaining an abortion or sterilization services, asserting that "[n]o individuals will be denied an abortion or sterilization" as a result of the Church Amendments. *Id.* at 9596.

41.     Church (b)(1) states that "[t]he receipt of any grant, contract, loan, or loan guarantee under [, *inter alia*,] the Public Health Services Act [42 U.S.C.A. § 201 *et seq.*] . . . by any individual . . . does not authorize any court or other public official to require . . . such individual to perform or assist in the performance of any sterilization procedure or abortion" if it "would be contrary to his religious beliefs or moral convictions." 42 U.S.C. § 300a-7(b)(1).

42. Church (b)(2) further provides that the receipt of such funds does not authorize any court or other public official to require a receiving entity to "(A) make its facilities available for the performance of any sterilization procedure or abortion if the performance of such procedure or abortion in such facilities is prohibited by the entity on the basis of religious beliefs or moral convictions, or (B) provide any personnel for the performance or assistance in the performance of any sterilization procedure or abortion" if it "would be contrary to the religious beliefs or moral convictions of such personnel." 42 U.S.C. § 300a-7(b)(2).

43. Church (c)(1) prohibits entities that receive funds under, *inter alia*, the Public Health Services Act, from "discriminat[ing] in the employment, promotion, or termination of employment of" or "in the extension of staff or other privileges to any physician or other health care personnel"

- because such person "performed or assisted in the performance of a lawful sterilization procedure or abortion," or

- because such person "refused to perform or assist in the performance of such a procedure or abortion" because such procedures are "contrary to his religious beliefs or moral convictions," or

- because of such person's "religious beliefs or moral convictions respecting sterilization procedures or abortions." 42 U.S.C. § 300a-7(c)(1).

**(ii)   Church (c)(2) and (d)**

44. Church (c)(2) and (d) were added in 1974 when the Senate was considering the National Research Act, which addresses funding for biomedical and behavioral research, and was designed to ensure that research projects involving human subjects were performed in an ethical manner. *See* 119 Cong. Rec. 29213–32 (Sept. 11, 1973). Subsection (c)(2) prohibits any

entity that receives a grant or contract for biomedical or behavioral research under any program administered by the Secretary of HHS from "discriminat[ing] in the employment, promotion, or termination of employment of" or "extension of staff or other privileges to any physician or other health care personnel":

- because such person "performed or assisted in the performance of any lawful health service or research activity;" or

- because such person "refused to perform or assist in the performance of any such service or activity on the grounds that" it would be "contrary to his religious beliefs or moral convictions;" or

- because of such person's "religious beliefs or moral convictions respecting any such service or activity." 42 U.S.C. § 300a-7(c)(2).

45.     Church (d), which was also passed as part of the National Research Act, provides that "[n]o individual shall be required to perform or assist in the performance of any part of a health service program or research activity funded in whole or in part under a program administered by [HHS] if his performance . . . would be contrary to his religious beliefs or moral convictions." *Id.* § 300a-7(d).

### (iii)     Church (e)

46.     Church (e) was enacted in 1979 and provides that entities that receive funds under, *inter alia*, the Public Health Service Act may not deny admission or otherwise discriminate against applicants for training or study based on their participation in abortions or sterilizations. *See* 42 U.S.C. § 300a-7(e).

47.     The substance of the Church Amendments has remained unchanged since 1979.

### b)       *The Coats-Snowe Amendment (1996)*

48.      In 1996, Congress adopted the Coats-Snowe Amendment in response to a decision by the Accrediting Council for Graduate Medical Education ("ACGME") to require obstetrician-gynecologist residency programs to provide abortion training. The ACGME required that all obstetrics and gynecology residency programs provide induced abortion training beginning January 1, 1996; however, "[n]o program or resident with a religious or moral objection [would] be required to provide training in or to perform induced abortions."[4]

49.      The Coats-Snowe Amendment prohibits the federal government, or any state or local government that receives federal financial assistance, from discriminating against any "health care entity" on the basis that:

- "the entity refuses to undergo training in the performance of induced abortions, to require or provide such training, to perform such abortions, or to provide referrals for such training or such abortions;"

- "the entity refuses to make arrangements for any of the [above] activities . . . ;" or

- "the entity attends (or attended) a post-graduate physician training program, or any other program of training in the health professions, that does not (or did not) perform induced abortions or require, provide or refer for training in the performance of induced abortions, or make arrangements for the provision of such training." 42 U.S.C. § 238n(a).

---

[4] *See* Committee Opinion No. 612 at 2–3, American College of Obstetricians and Gynecologists, Committee on Health Care for Underserved Women (Nov. 2014), https://www.acog.org/-/media/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/co612.pdf?dmc=1&ts=20170926T2329467312 (last visited June 10, 2019).

50.     The Coats-Snowe Amendment defines the term "health care entity" to "include[]

an individual physician, a postgraduate physician training program, and a participant in a

program of training in the health professions." 42 U.S.C. § 238n(c)(2).

51.     The substance of the Coats-Snowe Amendment has remained unchanged since

1996.

### c)     The Weldon Amendment (2004)

52.     The Weldon Amendment refers to a rider that has been attached to the

Departments of Labor, Health and Human Services, and Education, and Related Agencies

Appropriations Act every year since 2004.

53.     It provides that none of the funds appropriated in that Act

> may be made available to a Federal agency or program, or to a
> State or local government, if such agency, program, or government
> subjects any institutional or individual health care entity to
> discrimination on the basis that the health care entity does not
> provide, pay for, provide coverage of, or refer for abortions.

Departments of Labor, Health and Human Services, and Education, and Related Agencies

Appropriations Act, 2019, Div. B, § 507(d), Pub. L. No. 115-245, 132 Stat. 2981, 3118 (2018).

54.     The Weldon Amendment defines the term "health care entity" to "include[] an

individual physician or other health care professional, a hospital, a provider-sponsored

organization, a health maintenance organization, a health insurance plan, or any other kind of

health care facility, organization, or plan." *Id.*

55.     The substance of the Weldon Amendment has remained unchanged since 2004.

### 2.     Relevant Rulemaking History

### a)     The 2008 Rule

56.     The current Refusal of Care Rule is not the Department's first rulemaking in this

field. In 2008, the Department promulgated a regulation that also purported to implement the

Church, Weldon, and Coats-Snowe Amendments. *See* Ensuring That Department of Health and Human Services Funds Do Not Support Coercive or Discriminatory Policies or Practices in Violation of Federal Law, 73 Fed. Reg. 78,072 (Dec. 19, 2008) (the "2008 Rule"). The 2008 Rule broadened the reach of the underlying federal refusal laws by, for example, extending the right to refuse to a vastly greater number of individuals involved in health care and authorizing those individuals to refuse to provide information to patients about treatment options. Despite widespread public condemnation, HHS finalized the 2008 Rule in December 2008, and it became effective on January 20, 2009.

57.     Within months of its effective date, HHS proposed[5] rescinding the 2008 Rule and in 2011 issued a final rule[6] rescinding the 2008 Rule almost entirely. In the 2011 Rule, HHS noted several reasons for the rescission including, "the 2008 Final Rule may negatively affect the ability of patients to access care if interpreted broadly." *Id.* at 9,974; *see also infra* Part IV.B.2. In the end, HHS left in place only the limited provision designating OCR to receive and coordinate the handling of complaints based on the federal refusal statutes. *Id.* at 9,976–77.

**B.     The 2019 Refusal of Care Rule**

58.     On January 18, 2018, the day before the annual "March for Life" was scheduled, HHS announced the creation of a new "Conscience and Religious Freedom Division" within OCR charged with protecting health care providers who refuse to provide health care.[7] On the same day, HHS also announced that OCR planned to amend its mission statement to abandon its

---

[5] *See* Rescission of the Regulation Entitled "Ensuring That Department of Health and Human Services Funds Do Not Support Coercive or Discriminatory Policies or Practices in Violation of Federal Law," 74 Fed. Reg. 10,207, 10,209 (proposed Mar. 10, 2009).

[6] Regulation for the Enforcement of Federal Health Care Provider Conscience Protection Laws, 76 Fed. Reg. 9,968-02, 9,971 (Feb. 23, 2011) (the "2011 Rule").

[7] *HHS Announces New Conscience and Religious Freedom Division*, HHS Office for Civil Rights (Jan. 18, 2018), https://www.hhs.gov/about/news/2018/01/18/hhs-ocr-announces-new-conscience-and-religious-freedom-division.html (last visited June 10, 2019).

18

historic focus on protecting and improving patient health and instead to prioritize enforcing the federal refusal statutes.

59. The next day (the day of the March for Life), the Office of Information and Regulatory Affairs ("OIRA") released the proposed Refusal of Care Rule to the public.[8] HHS apparently sent the proposed Refusal of Care Rule to OIRA on January 12. But HHS did not first notify the public by publishing notice in its Unified Regulatory Agenda, as required by Executive Order 12,866.[9] Although the proposed Rule was hundreds of pages long, it cleared OIRA review in just one week.

60. In response to the proposed Rule, HHS received over 242,000 comments. More than 200,000 of those comments were from organizations and individuals who voiced staunch opposition to the Rule. Among the commenters were:

- Medical professional associations, including the American Medical Association, the American College of Emergency Physicians, the American Association of Medical Colleges, the American College of Obstetricians and Gynecologists, and the American Psychological Association;

- Other health care providers, including Planned Parenthood;

- Former leadership at the Equal Employment Opportunity Commission, the federal agency charged with administering and enforcing Title VII;

- State officials, including at least 20 State Attorneys General;

---

[8] OIRA Conclusion of E.O. 12866 Regulatory Review, Ensuring Compliance with Certain Statutory Provisions in Health Care; Delegations of Authority. HHS/OCR. RIN: 0945-ZA03. Received date: 01/12/18. Concluded date: 01/19/18, https://www.reginfo.gov/public/do/eoDetails?rrid=127838 (last visited June 10, 2019).

[9] Exec. Order No. 12866 at Sec. 4(b)–(c) (Sept. 30, 1993); OIRA, *Agency Rule List – Fall 2017, Dep't of Health Human Servs.*,
https://www.reginfo.gov/public/do/eAgendaMain?operation=OPERATION_GET_AGENCY_RULE_LIST&current PubId=201710&showStage=active&agencyCd=0900&Image58.x=35&Image58.y=13 (last visited June 10, 2019).

- Associations of state health officials, such as the National Alliance of State & Territorial AIDS Directors and the National Association of County and City Health Officials, as well as numerous state public health departments;

- Federal officials, including at least 106 members of the House of Representatives and 18 Senators;

- Religious groups, such as the Unitarian Universalist Association of Congregations, the United Methodist Church, Catholics for Choice and the Religious Action Center of Reform Judaism; and

- Advocates representing many of those groups of people most likely to be harmed by the Rule.

61.     More than one year later, the day before the National Day of Prayer, on May 1, 2019, OCR revised its website to include a new mission statement. As previously signaled, the new statement abandoned OCR's long-held mission to "improve the health and well-being of people across the nation" and "to ensure that people have equal access to and the opportunity to participate in and receive services from HHS programs without facing unlawful discrimination." OCR's new mission statement declares that OCR intends to operate as a "law enforcement agency" that prioritizes enforcing the federal refusal statutes, as well as civil rights laws and privacy and security laws.[10]

62.     HHS posted a nearly final version of the Refusal of Care Rule on OCR's website on May 2, 2019, to coincide with the National Day of Prayer. That same day, President Trump

---

[10] Dep't of Health & Human Servs., OCR Mission and Vision, https://www.hhs.gov/ocr/about-us/leadership/index.html (last visited June 10, 2019) (listing as one of three OCR priorities "Ensuring that HHS, state and local governments, health care providers, health plans, and others comply with federal laws that guarantee the protection of conscience and free exercise of religion and prohibit coercion and religious discrimination in HHS-conducted or funded programs.").

held a "National Day of Prayer Service" and press conference at the White House. In his remarks, President Trump confirmed that the Administration's intent in promulgating the Refusal of Care Rule was to expand existing federal refusal laws: "[J]ust today, we finalized new protections of conscience rights for physicians, pharmacists, nurses, teachers, students, and faith-based charities. . . . Together, we are building a culture that cherishes the dignity and worth of human life. Every child, born and unborn, is a sacred gift from God."

63.     The final rule was published in the Federal Register on May 21, 2019.

### 1.     The Refusal of Care Rule's Provisions

64.     The Rule states that its purpose is to "provide for the implementation and enforcement of the Federal conscience and anti-discrimination laws." 84 Fed. Reg. at 23,263 (to be codified at 45 C.F.R. § 88.1). In fact, the Rule dramatically expands the right to refuse to provide health care, even in emergency situations, beyond the plain language and intent of the underlying federal refusal statutes. It further appropriates anti-discrimination language from civil rights statutes to enable discrimination by health care providers. The Rule demands that it be interpreted and implemented broadly in order to achieve its stated purpose. *Id.* at 23,263, 23,272 (to be codified at 45 C.F.R. §§ 88.1, 88.9).

65.     The Rule sets forth various requirements and prohibitions related to each of the statutes it purports to interpret and implement, including the Church Amendments, the Coats-Snowe Amendment, the Weldon Amendment, the Medicare Advantage Program, and multiple sections of the Affordable Care Act, among others. *Id.* at 23,264–69 (to be codified at 45 C.F.R. § 88.3). As demonstrated by the examples below, while the Rule claims fidelity to the underlying laws, it in fact creates new rights to deny care that far exceed those Congress has provided—just as President Trump stated in his speech on May 2, 2019.

66.     The Rule creates a broad exemption that purports to permit any health care provider or individual that works in the health care setting—from hospitals to clinicians to receptionists to technicians who clean instruments—to deny patients basic healthcare, including reproductive and emergency care, on the basis of "religious, moral, ethical or other reasons." 84 Fed. Reg. at 23,264

67.     In addition, the Rule provides expansive definitions of the statutory and regulatory terms, which inject new meaning into defined statutory terms and stretch undefined terms beyond their plain meaning. *Id.* at 23,263–64 (to be codified at 45 C.F.R. § 88.2). A few of the most notable terms are discussed below.

68.     The Rule defines the term **"Assist in the performance"** in the Church Amendments to include actions that have a "specific, reasonable, and articulable connection" to "furthering" a procedure otherwise performed by someone else, including but not limited to "counseling, referral, training, or otherwise making arrangements" for the procedure or service, "depending on whether aid is provided by such actions." *Id.* at 23,263.

69.     This new definition is so broad that it means, for example, that simply scheduling an appointment, admitting a patient to a health care facility, filing a patient's chart, transporting a patient from one part of the facility to another, cleaning medical instruments, providing referrals, or even taking a person's temperature could conceivably be considered "assist[ing] in the performance" of a health care service, as any of those activities could have a "connection" to "furthering" the service. That individual could then impede the patient's access to care by refusing to perform those functions.

70.     This extends the reach of the Church Amendments to employees and activities far beyond those that Congress intended. During debate on the original Church Amendment, the

amendment's sponsor, Senator Church, made clear that it was not his intent to permit "a nurse or an attendant somewhere in the hospital who objected" to an abortion or sterilization to "veto the rights of a physician and the rights of patients to have a procedure which the Supreme Court has upheld," nor was there any "intention here to permit a frivolous objection from someone unconnected with the procedure to be the basis for a refusal to perform what would otherwise be a legal operation." 119 Cong. Rec. 9597 (Mar. 27, 1973).

71.     The Rule also defines **"Referral"** or **"refer for"** broadly to include the provision of "information in oral, written, or electric form" if "the purpose or reasonably foreseeable outcome" of providing that information is "to assist a person in receiving funding or financing for, training in, obtaining, or performing" a health care service or procedure. 84 Fed. Reg. at 23,264. However, this definition of "referral" or "refer for," which would include even telling a patient that abortion is an option they have, contravenes the ordinary understanding of the term. And because "referral" is included in the definition of "assist in the performance," addressed above, the Rule would allow any of the extremely broad range of individuals ostensibly covered by the Rule to refuse not only to participate in services to which they object directly, but also to withhold information from patients without the patients' knowledge.

72.     The new definition of "referral" or "refer for" also means that an individual could withhold critical information about a patient's health care options, even if those options are the standard of care. For example, a provider could refuse to inform a patient that the standard of care for an ectopic pregnancy is to terminate the pregnancy. Nor is there any requirement to inform patients about what services and information are being withheld. Thus, an individual working for a health care provider subject to the Rule (such as Planned Parenthood's member-

affiliates) could single-handedly decide that a patient should not *even know* about a life-saving procedure.

73.    The Coats-Snowe Amendment and the Weldon Amendment each have their own distinct and precise definition of **"Health care entity"** to establish the universe of individuals and entities who can claim a right to refuse care under each respective statute. The Rule, however, expands the term for both Amendments to permit refusals by new individuals and entities not sanctioned by Congress. 84 Fed. Reg. at 23,264.  For example, the new definition of "health care entity" expands the universe of individuals who can claim a right to refuse beyond physicians and nurses to include any health care "personnel" and pharmacists. Additionally, it expands the term in ways that would allow employers to deny abortion coverage to their employees and would allow third-party administrators whose only function is to process benefits claims to deny claims based on personal objections under the Weldon Amendment. None of this is authorized by Weldon or Coats-Snowe.

74.    The Rule defines **"Entity"**—which is used in the Church Amendments to define, under subsection (b), those protected by its provisions, and under subsections (c) and (e), those who must comply with its requirements—to now include "person[s]" (which in turn is defined to include corporations, associations, firms, and partnerships, among other organizations, as well as individuals), HHS, states, political subdivisions or instrumentalities of states, public agencies, public institutions, public organizations, and other public entities—including public hospitals— and foreign governments and organizations, 84 Fed. Reg. at 23,263. But during debate on the original Church Amendment, Senator Church made clear that "this amendment would not in any way affect sterilizations or abortions in publicly owned hospitals." 119 Cong. Rec. 9600 (Mar. 27, 1973).

75.     The Rule creates a definition of **"Discriminate"** or **"Discrimination,"** terms used in the Weldon, Coats-Snowe, and some of the Church Amendments, to define what actions an employer may take vis-à-vis its employees (or others). The final Rule includes three provisions that were not included in the definition of "discriminate" or "discrimination" that was in the proposed rule, and thus no comments were solicited as to these provisions. These provisions drastically alter the employment practices of covered entities by *inter alia*:

- prohibiting health care providers from asking prospective employees whether they are willing to perform the essential functions of the job they are seeking;

- prohibiting providers from asking employees if they object to the performance of any of their job functions more than once per calendar year absent an undefined "persuasive justification"—even in the event of an emergency; and

- prohibiting providers from taking steps to protect patient access to the objected-to health services unless the objecting employee "voluntarily accepts" an undefined "effective accommodation" that does not amount to an "adverse action" or otherwise "exclude" the employee from a "field[] of practice." 84 Fed. Reg. at 23,263.

76.     The Department explicitly declined to state that covered entities like Planned Parenthood are permitted to reject job candidates who refuse to perform or assist in the performance of a health service that comprises "the primary or substantial majority of the duties of the position." *Id*. at 23,192.

77.     The Rule is in stark contrast to Title VII, which has operated side by side with the underlying refusal statutes until now. For decades, Title VII has provided a functional framework to protect employees' religious beliefs. Employers must provide reasonable accommodations of

employees' or applicants' sincerely held religious beliefs, observances, and practices when requested, unless the accommodation would impose an "undue hardship" on an employer in performing business operations. *See* 42 U.S.C. §§ 2000e, 2000e-2. Under Title VII, when an individual requests an accommodation on the basis of religion, the employer may consider the potential effect such an accommodation would have on patients, coworkers, public safety, and other legal obligations, for example. *Id.*

78.     The aggregate effect of these definitions and statements made in the Rule is to require covered entities like Planned Parenthood's member-affiliates that receive funds from HHS to permit any employee, intern, volunteer, or contractor—from a receptionist to a sanitation worker to medical staff—to refuse to do anything with a "specific, reasonable, and articulable connection to furthering" abortion, sterilization, or other health service or research activity based on their personal objections, regardless of whether this means patients will be able to obtain critical care or information. 84 Fed. Reg. at 23,263. In other words, the personal beliefs of employees (and others)—even those with no medical training whatsoever and who have only the most attenuated connection to the health care being provided—could be dispositive as to whether a patient receives needed care.

79.     The Rule also contains numerous vague statements about the breadth of the Rule, and the obligations of covered entities under the Rule. For example, buried within the Rule's 440-page preamble is a single, confusing sentence about the Weldon Amendment that states the actions of (undefined) "contractors engaged by the Department, a Departmental program, or a State or local government [are] attributable to such Department, program, or government for purposes of enforcement or liability." 84 Fed. Reg. at 23,207. Yet, the preamble also recognizes that by its plain terms Weldon does not apply to private entities. Thus, it is unclear whether the

Department expects private entities that are subrecipients to a state or local government to de facto comply with the Weldon Amendment.

80.     The Rule encourages all covered entities to post a notice informing readers of their right to refuse to "perform, assist in the performance of, refer for, undergo, or pay for certain health care-related treatments, research, or services (such as abortion or assisted suicide, among others)" based on their "conscience, religious beliefs, or moral convictions," and how to file a complaint with OCR. *Id.* at 23,272 (to be codified at 45 C.F.R. pt. 88, App. A). In evaluating a covered entity's compliance with the Rule, OCR will take into account whether the covered entity has provided such notice, including, *inter alia*, on its website, in a personnel manual, and in a "prominent and conspicuous physical location" where notices to the public and workforce are posted. 84 Fed. Reg. 23,270 (to be codified at 45 C.F.R. § 88.5).

81.     In contrast, where a health care provider refuses to provide certain care, the Rule does not require that a similar notice be posted informing patients of this refusal and their right to receive full information about all of their options. Indeed, the Rule may actually prevent a health care employer from posting such a notice to patients, as the Rule states this could be deemed "discrimination" against the objecting employee.

82.     The Rule imposes various compliance requirements, including that each covered entity (or applicant to become a recipient of HHS funds), with limited exceptions, provide both an assurance of compliance and a certification of compliance with the various federal statutes on which it relies. 84 Fed. Reg. at 23,269–70 (to be codified at 45 C.F.R. § 88.4). Failure to submit the required assurance and certification subjects covered entities to any of the enforcement mechanisms set forth in the Rule, including termination and potentially even clawback of all HHS funding. *Id.* at 23,271–72 (to be codified at 45 C.F.R. § 88.7).

83.     The Rule makes a covered entity liable for violations by a subrecipient. *Id.* at 23,270–71 (to be codified at 45 C.F.R. § 88.6). This is pertinent to Planned Parenthood as some PPFA member-affiliates delegate HHS funds to subrecipients and, thus, under the Rule, are responsible not only for their compliance but also the compliance of their subrecipients. In addition, some PPFA member-affiliates are subgrantees—along with other providers—of HHS funds distributed by a State, which means that if any other subgrantee is found to be out of compliance with the Rule, the State could lose all of its HHS funding, thereby causing the PPFA member-affiliate to lose its funding through no fault of its own.

84.     Additionally, the Rule requires covered entities to maintain records "evidencing compliance"; provide OCR access to its books, records, accounts, facilities, and information upon request, and without regard for privacy or confidentiality concerns; cooperate with OCR investigations; report determinations of noncompliance in applications for new or renewed funding; and refrain from intimidating or retaliatory acts. *Id.*

85.     The Rule purports to grant broad enforcement authority to OCR, including authority to receive and handle complaints; initiate compliance reviews; conduct investigations; coordinate compliance within HHS; seek voluntary resolutions of complaints; coordinate with other HHS components to make enforcement referrals to the Department of Justice; utilize existing regulations for involuntary enforcement applicable to grants, contracts, or Centers for Medicare and Medicaid Services programs; and "coordinate other appropriate remedial action as the Department deems necessary." *Id.* at 23,271–72 (to be codified at 45 C.F.R. § 88.7).

86.     The Rule permits OCR to restrict funding to recipients, including by terminating or potentially even clawing back all HHS funding to the recipient, when the Department determines there is a failure to comply with the relevant statutes or the Rule itself. As a general

matter, it does not require any nexus between the funding subject to termination and the alleged violation nor does it specify procedures or factors for evaluating what sanction would be appropriate for a violation. *See id.*

87.     The Rule states that it does not preempt federal, state, or local laws that are "equally or more protective of religious freedom and moral convictions." *Id.* at 23,272 (to be codified at 45 C.F.R. § 88.8).

88.     The Rule states that it must be "construed in favor of a broad protection of the free exercise of religious beliefs and moral convictions, to the maximum extent permitted by the" underlying refusal laws and the Constitution. *Id.* at 23,272 (to be codified at 45 C.F.R. § 88.9).

### 2.     The Refusal of Care Rule Exceeds Statutory Authority, Is Not in Accordance with Law, and Is Arbitrary and Capricious

89.     None of the underlying federal refusal statutes—nor any other federal law— delegated authority to the Department to promulgate the final Rule, which carries the force of law. Nor has Congress delegated the broad enforcement authority that the Department claims for itself in the Rule.

90.     Even if the Department had the authority to issue the final Rule, it impermissibly expanded the universe of individuals and entities who can claim protections and broadens what can be refused under the Church, Weldon, and Coats-Snowe Amendments by defining terms such as "assist in the performance," "referral," "health care entity," "entity," and "discrimination" contrary to their plain meaning and Congressional intent;

91.     The Rule also conflicts with numerous other federal laws. For example, EMTALA requires covered hospitals, including public, private, and religiously affiliated hospitals, to provide an appropriate medical screening to any patient requesting treatment to determine whether an emergency medical condition exists, and either to stabilize the condition or

transfer the patient if medically indicated to another facility. *See* 42 U.S.C. § 1395dd(a)–(c). Yet the Refusal of Care Rule contains no emergency exception, and thus to the extent it applies to enable individuals and entities to refuse to provide proper medical care to patients facing medical emergencies (even in public hospitals), it conflicts with EMTALA.

92.     The Rule also conflicts with requirements under the Title X program, the nation's family planning assistance program established by Title X of the Public Health Service Act. Every year from 1996 to the present, Congress has mandated that within the Title X program, health care providers must provide pregnant women with counseling on all pregnancy options. *See* Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 2019, Pub. L. No. 115-245, 132 Stat. 2981, 3070–71 (2018) (requiring that "all pregnancy counseling shall be nondirective"). Moreover, while Title X projects do "[n]ot provide, promote, refer for, or support abortion as a method of family planning," a project must offer pregnant women the opportunity to be provided information and counseling regarding all of their options, including abortion, and provide a referral, if requested. 42 C.F.R. § 59.5(a)(5). Yet the Rule appears to impose an absolute requirement that Title X providers accommodate individuals who refuse to carry out the requirements of the program, and thus allow such individuals to refuse to provide counseling about all pregnancy options or to refer for abortion, upon request. Indeed, HHS admitted that the Rule conflicts with current Title X regulations. 84 Fed. Reg. at 23,190. The Rule could also reshape the Title X program by prohibiting direct grant recipients from rejecting prospective subrecipients that refuse to provide such counseling or to refer for abortion when a patient requests a referral.

93.     The Rule also runs contrary to Section 1554 of the ACA, which prohibits HHS from promulgating any regulation that "(1) creates any unreasonable barriers to the ability of

individuals to obtain appropriate medical care; (2) impedes timely access to health care services; (3) interferes with communications regarding a full range of treatment options between the patient and the provider; (4) restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions; (5) violates the principles of informed consent and the ethical standards of health care professionals; or (6) limits the availability of health care treatment for the full duration of a patient's medical needs." 42 U.S.C. § 18114. By empowering individuals in the health care setting and health institutions to restrict access to health services and withhold medical information, the Refusal of Care Rule is irreconcilable with the plain language of 42 U.S.C. § 18114.

94.     In promulgating the final Rule, the Department utterly failed to account for the Rule's devastating impact on patients and public health. *See infra* Part IV.B.3. Despite being presented with extensive information from commenters regarding the Rule's expected negative impact on access to health care services and health outcomes, including the Rule's disproportionate impact on already underserved communities, HHS simply refused to incorporate this information into its analysis. *See*, *e.g.*, 84 Fed. Reg. at 23,252 (refusing to consider the Rule's impact on access to health care services because the Department determined that it could not quantify the expected impact).

95.     HHS similarly failed to account for the Rule's negative impact on the provider-patient relationship or that patients will lose the ability to provide full informed consent when a provider refuses to provide a patient with information about all of their options. Instead, HHS stated simply and without explanation that it does not believe informed consent would be impaired. Similarly, HHS did not acknowledge that, in some circumstances, abortion,

sterilization, and other services are medically recommended, but may now be refused carte blanche.

96.     Indeed, the Department has chosen to make a complete reversal of its earlier position finding that the 2008 rule, which contains many of the same fundamental flaws as the challenged Rule here, "may negatively affect the ability of patients to access care if interpreted broadly." 76 Fed. Reg. at 9,974. The Department justified the partial rescission of the 2008 Rule on several grounds, including:

- The ambiguities that the 2008 Rule may have caused with respect to its interaction with other statutes, including Title X and EMTALA, among others. 76 Fed. Reg. at 9,973.

- The 2008 Rule may undermine informed consent, which is crucial to the provision of quality health care services. *Id.*

- The underlying statutes were never intended to allow providers to refuse to provide medical care to an individual because the individual engaged in behavior the health care provider found objectionable. *Id*. at 9,973–74.

- The 2008 Rule had the potential to reduce patient access to health care without a basis in the underlying statutes. *Id*. at 9,974.

- Even after the partial rescission, "the Federal health care provider conscience statutes . . . will continue to protect health care providers"; and the 2011 Rule's retention of the 2008 Rule's establishment of a complaint process within OCR "provides a clear process to enforce those laws." *Id.*

- The certification requirements in the 2008 Rule were unnecessary to ensure compliance with the underlying statutes and "created unnecessary additional financial and administrative burdens on health care entities." *Id*.

97.     HHS now claims that a rule with the same ambiguities and potential to reduce patient access to care will improve access to care by preventing a shortage of health care professionals who HHS believes are not participating in providing health care due to their religious beliefs. To support this claim, HHS relied on stale survey data of health care providers who self-selected into particular religiously-affiliated medical associations.[11] However, the rescission of the 2008 Rule in 2011 did *not* result in an exodus of health providers from the profession as predicted by these surveys; on the contrary, "the health care profession has continued to grow since; physicians' offices have added 400,000 jobs in the interim, for instance."[12]

98.     As discussed above, in addition to the federal refusal statutes, Title VII already protects individuals from employment discrimination based on religion, including, as relevant here, by providing health care workers with the right to an accommodation of their religious beliefs. Health care workers have successfully relied on Title VII to protect their religiously-based refusal to provide care.[13] The Department did not explain why Title VII is inadequate to protect the interests it purports to be protecting with the Refusal of Care Rule or why religious

---

[11] Dan Diamond & Andrew Restuccia, *How Kellyanne Conway influenced a new Trump rule cheered by religious conservatives*, Politico.com (May 9, 2019), https://www.politico.com/story/2019/05/09/kellyanne-conway-anti-abortion-doctors-1312316 ("The 440-page rule cites Conway's years-old polling, including another she conducted in 2011, a dozen times. No other surveys are cited more frequently—and no other data is more central to the Trump administration's arguments.") (last visited June 10, 2019).

[12] *Id*.

[13] *See*, *e.g*., Comment of Peggy Mastroianni and Jenny R. Yang, at 2, https://www.regulations.gov/document?D=HHS-OCR-2018-0002-71178 (last visited June 10, 2019).

discrimination should get a higher level of protection than all other categories protected by Title VII.

99.     Nor did the Department identify a significant number of health care providers who claim to have suffered from violations of federal refusal laws. Indeed, OCR received fewer than fifty complaints alleging violations of federal refusal laws between 2008 and January 2018. The Department identified an uptick in complaints immediately after publication of the proposed Rule, but it does not provide analysis of the veracity of these complaints or explain whether the complainants were able to obtain relief from existing legal protections. Instead, the Department has refused to respond to FOIA requests seeking records of these purported complaints to OCR. *See, e.g.*, Compl., *Ctr. for Reproductive Rights & Nat'l Women's Law Ctr. v. Dep't of Health & Human Servs.*, No. 1:18-cv-1688 (D.D.C. July 19, 2018), ECF No. 1. Moreover, the Department does not explain why existing protections are not adequate to redress any of those complaints, to the extent that they are legitimate.

100.     Finally, Pursuant to Executive Order 12,866, the Office of Management and Budget classified the Rule as a "significant regulatory action," thus requiring the Department to conduct a regulatory impact analysis. The Department's regulatory impact analysis disregards significant indirect and direct costs highlighted by commenters in violation of Executive Order 12,866. HHS also ignores instructions from both the Office of Management and Budget's Circular A-4 on Regulatory Analysis (2003) and HHS's own Guidelines for Regulatory Impact Analysis (2016) which detail best practices for assessing costs and benefits under regulatory

impact analyses and require that agencies account for and quantify direct and indirect health costs to the fullest extent practicable.[14]

101.    First, HHS significantly underestimated the direct costs imposed by the Rule. For example, HHS underestimated the number of covered entities that must submit written assurances and certifications of compliance because, among other reasons, the estimated total excludes all physicians' offices. 84 Fed. Reg. at 23,236. But not all physicians who accept HHS funding will be subject to the criteria for exemption (*i.e.* they accept Medicare Part B), making the total number of covered entities much higher than HHS's estimate. 45 C.F.R. § 88.4(c)(1).[15] Moreover, given the complexity of the Rule, and its drastic departure from what federal law currently requires with respect to accommodation of employees' religious beliefs, HHS failed to provide a realistic estimate of the compliance costs of covered entities, resulting from the need to retain legal counsel, to modify policies and procedures, and to retain additional personnel to make up for personnel that refuse to provide care.

102.    Second, HHS ignored the Rule's indirect costs. These costs include costs resulting from adverse health outcomes for patients who are denied information about and/or access to care, as well as costs related to these patients having to find and obtain care from another source, often at increased expense. They also include costs resulting from patients declining to seek health care because they fear refusal by a provider. But HHS has failed to acknowledge that

---

[14] Office of Mgmt. & Budget, Circular A-4 (Sept. 17, 2003),
https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/circulars/A4/a-4.pdf; Office of the Ass't Sec'y for Planning and Evaluation, Dep't of Health & Human Servs., *Guidelines for Regulatory Impact Analysis* (2016), https://aspe.hhs.gov/system/files/pdf/242926/HHS_RIAGuidance.pdf; *see, e.g.*, Comment of Institute for Policy Integrity, at 4-5, https://www.regulations.gov/document?D=HHS-OCR-2018-0002-72071 (last visited June 10, 2019).

[15] The Department states incorrectly that it received no comments on the methods used to estimate the scope of exempted recipients. 84 Fed. Reg. at 23,236; *see, e.g.*, Comment of Institute for Policy Integrity, at 8-9, https://www.regulations.gov/document?D=HHS-OCR-2018-0002-72071 (last visited June 10, 2019).

these are legitimate and actual costs of the Rule and failed to incorporate these costs into its cost-benefit analysis.

### 3. The Rule Will Cause Substantial and Multifaceted Harms, Including to Planned Parenthood and Its Patients

103.    The Refusal of Care Rule marks a radical departure from the work the Department should be doing: protecting patient access to care, eliminating health disparities, and combating discrimination against patients. The Rule's broadening of the right to refuse will harm many people, most significantly by limiting access to essential health services and information and by severely burdening those health care providers, like Planned Parenthood, that wish to provide such services.

104.    While the underlying federal refusal laws—the Church, Coats-Snowe, and Weldon Amendments—are narrowly targeted and focus primarily on abortion, sterilization, and research, the Rule will invite refusals of other health care services. Services likely to be refused (in addition to abortion and sterilization) include contraceptive care and counseling, HIV and STI testing and treatment, gender-affirming care for transgender individuals, fertility treatment, and information about these services. Patients who seek family planning services at federally-funded Title X clinics, including at Planned Parenthood health centers across the country, may no longer be assured that they will receive counseling on all pregnancy and contraceptive options. Nor will they necessarily be guaranteed that they can obtain a referral for an abortion or other needed care if they request one.

105.    The Refusal of Care Rule allows health care providers (both individuals and institutions) to ignore medical standards of care, particularly surrounding reproductive and sexual health. Medical practice guidelines and standards of care establish the boundaries of medical services that patients can expect to receive and that providers should be expected to

deliver. For example, the referral and provision of contraceptive and abortion services, and providing information and counseling concerning such services, can be a part of the standard of care for individuals experiencing a range of medical conditions.[16] Yet the Rule could be used as an excuse to disregard these standards of care regardless of the impact on patient health and access to information.

106.   The Refusal of Care Rule undermines the provider-patient relationship and the principles of informed consent. In order for patients to provide informed consent a provider must disclose relevant and medically accurate information about all treatment choices and alternatives so that patients can competently and voluntarily make decisions about their medical treatment. Indeed, Planned Parenthood's Medical Standards & Guidelines require that patients be provided information about all their options so they can provide informed consent. Yet, the Rule enables health care workers to refuse to provide patients with full information; it thus facilitates the violation of medical ethics and creates the risk that patients will not have full information regarding their care.[17]

107.   The lack of protections in the Refusal of Care Rule to ensure informed consent is exacerbated by the Rule's disparate notice standards, as nothing in the Rule ensures patients receive notice of the services or information that may be denied and may even penalize a covered entity for attempting to provide such notice. *See supra* ¶¶ 80–81. This is particularly dangerous in emergency situations. The Rule purports to protect refusals even where a patient is experiencing a health emergency. For example, a woman undergoing pregnancy complications

---

[16] *See*, *e.g*., Comment of Physicians for Reproductive Health at 10, https://www.regulations.gov/document?D=HHS-OCR-2018-0002-71284 (last visited June 10, 2019).

[17] *See*, *e.g*., Comment of AMA at 2 (stating that the AMA Code of Medical Ethics directs physicians to "[u]phold standards of informed consent and inform the patient about all relevant options for treatment, including options to which the physician morally objects."); Comment of American College of Obstetricians and Gynecologists at 2, https://www.regulations.gov/document?D=HHS-OCR-2018-0002-70647 (last visited June 10, 2019).

requiring emergency care, such as abortion services to protect her life or health, could be denied such care when she arrives at the emergency room—even at a public hospital. The Rule would further permit such a provider not to inform the woman that terminating the pregnancy would be the safest course.[18] In many circumstances, the failure to provide this information amounts to a denial of care because the patient does not know that option exists, and thus cannot seek care at a different medical facility. In addition, while abortion itself is a very safe medical procedure, a small percentage of abortion patients at Planned Parenthood's clinics will seek follow-up care at hospitals in the rare event of a complication. If the Refusal of Care Rule takes effect, such patients may be denied necessary care. For some, the denial of emergency care could threaten their lives, health, or future fertility.

108.    Further, although the Rule purports to protect the conscience rights of health care providers, the Rule allows an institutional health care provider, such as a hospital, to *prohibit* individual providers from providing various health care services—even when doing so would contradict those providers' medical judgment and conscience, violate the standard of care, and put their patients' health and lives in danger.

109.    Reduced access to health care services and information will be borne disproportionately by individuals who already face severe health disparities and systemic barriers to care, including women, people of color, patients living in rural areas, lesbian, gay, bisexual, transgender, and queer individuals, people with low incomes, immigrants, and people living with disabilities. The Rule will be especially harmful to those facing multiple and intersecting barriers to care, *e.g.*, low-income women of color or people living with disabilities in rural areas.[19] Many

---

[18] 84 Fed. Reg. 23,170, 23,264 (May 21, 2018) (to be codified at 45 C.F.R. pt. 88).

[19] *See, e.g.*, Comment of American Medical Association ("AMA") at 6, https://www.regulations.gov/document?D=HHS-OCR-2018-0002-70564 ("In the past, HHS and OCR have played (continued…)

such individuals are Planned Parenthood patients, because of Planned Parenthood's commitment to providing broadly accessible and non-judgmental care.

110.    Women—particularly women of color—already face significant barriers to obtaining health care, especially reproductive health care.[20] These barriers will increase as a result of the Rule, which expands the ability of providers to refuse essential health care services disproportionately relied on by women. Pregnant women experiencing a miscarriage or who are suffering other serious pregnancy-related health conditions for which the standard and medically appropriate treatment is immediate pregnancy termination will be more likely to find themselves at a hospital—including even a public hospital—where either the institution or the provider may refuse to provide them with the emergency care they need. Such a refusal jeopardizes women's lives, health, and future fertility.

111.    People living in rural communities have limited health care options available to them, making them especially vulnerable to the harmful effects of the Rule.[21] If a patient is denied care at one facility, there may be no other facilities in their rural area where they can access the care they need. Many of Planned Parenthood's smaller health centers serve such rural areas. The Rule prevents such clinics from ensuring that their patients receive comprehensive reproductive health care because the single clinician who may be on staff at any given time may now refuse to provide such services or information. Plaintiff PPNNE, for example, has eighteen

---

an important role in protecting patient access to care, reducing and eliminating health disparities, and fighting discrimination. There is still much more work to be done in these areas given disparities in racial and gender health outcomes and high rates of discrimination in health care experienced by LGBTQ patients. The Proposed Rule is a step in the wrong direction and will harm patients."); Comment of National Health Law Program ("NHeLP") at 3–6, https://www.regulations.gov/document?D=HHS-OCR-2018-0002-70692 (last visited June 10, 2019).

[20] *See*, *e.g.*, Comment of National Women's Law Center at 10–11, https://www.regulations.gov/document?D=HHS-OCR-2018-0002-71477 (last visited June 10, 2019).

[21] *See*, *e.g.*, Comment of NHeLP at 4–6, https://www.regulations.gov/document?D=HHS-OCR-2018-0002-70692 (last visited June 10, 2019).

health centers where there is only one licensed clinician at any given time, who is expected to provide a full range of reproductive health care, including contraception, emergency contraception, and medication abortion.

112.    In addition, if the only local pharmacy in a rural area refuses to dispense medication to manage a miscarriage, for example, rural patients may be left without access to such medication. If the only regional hospital follows religious directives—an increasingly common scenario given hospital consolidation—essential health services may simply be unavailable.

113.    Lesbian, gay, bisexual, transgender, and queer people already face significant health disparities, a finding HHS itself has made.[22] These disparities include denials of care based on patients' gender identity and sexual orientation. For example, providers have refused access to treatment, including fertility treatments, for members of same-sex couples and have refused to provide standard day-to-day care for lesbian, gay, bisexual, transgender, and queer patients in assisted living facilities.[23] Given the Rule's broad definitions and confusing requirements, it is foreseeable that some providers will improperly invoke the Rule to refuse basic care to patients simply because of their gender identity or sexual orientation.[24]

114.    Immigrants and people with limited English proficiency are already among the most disproportionately uninsured people in the United States and often face cultural and linguistic barriers to care, especially in rural areas. These individuals often lack access to transportation and may have to travel great distances to get the care they need. Planned

---

[22] Healthy People 2020, *Disparities*, https://www.healthypeople.gov/2020/about/foundation-health-measures/disparities (last visited June 10, 2019).

[23] *See*, *e.g.*, Comment of Human Rights Campaign at 2, https://www.regulations.gov/document?D=HHS-OCR-2018-0002-70848; Comment of Justice in Aging at 4, https://www.regulations.gov/document?D=HHS-OCR-2018-0002-71292 (last visited June 10, 2019).

[24] *See id*.

Parenthood's provision of culturally competent care and its ability to provide a "one stop shop" for services (*e.g.*, an office visit, testing, and pharmaceutical products in one location) is essential for ensuring that such individuals are able to access health care services. By inviting individuals involved in health care and health institutions to refuse care to these individuals, the Rule will exacerbate existing systemic barriers to care among immigrant communities.[25]

115.    The Rule also poses a particular threat to the health of people with disabilities, many of whom live or spend much of their day in provider-controlled settings where they receive support and services. They may rely on a case manager to coordinate services, a transportation provider, and/or a personal care attendant. The Rule invites the refusal of care by any of these individuals, resulting in significant negative effects on people with disabilities.[26]

116.    Such denials of care violate patients' dignity, risk adverse health outcomes, and sometimes require costly and time-consuming alternatives. Patients may be forced to delay or forgo necessary care, harming those patients and creating external social costs.[27]

117.    The Rule's harm to patients is exacerbated by its attack on state and local governments' attempts to protect access to care and prevent discrimination in health care services. For example, New York and Vermont both have laws requiring provision of emergency and medically necessary care. *See* N.Y. Pub. Health Law § 2805-b; Vt. Stat. Ann. tit. 12, § 519. Maine, New York, and Vermont have laws prohibiting health care professionals from abandoning a patient in need. *See* 02-380 Me. Code R. ch. 4 § 3; 8 NYCRR § 29.2; Vt. Stat. Ann. tit. 26 § 1354(a)(4), Vt. Stat. Ann. tit. 18 § 1852(a). And New Hampshire, New York, and

---

[25] *See, e.g.*, Comment of National Immigration Law Center at 3–5, https://www.regulations.gov/document?D=HHS-OCR-2018-0002-71248 (last visited June 10, 2019).

[26] *See, e.g.*, Comment of Consortium for Citizens with Disabilities Rights Task Force at 2–3, https://www.regulations.gov/document?D=HHS-OCR-2018-0002-71813 (last visited June 10, 2019).

[27] *See, e.g.*, Comment of Nat'l Women's Law Ctr. at 12; Comment of Institute for Policy Integrity at 4–5, https://www.regulations.gov/document?D=HHS-OCR-2018-0002-72071 (last visited June 10, 2019).

Vermont have laws protecting patients' right to informed consent. *See* N.H. Rev. Stat. § 151:21, N.Y. Pub. Health Law § 2805-d, Vt. Stat. Ann. tit. 12 § 1909(d), Vt. Stat. Ann. tit. 18 § 1871(a) & (b), Vt. Stat. Ann. tit. 18 §§ 1852 & 1854, Vt. Stat. Ann. tit. 18 §§ 5281–5293. Numerous states, including New York, 11 N.Y.C.R.R. 52.16, have laws requiring insurance coverage of abortion;[28] Planned Parenthood's patients rely on these laws. But the Rule does not disclaim preemption of them. 84 Fed. Reg. at 23,272 (to be codified at 45 C.F.R. § 88.8). Indeed, in illustrating the purported need for the Rule, the preamble specifically points to efforts by New York and California to enforce their laws requiring insurance coverage of abortion. *Id.* at 23,171, 23,177. As such, the Rule jeopardizes the ability of states to enforce laws that prioritize patients' rights to access care.[29]

118.    Moreover, at least four states require pharmacies or pharmacists to dispense all validly prescribed drugs and devices.[30] By unlawfully expanding the term "health care entity" to include pharmacists, the Rule jeopardizes the ability of states to enforce these laws, which exist to ensure that people can access the medications they need. Some individuals and entities incorrectly believe that medication prescribed for certain types of miscarriage management constitutes an abortion. There have been several reports of pharmacists turning away women seeking miscarriage management medication in recent years, including since Defendants issued

---

[28] *See* Nat'l Women's Law Ctr., *State Laws Regulating Insurance Coverage of Abortion Have Serious Consequences for Women's Equality, Health, and Economic Stability* 1, https://nwlc.org/wp-content/uploads/2017/08/50-State-Insurance-Coverage-of-Abortion-1.pdf (Aug. 2017) (noting that "[t]hree states—California, New York and Oregon—require nearly all insurance plans to provide coverage of abortion) (last visited June 10, 2019).

[29] *See, e.g.*, Comment of the Attorneys General of New York, et al., at 13, https://www.regulations.gov/document?D=HHS-OCR-2018-0002-70108 (last visited June 10, 2019).

[30] Guttmacher Inst., Emergency Contraception (May 1, 2019), https://www.guttmacher.org/state-policy/explore/emergency-contraception (last visited June 10, 2019).

the proposed Rule.[31] The Rule thus threatens to exacerbate the incidence of pharmacy refusals, threatening the health and lives of patients.

119.    In addition, the Rule's enforcement measures, which permit the termination of all HHS funding based on a failure to comply with the Rule, or even with a subrecipient's failure to comply, could compel state and local governments, which receive significant levels of funding from HHS, to forgo their efforts to protect their citizens' access to care for fear that any small violation would cripple the state's budget.

120.    The Rule creates significant legal confusion for covered entities like Planned Parenthood. The Rule not only conflicts with various state and federal laws, including EMTALA, Title X, and 42 U.S.C. § 18114, and imposes different requirements for religious accommodation than does Title VII, but in many critical ways the Department refused to provide clear guidelines about how to avoid running afoul of the Rule. Instead, covered entities are left with confusing, vague, and contradictory legal requirements.

121.    In addition, the Rule puts health care employers like Planned Parenthood, whose mission it is to provide comprehensive reproductive health care in a non-judgmental manner, in an impossible situation. The Rule explicitly refuses to incorporate an "undue hardship" limitation on accommodations it requires, yet it does not consider the impact of this decision on employers and their ability to perform operations that are core to their business. The expansive definition of "discrimination" prohibits Planned Parenthood from asking applicants about whether they object

---

[31] *See, e.g.*, Christina Caron, *Michigan Pharmacist Refused to Dispense Miscarriage Medication, Citing Religious Beliefs*, N.Y. TIMES (Oct. 18, 2018), https://www.nytimes.com/2018/10/18/us/catholic-pharmacist-miscarriage.html (last visited June 10, 2019); Louis Lucero II, *Walgreens Pharmacist Denies Woman With Unviable Pregnancy the Medication Needed to End It*, N.Y. TIMES (June 25, 2018), https://www.nytimes.com/2018/06/25/us/walgreens-pharmacist-pregnancy-miscarriage.html (last visited June 10, 2019).

to Planned Parenthood's mission or the core services it provides, thereby threatening its ability to provide care to patients.

122.    In addition, the Rule hampers Planned Parenthood's ability to identify individuals who may seek positions with affiliates in order to infiltrate Planned Parenthood and use the information they gather or their access to Planned Parenthood's facilities to harm its staff, providers, and patients. The Rule could force Planned Parenthood to open its doors—and even *to compensate*—anti-abortion protestors who, posing as job applicants, seek to sabotage Planned Parenthood's operations. That anti-abortion groups would seek to do so is hardly hypothetical; it is already the case that anti-abortion individuals seek positions at Planned Parenthood affiliates in order to obtain information about Planned Parenthood and its patients. And once these individuals have been hired, Planned Parenthood is constrained in its ability to terminate or transfer an employee who refuses to perform job functions and make sure that patients get the care they need.

123.    And, as explained above, HHS refused to disclaim that the Rule would require an employer to hire an individual who objects to the primary or substantial majority of a position's duties. Nor does the Rule explain what is a "persuasive" enough justification for inquiring about employee objections more than "once per calendar year," what constitutes an "effective accommodation" of an objecting employee that would be permissible under the Rule, or how an employer like Planned Parenthood can ensure its patients receive the care they need in the event an employee objects and refuses a proposed accommodation.

124.    The Rule's imposition of an absolute requirement to accommodate objecting employees will also raise personnel costs. If Planned Parenthood's staff (or staff at another provider) refuse to perform certain services or treat certain patients, Planned Parenthood will be

forced, where financially possible, to hire additional staff, at additional cost, to meet the same level of demand or forgo providing essential health services.[32]

125.    Planned Parenthood will also have to expend a significant amount of time and, in turn, money in order to ensure compliance with the Rule, including by revising employment practices, manuals, and handbooks; training staff with supervisory responsibilities on hiring and accommodation requests; and reviewing all job descriptions, applications, and other employment recruitment materials. And in states where there are potentially conflicting state laws, member-affiliates may need legal counsel to decipher how the Rule and state laws interact.

126.    Compounding the burden on providers caused by the vagueness of the Rule's requirements, the Rule gives OCR unprecedented authority to investigate complaints and terminate federal funding based on arbitrary criteria.[33] For Planned Parenthood, the threat of losing federal funding is real. President Trump has made public statements that he would strip Planned Parenthood of federal funding[34] and has sought to do just that by including language in his proposed budgets that specifically "prohibits any funding in the Labor-HHS appropriations bill for certain entities that provide abortions, including Planned Parenthood."[35] The Rule empowers OCR to defund Planned Parenthood based on arbitrary criteria, which is consistent with President Trump's stated policy goals.

---

[32] See, e.g., Comment of Institute for Policy Integrity at 6, https://www.regulations.gov/document?D=HHS-OCR-2018-0002-72071 (last visited June 10, 2019).

[33] See, e.g., Comment of PPFA at 15–17.

[34] https://www.nytimes.com/2017/03/06/us/politics/planned-parenthood.html ("I would defund it because I'm pro-life, but millions of women are helped by Planned Parenthood."); https://www.politifact.com/truth-o-meter/promises/trumpometer/promise/1357/defund-planned-parenthood/ ("I would defund [Planned Parenthood] because of the abortion factor").

[35] For three years in a row, the President's budget proposal prohibits Planned Parenthood from participating in all HHS Programs, including Medicaid and Title X. Specifically, the budget "prohibits any funding in the Labor-HHS appropriations bill for certain entities that provide abortions, including Planned Parenthood," which applies to "all funds in the [Labor-HHS] bill, including Medicaid." See Press Release, Planned Parenthood, Trump Budget Singles Out Planned Parenthood for First Time in History (May 23, 2017), https://www.plannedparenthood.org/about-us/newsroom/press-releases/trump-budget-singles-out-planned-parenthood-for-first-time-in-history.

127.    Were Planned Parenthood to lose its federal funding, it would be forced to close health centers or cut services, thereby threatening the health of the millions of patients who rely on Planned Parenthood for their health care. In many areas, Planned Parenthood is the only provider of comprehensive reproductive health care services for low-income individuals.

## V.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### APA, 5 U.S.C. § 706(2)(C), Exceeds Statutory Authority

128.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

129.    The Refusal of Care Rule, including its mandatory assurance and certification requirements, is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," in violation of the Administrative Procedure Act. 5 U.S.C. § 706(2)(C).

130.    While the Refusal of Care Rule purports to interpret and rely for its authority on (primarily) the Church, Coates-Snowe, and Weldon Amendments, Congress has not delegated authority to the Department to promulgate this force of law regulation interpreting those Amendments.

131.    The Rule also purports to grant OCR expansive authority to enforce its provisions, *see* 84 Fed. Reg. at 23,271 (to be codified at 45 C.F.R. § 88.7), including by terminating federal financial assistance to entities found to be in violation of the Rule's requirements, *see* 45 C.F.R. § 88.7(i)(3)(iv). But unlike other statutes where Congress has authorized—and carefully restricted—such enforcement authorities, *see, e.g.*, 42 U.S.C. § 2000d-1 (Title VI of the Civil Rights Act of 1964), none of the statutory authorities upon which the Rule relies delegate the broad enforcement authority that the Department claims for itself in the Rule.

## SECOND CLAIM FOR RELIEF
## APA, 5 U.S.C. § 706(2)(A), Not in Accordance with Law

132.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

133.    The Refusal of Care Rule is not in accordance with the Church, Weldon, and Coats-Snowe Amendments, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), because, among other reasons:

- it impermissibly expands the universe of individuals and entities who can claim protections and broadens what can be refused under the Church, Weldon, and Coats-Snowe Amendments by defining terms such as "assist in the performance," "referral," "health care entity," "entity," and "discrimination" contrary to their plain meaning and Congressional intent;

- its reference to "contractors" in the preamble could be read to expand the Weldon Amendment's restrictions to apply to individuals and private entities;

- it extends the application of the Coats-Snowe Amendment beyond the abortion training context.

134.    The Refusal of Care Rule is not in accordance with EMTALA, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). EMTALA requires covered hospitals, including public, private, and religiously affiliated hospitals, to provide an appropriate medical screening to any patient requesting treatment to determine whether an emergency medical condition exists, and either to stabilize the condition or transfer the patient if medically indicated to another facility. *See* 42 U.S.C. § 1395dd(a)-(c). The Refusal of Care Rule contains no emergency exception, and thus to the extent it applies to enable individuals and entities to refuse

to provide proper medical care to patients facing medical emergencies (even in public hospitals), it conflicts with EMTALA.

135.    The Refusal of Care Rule is not in accordance with the Title X program, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). The Refusal of Care Rule directly conflicts with the terms and purpose of Title X by imposing an absolute requirement on Title X providers to accommodate employees who refuse to comply with the statutory requirement of nondirective options counseling.[36] HHS has also overridden Title X regulations that are currently in effect, which require Title X providers to offer pregnant women the opportunity to be provided information and counseling regarding all of their options, including abortion, and, a referral, if requested. 42 C.F.R. §59.5(a)(5).

136.    The Refusal of Care Rule is not in accordance with 42 U.S.C. § 18114, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). 42 U.S.C. § 18114 prohibits HHS from promulgating any regulation that "(1) creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care; (2) impedes timely access to health care services; (3) interferes with communications regarding a full range of treatment options between the patient and the provider; (4) restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions; (5) violates the principles of informed consent and the ethical standards of health care professionals; or (6) limits the availability of health care treatment for the full duration of a patient's medical needs." By empowering individuals in the health care setting and health institutions to restrict access to health services and withhold medical information, the Refusal of Care Rule is irreconcilable with the plain language of 42 U.S.C. § 18114.

---

[36] 84 Fed. Reg. 23,170, 23,265 (May 21, 2018) (to be codified at 45 C.F.R. pt. 88).

### THIRD CLAIM FOR RELIEF
### APA, 5 U.S.C. § 706(2)(A), Arbitrary, Capricious, and Abuse of Discretion

137.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

138.    The Refusal of Care Rule, including its definition of key terms, is arbitrary, capricious, and an abuse of discretion in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), because, among other reasons, the Department failed to:

- consider the Rule's deleterious effects on patient health, informed consent, and the patient-provider relationship, as well as the burden on providers;

- adequately reconcile the Rule with other federal laws;

- clarify the Rule's vague terms and unworkable requirements;

- provide any reasoned explanation for its dramatic reversal of policy from 2011;

- show that existing legal protections for providers are inadequate;

- conduct an adequate regulatory impact analysis that incorporates the considerable costs to patients and providers; and

- respond to significant comments regarding the Rule's detrimental impact on health care access; exacerbation of existing inequities in health care and barriers to health care; the Rule's interference with the patient-provider relationship and patients' inabilities to provide informed consent; burdens imposed by the Rule on health care providers like Planned Parenthood; the vague, overly broad, and unduly punitive enforcement authority assumed by OCR.

139.    As a result, the Department failed to "consider an important aspect of the problem," "examine the relevant data," or "articulate a satisfactory explanation for its action

including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted).

## FOURTH CLAIM FOR RELIEF
### APA, 5 U.S.C. § 706(2)(D), Without Observance of Procedure Required by Law

140.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

141.    The Refusal of Care Rule was promulgated without observance of procedure required by law in violation of the Administrative Procedure Act. Regulations adopted without the notice-and-comment procedure required by 5 U.S.C. § 553 of the APA are invalid. *See* 5 U.S.C. § 706(2)(D).

142.    The final Rule includes three key subsections within the definition of "discrimination"—subsections (4), (5), and (6)—that were not contained in the proposed Rule and for which no comments were solicited. *See* 84 Fed. Reg. at 23,263 (to be codified at 45 C.F.R. § 88.2). Planned Parenthood did not have fair notice of HHS' intent to add these new subsections into the definition of "discrimination," and had no reasonable opportunity to comment on them. Moreover, had they known that HHS was considering defining the term "discrimination" in this manner, they would have made clear to HHS that these subsections are onerous, vague, and unworkable and constrain the ability of Planned Parenthood to ensure that its patients receive necessary care.

143.    This error infects multiple provisions of the Rule, as the singular definition of "discrimination" applies to subsections of the Rule implementing parts of the Church Amendments, the Weldon Amendment, and the Coats-Snowe Amendment.

144.    Accordingly, the Rule violates the APA's procedural requirements and must be set aside.

## FIFTH CLAIM FOR RELIEF
## APA, 5 U.S.C. § 706(2)(B), Contrary to Constitutional Right
## U.S. Constitution, Establishment Clause

145.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

146.    The Establishment Clause of the First Amendment of the United States Constitution prohibits the government from making any "law respecting an establishment of religion." U.S. Const., amend. I. To pass constitutional muster, government action must not only have a secular purpose and not foster excessive entanglement of government with religion, its primary effect must not advance or inhibit religion. A law that imposes on employers and employees an absolute duty to conform their business practices to the particular religious practices of the employee constitutes an impermissible religious preference.

147.    By imposing on Plaintiffs an absolute duty to accommodate the religious objections of their employees, even at the expense of the health of their patients and their desire to provide care in accordance with medical ethics and the standard of care, the Refusal of Care Rule violates the Establishment Clause of the First Amendment of the United States Constitution.

## SIXTH CLAIM FOR RELIEF
## APA, 5 U.S.C. § 706(2)(B), Contrary to Constitutional Right
## U.S. Constitution, Void for Vagueness

148.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

149.    It is "[a] fundamental principle in our legal system . . . that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). "This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment." *Id.*

150.    Because of its many ambiguities, and its inconsistency with other federal laws , the Rule does not provide Planned Parenthood with adequate guidance as to what conduct is prohibited and encourages arbitrary enforcement. The Rule is impermissibly vague in violation of the Due Process Clause of the Fifth Amendment of the United States Constitution.

**SEVENTH CLAIM FOR RELIEF**
**APA, 5 U.S.C. § 706(2)(B), Contrary to Constitutional Right**
**U.S. Constitution, Rights to Privacy and Liberty**

151.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

152.    By interfering with patients' ability to obtain abortions necessary to preserve their health or life, the Refusal of Care Rule violates Planned Parenthood's patients' rights to privacy and liberty guaranteed by the Fifth Amendment of the United States Constitution.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court:

a.    Enter a declaratory judgment that the Refusal of Care Rule is invalid;

b.    Set aside and vacate the Refusal of Care Rule;

c.    Issue preliminary and permanent injunctive relief, without bond, restraining the enforcement, operation, and execution of the Refusal of Care Rule, by enjoining Defendants, their agents, employees, appointees, or successors, from enforcing, threatening to enforce, or otherwise applying the provisions of the Refusal of Care Rule;

d.    Award Plaintiffs attorney's fees and costs of bringing this action under 28 U.S.C. § 2412; and

e.    Grant Plaintiffs such other relief as is just and appropriate.

Dated: June 11, 2019

Respectfully submitted,

/s/ *Sarah Mac Dougall*

Diana Salgado*
Planned Parenthood Federation of America, Inc.
1110 Vermont Ave., NW Ste. 300
Washington, D.C. 20005
Tel.:  (202) 973-4800
Fax:  (202) 296-3480
diana.salgado@ppfa.org

Hana Bajramovic
Planned Parenthood Federation of America, Inc.
123 William St., 9th Floor
New York, NY 10038
Tel.:  (212) 541-7800
Fax:  (212) 247-6811
hana.bajramovic@ppfa.org

Michelle Banker
Sunu Chandy*
National Women's Law Center
11 Dupont Circle, NW #800
Washington DC 20036
Tel:  (202) 588-5180
Fax:  (202) 588-5185
mbanker@nwlc.org
schandy@nwlc.org

Adam Grogg*
Robin F. Thurston*
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
Tel:  (202) 448-9090
agrogg@democracyforward.org
rthurston@democracyforward.org

*Counsel for Plaintiffs*

Sarah Mac Dougall
Cristina Alvarez*
Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018-1405
Tel:  (212) 841-1000
Fax:  (212) 841-1010
smacdougall@cov.com
calvarez@cov.com

Kurt G. Calia*
Marina Dalia-Hunt*
Covington & Burling LLP
3000 El Camino Real, 5 Palo Alto Square
Palo Alto, CA 94306-2112
Tel:  (650) 632-4717
Fax:  (650) 632-4800
kcalia@cov.com
mdaliahunt@cov.com

Ryan Weinstein*
Paulina Slagter*
Covington & Burling LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
Tel:  (424) 332-4800
Fax:  (424) 332-4749
rweinstein@cov.com
pslagter@cov.com

*Counsel for Plaintiffs*

* Motion to appear *pro hac vice* forthcoming.