# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

STATE OF NEW YORK, *et al.*,

      Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al*.,

      Defendants,

DR. REGINA FROST and CHRISTIAN
MEDICAL AND DENTAL
ASSOCIATIONS,

      Defendants-Intervenors.

Civil Action Nos.
1:19-cv-4676 (PAE) (lead)
1:19-cv-5433 (PAE) (consolidated)
1:19-cv-5435 (PAE) (consolidated)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR
SUMMARY JUDGMENT, IN OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT, AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ III

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 3

  A.  Plaintiffs and Their Patients ...................................................................................... 3

  B.  Statutory Background, Relevant Rulemaking History, and Promulgation of the Final Rule 5

ARGUMENT ..................................................................................................................... 5

  I.  The Rule Exceeds HHS's Statutory Authority in Violation of the APA ........................... 7

    A.  Congress Did Not Delegate Authority to HHS to Issue Interpretations of Church, Coats-Snowe, and Weldon with the Force of Law ....................................................... 8

    B.  Congress Did Not Delegate to HHS the Sweeping New Enforcement Authority It Claims the Rule Provides ......................................................................................... 12

  II.  The Rule Is Contrary to Law in Violation of the APA ...................................................... 16

    A.  The Rule Impermissibly Expands the Narrow Underlying Statutes ............................... 16

      1.  "Discriminate" or "Discrimination" ...................................................................... 17

      2.  "Assist in the performance" ................................................................................. 21

      3.  "Referral" or "Refer for" ..................................................................................... 24

      4.  "Health care entity" ............................................................................................ 25

    B.  The Rule Conflicts with EMTALA ............................................................................ 28

    C.  The Rule Conflicts with Title X ................................................................................ 35

    D.  The Rule Conflicts with Section 1554 of the Affordable Care Act ................................ 36

    E.  The Rule Violates the Establishment Clause ............................................................. 41

      1.  The Rule Impermissibly Advances Religious Beliefs in Violation of the Establishment Clause. ........................................................................................ 41

      2.  Plaintiffs' Establishment Clause Claim Is Ripe ...................................................... 45

III.  The Rule Is Arbitrary and Capricious ................................................................................ 48

IV.  HHS's Definition of "Discrimination" in the Final Rule Is Not a Logical Outgrowth of the Proposed Rule ...................................................................................................................... 48

V.  In the Alternative, Plaintiffs Are Entitled to a Preliminary Injunction ............................. 53

   A.  Irreparable Harm Will Ensue if the Rule Is Allowed to Take Effect ............................ 53

   B.  The Balance of the Equities and Public Interest Favor an Injunction ........................... 56

VI.  Scope of Relief ..................................................................................................................... 58

CONCLUSION ................................................................................................................................ 59

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner,*
    387 U.S. 136 (1967) ................................................................................ 54

*AFL-CIO v. Donovan,*
    757 F.2d 330 (D.C. Cir. 1985) ............................................................... 49

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .................................................................................. 6

*Ass'n of Civilian Technicians v. Fed. Labor Relations Auth.,*
    370 F.3d 1214 (D.C. Cir. 2004) ............................................................. 11

*Ass'n of Proprietary Colls. v. Duncan,*
    107 F. Supp. 3d 332 (S.D.N.Y. 2015) ...................................................... 6

*Ayotte v. Planned Parenthood of N. New Eng.,*
    546 U.S. 320 (2005) ................................................................................ 59

*Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet,*
    512 U.S. 687 (1994) ................................................................................ 43

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ............................................................................ 6, 7

*California v. United States,*
    No. C05-00328, 2008 WL 744840 (N.D. Cal. Mar. 18, 2008) ............. 30

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. Envtl. Prot. Agency,*
    846 F.3d 492 (2d Cir. 2017) .................................................................. 17

*Chauffeur's Training Sch., Inc. v. Spellings,*
    478 F.3d 117 (2d Cir. 2007) .................................................................. 17

*Chen v. Bd. of Immigration Appeals,*
    164 F. Supp. 3d 612 (S.D.N.Y. 2016) .................................................. 17

*Chevron, U.S.A., Inc. v Nat. Res. Def. Council, Inc.,*
    467 U.S. 837 (1984) .......................................................................... 16, 17

*Chrysler Corp. v. Brown,*
    441 U.S. 281 (1979) .................................................................................. 8

*Cisneros v. Alpine Ridge Grp.,*
    508 U.S. 10 (1993) .................................................................................. 39

*Citizens Against Casino Gambling v. Hogen*,
    No. 07–CV–0451 S, 2008 WL 2746566 (W.D.N.Y. July 8, 2008) ...................... 5

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ................................................................................................ 40

*Citizens United v. Fed. Election Comm'n*,
    558 U.S. 310 (2010) ................................................................................................ 59

*Conyers v. Rossides*,
    558 F.3d 137 (2d Cir. 2009) .................................................................................... 39

*Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*,
    483 U.S. 327 (1987) .......................................................................................... 42, 43

*Crandon v. United States*,
    494 U.S. 152 (1990) ................................................................................................ 10

*CSX Transp., Inc. v. Ala. Dep't of Revenue*,
    562 U.S. 277 (2011) ................................................................................................ 19

*CSX Transp., Inc. v. Surface Transp. Bd.*,
    584 F.3d 1076 (D.C. Cir. 2009) .............................................................................. 48

*Cuoco v. Moritsugu*,
    222 F.3d 99 (2d Cir. 2000) ........................................................................................ 7

*Cutter v. Wilkinson*,
    544 U.S. 709 (2005) ................................................................................................ 43

*Del. Riverkeeper Network v. Fed. Energy Regulatory Comm'n*,
    857 F.3d 388 (D.C. Cir. 2017) ................................................................................ 11

*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019) ............................................................................................ 40

*Disabled in Action of Metro. N.Y. v. Hammons*,
    202 F.3d 110 (2d Cir. 2000) .................................................................................... 23

*DLS Precision Fab LLC v. U.S. Immigration & Customs Enf't*,
    867 F.3d 1079 (9th Cir. 2017) ................................................................................ 12

*Doe v. Trump*,
    284 F. Supp. 3d 1172 (W.D. Wash. 2018) .............................................................. 57

*EEOC v. Arabian Am. Oil Co.*,
    499 U.S. 244 (1991) ................................................................................................ 11

*Estate of Thornton v. Caldor, Inc.*,
    472 U.S. 703 (1985) .................................................................... passim

*Fertilizer Inst. v. U.S. EPA*,
    935 F.2d 1303 (D.C. Cir. 1991) ........................................................ 49

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ......................................................................... 10

*Glara Fashion, Inc. v. Holder*,
    No. 11-cv-889, 2012 WL 352309 (S.D.N.Y. Feb. 3, 2012) ................. 6

*Gonzales v. Oregon*,
    546 U.S. 243 (2006) ............................................................... 7, 9, 10

*Hobbie v. Unemployment Appeals Comm'n of Fla.*,
    480 U.S. 136 (1987) ......................................................................... 43

*Idaho Conservation League v. Wheeler*,
    930 F.3d 494 (D.C. Cir. 2019) ......................................................... 48

*In re Mylan N.V. Sec. Litig.*,
    379 F. Supp. 3d 198 (S.D.N.Y. 2019) ................................................ 7

*J.S.R., by and through J.S.G. v. Sessions*,
    330 F. Supp. 3d 731 (D. Conn. 2018) .............................................. 56

*Jackson v. Birmingham Bd. of Educ.*,
    544 U.S. 167 (2005) ......................................................................... 20

*Koontz v. St. Johns River Water Mgmt. Dist.*,
    570 U.S. 595 (2013) ......................................................................... 42

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ............................................................. 57

*LG Elecs., Inc. v. Wi-LAN USA, Inc.*,
    No. 13 Civ. 2237, 2014 WL 3610796 (S.D.N.Y. July 21, 2014) .......... 7

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ......................................................................... 45

*Lyons v. Litton Loan Servicing LP*,
    158 F. Supp. 3d 211 (S.D.N.Y. 2016) ................................................ 6

*Makarova v. United States*,
    201 F.3d 110 (2d Cir. 2000)) ............................................................. 6

*Marchi v. Bd. of Coop. Educ. Servs. of Albany*,
 173 F.3d 469 (2d Cir. 1999)..................................................................... 48

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
 883 F.3d 32 (2d Cir. 2018)........................................................................ 58

*N. Haven Bd. of Educ. v. Bell*,
 456 U.S. 512 (1982).................................................................................. 23

*N.Y. Civil Liberties Union v. Grandeau*,
 528 F.3d 122 (2d Cir. 2008).............................................................. 47, 48

*N.Y. State Nat'l Org. for Women v. Terry*,
 886 F.2d 1339 (2d Cir. 1989).................................................................... 55

*N.Y. Urban League, Inc. v. New York*,
 71 F.3d 1031 (2d Cir. 1995)...................................................................... 51

*N.Y.C. Envtl. Justice All. v. Giuliani*,
 214 F.3d 65 (2d Cir. 2000)........................................................................ 51

*Nat. Res. Def. Council v. Abraham*,
 355 F.3d 179 (2d Cir. 2004)........................................................................ 7

*Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*,
 894 F.3d 95 (2d Cir. 2018).......................................................................... 7

*Nat. Res. Def. Council v. U.S. Dep't of Energy*,
 362 F. Supp. 3d 126 (S.D.N.Y. 2019)....................................................... 41

*Nat. Res. Def. Council, Inc. v. U.S. Dep't of the Interior*,
 No. 18-CV-4596, 2019 WL 3456886 (S.D.N.Y. July 31, 2019) ........................ 48

*Nat'l Black Media Coal. v. FCC*,
 791 F.2d 1016 (2d Cir. 1986).............................................................. 49, 51

*Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Gonzales*,
 468 F.3d 826 (D.C. Cir. 2006)................................................................... 18

*Nat'l Mining Ass'n v. Kempthorne*,
 512 F.3d 702 (D.C. Cir. 2008)................................................................... 19

*Nat'l Org. for Marriage, Inc. v. Walsh*,
 714 F.3d 682 (2d Cir. 2013)...................................................................... 48

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
 538 U.S. 803 (2003)...................................................................... 45, 47, 48

*New York v. U.S. Dep't of Commerce*,
    351 F. Supp. 3d 502 (S.D.N.Y. 2019)............................................................ 56, 57

*NLRB v. SW Gen., Inc.*,
    137 S. Ct. 929 (2017) .................................................................................... 39

*Noroozi v. Napolitano*,
    905 F. Supp. 2d 535 (S.D.N.Y. 2012)............................................................. 5

*Otten v. Balt. & O.R. Co.*,
    205 F.2d 58 (2d Cir. 1953)............................................................................ 41

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*,
    555 F. App'x 730 (9th Cir. 2014) ................................................................. 55

*Perry v. Sindermann*,
    408 U.S. 593 (1972).................................................................................... 42

*Pharm. Res. & Mfrs. of Am. v. HHS*,
    43 F. Supp. 3d 28 (D.D.C. 2014) .................................................................. 7

*Register.com, Inc. v. Verio, Inc.*,
    356 F.3d 393 (2d Cir. 2004)......................................................................... 54

*Reno v. Flores*,
    507 U.S. 292 (1993)..................................................................................... 30

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
    547 U.S. 47 (2006)....................................................................................... 42

*Sharkey v. Quarantillo*,
    541 F.3d 75 (2d Cir. 2008)........................................................................... 47

*Sharp Healthcare v. Leavitt*,
    No. 08-CV-0170 W(POR), 2008 WL 962628 (S.D. Cal. Apr. 8, 2008) ............ 55

*Shell Oil Co. v. EPA*,
    950 F.2d 741 (D.C. Cir. 1991)...................................................................... 52

*Shelton v. Univ. of Med. & Dentistry of N.J.*,
    223 F.3d 220 (3d Cir. 2000)...................................................................... 31, 32

*Sherbert v. Verner*,
    374 U.S. 398 (1963)..................................................................................... 44

*Sherley v. Sebelius*,
    689 F.3d 776 (D.C. Cir. 2012) ..................................................................... 11

*Singleton v. Wulff*,
    428 U.S. 106 (1976)........................................................................................... 55

*Small Refiner Lead Phase–Down Task Force v. U.S. EPA*,
    705 F.2d 506 (D.C. Cir. 1983) ..................................................................... 49, 52

*South Dakota v. Dole*,
    483 U.S. 203 (1987)........................................................................................... 15

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)........................................................................................... 46

*Taylor v. St. Vincent's Hosp.*,
    523 F.2d 75 (9th Cir. 1975) .............................................................................. 23

*Toilet Goods Ass'n, Inc. v. Gardner*,
    387 U.S. 158 (1967)........................................................................................... 48

*U.S. Dep't of Navy v. FLRA*,
    655 F.3d 1339 (D.C. Cir. 2012) ....................................................................... 11

*U.S. ex rel. O'Keefe v. McDonnell Douglas Corp.*,
    132 F.3d 1252 (8th Cir. 1998) ............................................................................ 8

*United States v. Mead Corp.*,
    533 U.S. 218 (2001)................................................................................... 11, 17

*United Steelworkers of Am., AFL-CIO-CLC v. Marshall*,
    647 F.2d 1189 (D.C. Cir. 1980) ....................................................................... 49

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981)........................................................................................... 58

*Util. Air Regulatory Grp. v. EPA*,
    573 U.S. 302 (2014)........................................................................................... 10

*Warth v. Seldin*,
    422 U.S. 490 (1975)........................................................................................... 55

*Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*,
    537 U.S. 371 (2003)........................................................................................... 28

*Watkins v. Mercy Med. Ctr.*,
    364 F. Supp. 799 (D. Idaho 1973) ................................................................... 23

*Wojchowski v. Daines*,
    498 F.3d 99 (2d Cir. 2007)................................................................................ 28

*Woods v. START Treatment & Recovery Ctrs., Inc.,*
     864 F.3d 158 (2d Cir. 2017) ................................................................................. 9

**Statutes**

5 U.S.C. § 706 ............................................................................................................... 3

5 U.S.C. § 706(2) ........................................................................................... 7, 16, 48, 58

13 U.S.C. § 141 ............................................................................................................ 40

20 U.S.C. § 1682 .......................................................................................................... 15

29 U.S.C. § 794 ............................................................................................................ 15

42 U.S.C. § 238n .................................................................................................... 12, 26

42 U.S.C. § 238n(a) ............................................................................................... 25, 38

42 U.S.C. § 238n(c)(2) ................................................................................................. 25

42 U.S.C. § 300a-7 ............................................................................................ 12, 21, 38

42 U.S.C. § 6104 .......................................................................................................... 15

42 U.S.C. § 1395dd(a) ................................................................................................. 30

42 U.S.C. § 1395dd(d)(2)(A) ....................................................................................... 30

42 U.S.C. § 1396a ........................................................................................................ 15

42 U.S.C. § 18113 .................................................................................................... 8, 38

42 U.S.C. § 18114 .................................................................................................. 36, 38

42 U.S.C. § 18116(a) .................................................................................................... 15

42 U.S.C. § 18116(c) ...................................................................................................... 7

42 U.S.C. § 2000d ........................................................................................................ 14

42 U.S.C. § 2000d-1 .................................................................................................... 14

42 U.S.C. § 2000e(j) ........................................................................................ 19, 21, 46

42 U.S.C. § 2000e-2(a) ............................................................................... 19, 21, 44, 46

Pub. L. No. 115-245, 132 Stat. 2981, 3118 (2018) ..................................................... 27

Pub. L. 115–245, Div. B, sec. 507(d) .......................................................................... 38

Pub. L. No. 93-145 (1973) ............................................................................... 12

## Regulations

29 C.F.R. § 1605.2 ................................................................................... 19, 21

45 C.F.R. § 75.371 ................................................................................... 12, 14

45 C.F.R. § 75.371(b) ...................................................................................... 14

45 C.F.R. § 75.371(c) ...................................................................................... 14

45 C.F.R. § 88.2(4) .......................................................................................... 18

45 C.F.R. § 88.7(i)(2) ....................................................................................... 14

45 C.F.R. § 88.7(i)(3)(iv) .................................................................................. 14

45 C.F.R. § 88.7(i)(3)(v) ................................................................................... 14

Notice of Proposed Rulemaking, Protecting Statutory Conscience Rights in Health Care;
    Delegations of Authority,
    83 Fed. Reg. 3,881 (Jan. 26, 2018) ................................................... 43, 50

Promoting Free Speech and Religious Liberty,
    82 Fed. Reg. 21,675 (May 4, 2017) ........................................................ 44

Protecting Statutory Conscience Rights in Health Care; Delegations of Authority,
    84 Fed. Reg. 23,170 (May 21, 2019) ................................................ passim

Regulation for the Enforcement of Federal Health Care Provider Conscience Protection
    Laws,
    76 Fed. Reg. 9,968 (Feb. 23 2011) ........................................................ 16

Standards of Compliance for Abortion-Related Services in Family Planning Service
    Projects,
    58 Fed. Reg. 34,024 (June 23, 1993) ...................................................... 52

## Treatises

5 Wright & Miller § 1202 .................................................................................. 6

Black's Law Dictionary (9th ed. 2009) .............................................................. 19

## Other Authorities

Accreditation Council for Graduate Med. Educ., Program Requirements for Residency
    Education in Obstetrics and Gynecology, 1996–1997 Graduate Medical Education
    Directory 131 (1996), https://www.acgme.org/Portals/0/PDFs/1996-97.pdf ....... 26

Angel M. Foster, Amanda Dennis & Fiona Smith, *Do Religious Restrictions Influence Ectopic Pregnancy Management? A National Qualitative Study*, 21 Women's Health Issues 104 (2011), https://www.ncbi.nlm.nih.gov/pubmed/21353977 ........................................ 29, 34

Lori R. Freedman, Uta Landy & Jody Steinauer, *When There's a Heartbeat: Miscarriage Management in Catholic-Owned Hospitals*, 98 Am. J. Public Health 1774 (2008) ................................................................................................................................ 33

Maegan Vazquez & Jessica Ravitz, *Trump Announces 'Conscience Objection' Rule for Medical Care is Finalized*, CNN, May 2, 2019, https://www.cnn.com/2019/05/02/politics/trump-administration-final-rule-conscience-objections/index.html ..................................................................... 1, 9

*Refusals to Provide Health Care Threaten the Health and Lives of Patients Nationwide*, Nat'l Women's Law Center (2017), https://nwlc.org/resources/refusals-to-provide-health-care-threaten-the-health-and-lives-of-patients-nationwide/ ......... 33

Rob Stein, *Religious Hospitals' Restrictions Sparking Conflicts, Scrutiny*, Wash. Post, Jan. 3, 2011, https://www.washingtonpost.com/health-environment-science/religious-hospitals-restrictions-sparking-conflicts-scrutiny/2011/01/03/ABVVxmD_story.html........................................................ 34

## Legislative Materials

119 Cong. Rec. 9,597 (1973) ............................................................................................ 23

142 Cong. Rec. 4,926 (1996) ............................................................................................ 26

142 Cong. Rec. 5,158 (1996) ............................................................................................ 26

142 Cong. Rec. 5,171 (2006) ............................................................................................ 26

150 Cong. Rec. H10,090 (Nov. 20, 2004) ...................................................................... 27

## INTRODUCTION

When President Trump announced that the Department of Health and Human Services ("HHS") would issue the Final Rule at issue here, he advertised it as creating "new protections of conscience rights."[1] This was an apt description of the novelty and sweep of the agency's action. But it also told only part of the story. In this instance, the new rights HHS created for some entail new and significant burdens on others—health care providers and the patients they serve.

Under the Rule, health care providers subject to the Rule will not be able to ask prospective employees if they are willing to perform the functions of their job. Health care providers will be compelled to make *unreasonable* accommodations, even if doing so would profoundly compromise their ability to deliver care to patients. Patients will be harmed as employees defy their ethical obligations, refusing to inform patients of their options and denying them emergency care. And this new regime will be enforced by a federal agency that has arrogated to itself the power to create new rights, and erected a draconian enforcement scheme that would strip perceived violators of federal funding that is supposed to help patients.

But in our system of government, the Executive Branch does not have *carte blanche* to create new rights for those it favors and impose new burdens on those it does not. HHS cannot point to actual delegations of authority from Congress giving it the power to promulgate this Rule. Nonetheless, HHS has taken it upon itself to promulgate a substantive rule. Not only that, but HHS has rewritten the federal laws it purports to enforce and weaponized them to compromise the ability of health care providers to deliver care. The Final Rule defies a host of statutes, including the very laws that HHS claims to be enforcing. These novel revisions to long-existing federal laws go so

---

[1] Maegan Vazquez & Jessica Ravitz, *Trump Announces 'Conscience Objection' Rule for Medical Care is Finalized*, CNN, May 2, 2019, https://www.cnn.com/2019/05/02/politics/trump-administration-final-rule-conscience-objections/index.html (emphasis added).

far as to make health care providers beholden to the particular religious views of particular employees, contradicting not just the underlying statutes but the Establishment Clause of the Constitution.

HHS accomplished this substantive overreach through a procedurally deficient administrative process. As the administrative record has revealed, the justification for the Rule was a lie. HHS claimed it was acting due to a surge of complaints of conscience violations, yet the record shows—and the agency's counsel now all but admits—that these claims were false. On top of that, the agency executed a classic bait-and-switch, adopting in its Final Rule an absolutist vision of refusal rights that is not a logical outgrowth of the rule that HHS had initially proposed.

The agency's brief only reveals how far afield it has strayed. Indeed, the version of the Rule that the brief purports to defend bears little resemblance to what HHS has actually done. What the President announced to great fanfare as the creation of "new protections," counsel now presents as "truly a housekeeping measure," Defs.' Consolidated Mem. Law Supp. Defs.' Mot. Dismiss or, in the Alternative, Mot. Summ. J., Opp'n Pls.' Mots. Prelim. Inj. ("HHS Br.") 27, ECF No. 148 (No. 1:19-cv-4676), with the expansive new interpretations not "chang[ing] any of the substantive requirements of the Federal Conscience Statutes," *id.* at 3. With all of this revisionist history, it is understandable that the agency cannot keep its story straight. The agency says that this "housekeeping measure" merely relies on "preexisting regulations" for enforcement, *id.* at 26–27, while simultaneously admitting that "[t]he Rule undeniably revises HHS's approach to enforcing the Federal Conscience Statutes," *id.* at 52, because previous enforcement frameworks were "inadequate to non-existent," *id.* at 59. The Rule's sweeping definitions are said to be "another housekeeping matter" internal to the agency, *id.* at 24, yet HHS simultaneously claims *Chevron* deference for those interpretations, *id.* at 28–29, defying the elementary principle of

administrative law that *Chevron* deference is available only when an agency is delegated authority to issue substantive regulations with the force of law.

This is lawlessness. The Final Rule is in excess of HHS's statutory authority, not in accordance with law, arbitrary and capricious, and it was enacted without observance of required procedure. It must accordingly be "h[e]ld unlawful and set aside." 5 U.S.C. § 706. Alternatively, if the Court does not invalidate the Rule before its November 22 effective date, Plaintiffs' motion for a preliminary injunction should be granted.

## BACKGROUND

### A.  Plaintiffs and Their Patients

Plaintiff Planned Parenthood Federation of America ("PPFA") is a not-for-profit corporation that strives to ensure access to comprehensive reproductive health care services, advocates for public policies that support access to health care—especially for individuals who are low-income or from underserved communities—and provides educational programs relating to reproductive and sexual health. Joint Mem. Law Supp. Pls.' Mot. Prelim. Inj. ("Providers' PI Br.") 7, ECF No. 20 (No. 1:19-cv-5433). Medical services are provided by 53 PPFA affiliates, including Plaintiff Planned Parenthood Northern New England ("PPNNE"), which operate more than 600 health centers in 48 states and the District of Columbia, providing services to millions of patients each year. *Id.* Planned Parenthood affiliates play a particularly important role in providing reproductive and other healthcare to individuals with low incomes. *Id.* at 7–8. Most of Plaintiffs' patients have low incomes and/or are uninsured; approximately 73% have incomes at or below 150% of the federal poverty level. *Id.* at 8. Planned Parenthood affiliates, including PPNNE, also serve a significant number of rural patients. *Id*. at 8.

National Family Planning & Reproductive Health Association ("NFPRHA") is a national, non-profit membership association that advances and elevates the importance of family planning

in the nation's health care system and promotes and supports the work of family planning providers and administrators, especially those in the safety net (i.e., those providing publicly funded care). Decl. of Clare M. Coleman ("First Coleman Decl.") ¶ 9, ECF No. 21-4 (No. 1:19-cv-5433). NFPRHA's members include more than 850 health care organizations—including state, county, and local health departments; private non-profit family planning organizations; hospital-based health practices; and federally qualified health centers—in all 50 states, the District of Columbia, and the U.S. territories. Providers' PI Br. 9; First Coleman Decl. ¶ 9. NFPRHA member organizations operate or fund a network of more than 3,500 health centers that provide family planning services to millions of patients each year who live on income levels at or below the poverty line. Providers' PI Br. 9; First Coleman Decl. ¶¶ 11–13.

Public Health Solutions ("PHS") was first established in 1957 and is currently the largest public health nonprofit serving New York City. Providers' PI Br. 9. PHS addresses critical public health issues through a client-centered approach, which is at the core of its mission. *Id.* In 2018, PHS served 105,000 individuals and families across New York City through various direct services programs, including its two sexual and reproductive health centers which have been a stable and trusted presence in their communities for over 50 years. *Id.*

Central to each of the Plaintiffs' missions is the ability to provide comprehensive reproductive health care services, including information about all pregnancy options. Providers' PI Br. 43–46. The health care services Plaintiffs provide are critical, even life-saving, services. Moreover, Plaintiffs deliver—and their patients have come to expect—high quality, evidence-based health care in accordance with standards of medical ethics; this is true for all services Plaintiffs provide and regardless of the identify of Plaintiffs' patients. *Id.*

Provider Plaintiffs rely on federal funding to provide this care, and so much more, to millions of patients each year, *see, e.g.*, Providers' PI Br. 8–10 (citing declarations). The federal funding Plaintiffs receive includes HHS funds that trigger obligations under or otherwise make them subject to the refusal statutes, as well as funds that are at risk if Plaintiffs were found not to be in compliance with the Rule. *See id.*; Second Decl. of Kimberly Custer ("Second Custer Decl.") ¶¶ 9–10, filed herewith; Second Decl. of Meagan Gallagher ("Second Gallagher Decl.") ¶¶ 7–8, filed herewith; First Coleman Decl. ¶¶ 15–16; Second Decl. of Clare M. Coleman ("Second Coleman Decl.") ¶¶ 12, 14, filed herewith; Decl. of Lisa David ("First David Decl.") ¶¶ 8–13, ECF No. 21-5 (No. 1:19-cv-5433); Second Decl. of Lisa David ("Second David Decl.") ¶ 6, filed herewith. As Plaintiffs have explained previously, loss of this funding would have a devastating impact on Plaintiffs' ability to carry out their missions by forcing the discontinuation of essential services and even closure of some health centers, jeopardizing care for millions of patients, many of whom have nowhere else to turn. *See*, *e.g.*, Providers' PI Br. 10.

**B.  Statutory Background, Relevant Rulemaking History, and Promulgation of the Final Rule**

Plaintiffs incorporate by reference Providers' PI Br. 2–7.

## ARGUMENT

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where, as here, a party seeks review of agency action under the APA and 'the entire case on review is a question of law,' summary judgment is generally appropriate." *Noroozi v. Napolitano*, 905 F. Supp. 2d 535, 541 (S.D.N.Y. 2012) (quoting *Citizens Against Casino Gambling v. Hogen*, No. 07–CV–0451 S, 2008 WL 2746566, at *25 (W.D.N.Y. July 8, 2008)). For the reasons that follow, including Parts II.C and V of the State Plaintiffs' Memorandum

of Law filed today, and as previously set forth in Provider Plaintiffs' Joint Memorandum of Law in Support of Motion for Preliminary Injunction and attached exhibits, incorporated here in its entirety, the Final Rule, Protecting Statutory Conscience Rights in Health Care; Delegations of Authority, 84 Fed. Reg. 23,170 (May 21, 2019), is invalid as a matter of law. This Court should grant summary judgment for the Plaintiffs and deny Defendant HHS's and Defendants-Intervenors'[2] motion for summary judgment.

HHS's Motion to Dismiss this case for lack of subject matter jurisdiction should also be denied. A case may be "dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Lyons v. Litton Loan Servicing LP*, 158 F. Supp. 3d 211, 218 (S.D.N.Y. 2016) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). To survive a motion to dismiss under Rule 12(b)(6), a complaint must provide "'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 n.3 (2007) (citing 5 Wright & Miller § 1202, at 94, 95). Plaintiffs need only allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly, 550*

---

[2] Along with their memorandum of law, Defendants-Intervenors filed a Rule 56.1 Statement, s*ee* Defs.-Intervenors' Local Civil Rule 56.1 Statement Undisputed Facts Supp. Mot. Summ. J., ECF No. 154, even though a Rule 56.1 Statement is not necessary where the case "arises under the APA," *Glara Fashion, Inc. v. Holder*, No. 11-cv-889, 2012 WL 352309, at *1 n.1 (S.D.N.Y. Feb. 3, 2012). The fact that Plaintiffs have not filed a response does not mean the assertions in Defendants-Intervenors Rule 56.1 Statement are undisputed or admitted. Defendants-Intervenors' Rule 56.1 Statement consists primarily of legal characterizations of the administrative record, which are not appropriate in a Rule 56.1 Statement and do not require a response. Moreover, because this is an APA case and the "usual" summary judgment standard does not apply, *see Ass'n of Proprietary Colls. v. Duncan*, 107 F. Supp. 3d 332, 344 (S.D.N.Y. 2015), Plaintiffs have not conducted discovery or otherwise developed record evidence and therefore are unable to rebut (or admit) Defendants-Intervenors' assertions.

U.S. at 570). As explained below, *see infra* Part II.E.2, Plaintiffs adequately allege that their Establishment Clause claim is ripe, so Defendants' motion to dismiss this claim must be denied.[3]

## I.   The Rule Exceeds HHS's Statutory Authority in Violation of the APA

The Rule must be "[held] unlawful and set aside," 5 U.S.C. § 706(2), because Congress did not delegate to HHS the broad rulemaking, interpretive, and enforcement authority over the Church, Coats-Snowe, and Weldon Amendments that HHS claims for itself. "[A]n agency literally has no power to act unless and until Congress confers power upon it." *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 112 (2d Cir. 2018) (quoting *Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 202 (2d Cir. 2004)). Some agencies are granted "broad power to enforce all provisions of [a] statute," while others, like HHS, have only "limited powers, to be exercised in specific ways." *Gonzales v. Oregon*, 546 U.S. 243, 258–59 (2006); *see, e.g.*, 42 U.S.C. § 18116(c) (limited authorization for HHS to "promulgate regulations to implement" Section 1557 of the Affordable Care Act); *see also Pharm. Res. & Mfrs. of Am. v. HHS*, 43 F. Supp. 3d 28, 39 (D.D.C. 2014) (applying *Gonzales* to reject attempt by HHS to "str[i]ng together" various "specific grants of authority" to give it a broader "rulemaking authority").

In *Gonzales*, "[t]he starting point for th[e] inquiry [wa]s, of course, the language of the delegation provision itself." 546 U.S. at 258. Here, there *is no* delegation provision. HHS effectively concedes that the Church, Coats-Snowe, and Weldon Amendments "do not delegate interpretative or enforcement authority to HHS." HHS Br. 26. HHS weakly responds that this is

---

[3] While Defendants state that they "move to dismiss Plaintiffs' claims in their entirety," HHS Br. 16, they argue only that Plaintiffs' Establishment Clause claim and State Plaintiffs' Spending Clause claim should be dismissed. Because "a 'single, conclusory, one-sentence argument' [i]s insufficient to adequately raise an issue," *In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 208 n.4 (S.D.N.Y. 2019) (quoting *LG Elecs., Inc. v. Wi-LAN USA, Inc.*, No. 13 Civ. 2237, 2014 WL 3610796, at *3 n.3 (S.D.N.Y. July 21, 2014); *Cuoco v. Moritsugu*, 222 F.3d 99, 112 n.4 (2d Cir. 2000)), the Court should treat Defendants' motion as seeking dismissal of only Provider Plaintiffs' Establishment Clause claim.

"not entirely true" with respect to *every* refusal statute, but does not dispute this fact with respect to Church, Coats-Snowe, and Weldon. *Id.* Instead, it cites a provision that "designat[es]" the agency to "receive complaints of discrimination" against health care entities that do not perform assisted suicide. 42 U.S.C. § 18113. HHS further states that "certain statutes explicitly authorize HHS to promulgate regulations implementing conscience protections," again not identifying any such delegation related to Church, Coats-Snowe, or Weldon. HHS Br. 25–26. Far from helping HHS, these express and narrow delegations only confirm that no broader delegation exists.

HHS responds that it needs no delegation because the Rule does not really do anything: "HHS's promulgation of the Rule is . . . truly a housekeeping measure." HHS Br. 27. On this basis, HHS invokes 5 U.S.C. § 301 (HHS Br. 23), a "housekeeping statute" that is "simply a grant of authority to the agency to regulate its own affairs." *Chrysler Corp. v. Brown*, 441 U.S. 281, 309 (1979). It is not "a substantive grant of legislative power to promulgate rules," *id.* at 310, and courts have rejected attempts "to twist this simple administrative statute into an authorization for the promulgation of substantive rules," *U.S. ex rel. O'Keefe v. McDonnell Douglas Corp.*, 132 F.3d 1252, 1255 (8th Cir. 1998). HHS's attempt to defend its Rule as mere housekeeping—when it reinterprets federal statutes to impose substantial new burdens on third parties, and announces draconian enforcement measures expressly intended to induce third parties to change their practices—is both disingenuous and wrong.

**A. Congress Did Not Delegate Authority to HHS to Issue Interpretations of Church, Coats-Snowe, and Weldon with the Force of Law**

As the Provider Plaintiffs have explained, the Rule expansively revises the federal refusal statutes, imposing massive new burdens on private entities and State and local governments. Providers' PI Br. 43–46. When the Rule was announced, President Trump aptly described it as

creating "*new* protections of conscience rights."[4] Now, however, the agency insists that "[t]he substantive requirements of the Rule . . . do nothing more than reiterate the text of the Federal Conscience Statutes." HHS Br. 24. And HHS trivializes the Rule's "definitions" by mischaracterizing them as a "housekeeping matter concerning how HHS interprets the Federal Conscience Statutes." *Id.*

This is nonsense. It is these definitions that interpret and expand the statutes in unprecedented ways, thereby creating the "new protections" the President announced—along with corresponding new burdens. HHS claims *Chevron* deference for these interpretations. HHS Br. 28–29. Yet the basis of *Chevron* deference is that "Congress has delegated authority to an administrative agency to make rules *carrying the force of law* and that agency's interpretation to which deference is to be given was promulgated *in the exercise of that authority*." *Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 168 (2d Cir. 2017) (emphasis added). It is remarkable that HHS would characterize an expansive interpretation of a statute as mere "housekeeping," and then demand deference to such an interpretation as having the force of law. It is obvious that HHS does so to try to obscure that it is acting without statutory authority.

Misguided claims of "housekeeping" aside, HHS never explains the purported basis for its authority to do what it has actually done. Understandably so, because no such authority exists, express or implicit. *See Gonzales*, 546 U.S. at 262–68 (rejecting similarly groundless claims of implicit authority). HHS has no inherent "historical familiarity and policymaking expertise" concerning the refusal statutes. *Id.* at 266. HHS's attempted expansion of refusal rights for medical professionals raises significant federalism concerns by encroaching on states' authority to regulate the practice of medicine. *E.g.*, Compl. Declaratory Injunctive Relief ("States' Compl.") Part III.A,

---

[4] Vazquez & Ravitz, *supra* note 1.

¶¶ 101–118, ECF No. 3 (No. 1:19-cv-4676) (listing state laws jeopardized by the Rule); *see Gonzales*, 546 U.S. at 274 ("[T]he background principles of our federal system also belie the notion that Congress would use such an obscure grant of authority to regulate areas traditionally supervised by the States' police power."). Moreover, refusal rights relating to abortion, and the related burdens on health care providers, are undoubtedly a subject of "earnest and profound debate across the country," which "makes the oblique form of the claimed delegation all the more suspect." *Gonzales*, 546 U.S. at 267–68 (quotation omitted). Courts "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000)). Here, as HHS does not dispute, Congress did not speak at all.

HHS nonetheless argues that it has implicit authority to interpret the refusal statutes so that it can "ensure[] compliance with them." HHS Br. 24. But that does not give the agency free reign to promulgate authoritative interpretations. *See Gonzales*, 546 U.S. at 264 (even though the statute "does require the Attorney General to decide '[c]ompliance' with the law, it does not suggest that he may decide what the law says" (alteration in original)); *id.* ("The Justice Department, of course, has a very specific responsibility to determine for itself what this statute means, in order to decide when to prosecute; but we have never thought that the interpretation of those charged with prosecuting criminal statutes is entitled to deference." (quoting *Crandon v. United States*, 494 U.S. 152, 177 (1990) (Scalia, J., concurring in judgment))); *see also infra* Part I.B (discussing claimed enforcement authority). For example, the EEOC has unquestionable "responsibility for enforcing Title VII" of the Civil Rights Act, yet the Supreme Court has declined to grant *Chevron* deference to the EEOC's interpretations of Title VII. *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 257

(1991); *see also United States v. Mead Corp.*, 533 U.S. 218, 229 (2001) (noting that EEOC receives "no *Chevron* deference" for its interpretations of Title VII because its "congressional delegation did not include the power to 'promulgate rules or regulations'" for that statute (quoting *Arabian Am. Oil Co.*, 499 U.S. at 257)). HHS analogizes the refusal statutes with "other civil rights laws." HHS Br. 15. So it would be particularly odd to conclude that Congress *sub silentio* granted HHS the authority to issue force of law regulations under the refusal statutes, when the Supreme Court has already held that silence does *not* confer such authority to at least one other federal agency interpreting at least one of their civil rights laws.

Yet another reason that HHS cannot issue authoritative interpretations of the refusal statutes is that "[a] court does not defer to an agency's interpretation of a statute that it is not charged with administering." *Del. Riverkeeper Network v. Fed. Energy Regulatory Comm'n*, 857 F.3d 388, 396 (D.C. Cir. 2017). Nothing in the Church, Coats-Snowe, and Weldon Amendments suggest that HHS is "charged with administering" them. Weldon, for example, is simply an appropriations rider that issues instructions to various agencies. *See Ass'n of Civilian Technicians v. Fed. Labor Relations Auth.*, 370 F.3d 1214, 1221 (D.C. Cir. 2004) ("[T]he court owes no deference to FLRA's interpretation of the appropriations act . . . ."); *see also Sherley v. Sebelius*, 689 F.3d 776, 786 (D.C. Cir. 2012) (Henderson, J., concurring) (explaining that a "rider to a federal appropriations statute" is "'not within [any agency's] area of expertise' and therefore a particular agency's interpretation thereof 'receives no deference'" (alteration in original) (quoting *U.S. Dep't of Navy v. FLRA*, 655 F.3d 1339, 1348 (D.C. Cir. 2012))). Presumably this is why HHS has previously conceded that "it is not clear that the Weldon Amendment can be said to delegate regulatory authority to the Executive Branch at all." Defendants' Memorandum of Points and

Authorities in Opposition to Plaintiff's Motion for a Preliminary Injunction 35, *NFPRHA v. Ashcroft*, No. 1:04-cv-02148 (D.D.C. Dec. 24, 2004), ECF No. 9.

The same is true of Coats-Snowe and Church. *Chevron* deference is unavailable with respect to a statute that "is generally applicable to all federal agencies." *DLS Precision Fab LLC v. U.S. Immigration & Customs Enf't*, 867 F.3d 1079, 1087 (9th Cir. 2017). This describes Coats-Snowe, which is applicable generally to "[t]he Federal Government, and any State or local government that receives Federal financial assistance." 42 U.S.C. § 238n. And the Church Amendments are not applicable to any agency at all; rather, subsections (b), (c), and (e) are directed to recipients of specific federal grants, contracts, loans, or loan guarantees, and (d) is not directed to any specific entity at all, but to individuals. Notably, while the statute refers to grants under the Public Health Service Act as the trigger for Church's requirements to apply, 42 U.S.C. § 300a-7, the Congress that enacted Church declined to place those amendments in that Act. *See* Pub. L. No. 93-145 (1973) (enacting the Church Amendment as a "Miscellaneous" provision (title IV), separate from the law's "amendments to [the] Public Health Service Act" (title I)).

## B. Congress Did Not Delegate to HHS the Sweeping New Enforcement Authority It Claims the Rule Provides

The Rule is equally brazen in claiming new authority to take expansive enforcement action that Congress has not authorized. *See* 84 Fed. Reg. at 23,269–72 (to be codified at 45 C.F.R. §§ 88.4–88.7).

HHS insists that the Rule simply incorporates the enforcement mechanisms of HHS's generally applicable Uniform Administrative Requirements ("UAR"), 45 C.F.R. § 75.371. However, this assertion is belied by the agency's own repeated pronouncements that the Rule's very purpose is to expand HHS's authority to enforce the refusal statutes. Per the plain language

of the Rule's preamble, the problem the Rule addresses is "*inadequate* enforcement tools." 84 Fed. Reg. at 23,228 (emphasis added). The Rule states HHS believed there were "*inadequate to non-existent* regulatory frameworks to *enforce* existing Federal conscience and anti-discrimination laws," which "may have undermined incentives for covered persons and entities to institute proactive measures to protect conscience, prohibit coercion, and promote nondiscrimination." *Id.* (emphasis added). The Rule, by contrast, "incentivizes the desired behavior," according to the agency. *Id.* at 23,227. Even in the same brief where it calls the Rule's enforcement provisions mere housekeeping, HHS admits that "the Rule undeniably revises HHS's approach to *enforcing* the Federal Conscience Statutes." HHS Br. 52 (emphasis added); *see also id.* (explaining that HHS "determined that the preexisting regulatory structure was insufficient").

    HHS cannot speak out of both sides of its mouth. Reliance on a preexisting enforcement process would be a surprising solution to the problem of "inadequate enforcement tools." Internal housekeeping measures do not "incentivize desired behavior" by third parties. And since HHS believes that the new enforcement tools in the Rule will induce third parties to take "proactive measures" they would not otherwise take, it cannot plausibly maintain that vacatur of that Rule would not redress Plaintiffs' injury. HHS Br. 27.

    Thus, although the Rule states that compliance will be effectuated "pursuant to" existing regulations governing the administration of grants and contracts, 84 Fed. Reg. at 23,272, HHS clearly contemplates that it has assumed broader enforcement authority than it held previously. This conclusion is further bolstered by the text of the Rule, which states that "compliance with these laws and this part may be effected *by the following actions*," *id.*, and then proceeds to spell out what remedial actions OCR may take, *id.* (to be codified at 45 C.F.R. § 88.7(i)(3)(i)–(vii)). Consistent with the claims HHS makes in the Rule's preamble, the remedial actions listed are more

expansive and less protective of funding recipients than the UAR, 45 C.F.R. § 75.371. Most notably, UAR remedies focus on "the cost of the activity or action not in compliance," or the specific "Federal award" involved. 45 C.F.R. § 75.371(b), (c). The Rule, by contrast, speaks of terminating, denying, and withholding *all* federal funding by the Department. 45 C.F.R. § 88.7(i)(3)(iv), (v). As another example, under the UAR, HHS will first consider "additional Federal award conditions," and only pursue more aggressive remedies if it determines that cannot remedy the noncompliance. 45 C.F.R. § 75.371. The Rule does not replicate this part of the UAR, instead expressly reserving the right to undertake involuntary enforcement before exhausting attempts to resolve the matter informally. 45 C.F.R. § 88.7(i)(2). Similarly, the Rule warns that it may attempt "funding claw backs," 84 Fed. Reg. at 23,180, which is not an available remedy under the UAR. 45 C.F.R. § 75.371.

Again, HHS can point to no actual delegation of authority in the refusal statutes for the broad new enforcement power it assumes. Instead, HHS casually asserts that the delegation is implied. HHS Br. 24. But contrary to HHS's blithe assumptions of authority, when Congress intends to impose broad withholding of federal funds as a remedy, it says so. The silence of Church, Coats-Snowe, and Weldon on enforcement is particularly striking in comparison to other civil rights statutes. Title VI of the Civil Rights Act prohibits discrimination on grounds of race, color, or national origin for any federally-funded program, 42 U.S.C. § 2000d, but unlike with the refusal statutes, Congress "authorized and directed" every agency administering federal grants, loans, or contracts to "effectuate the provisions of" Title VI "by issuing rules, regulations, or orders of general applicability," *id.* § 2000d-1. In addition to expressly authorizing "termination" of federal assistance, the delegation tempers such authority with protections for the funding recipient: opportunity for a hearing, express findings on the record, opportunity to restore compliance

voluntarily, and written advance notice by the agency head to relevant committees of Congress. *Id.* To put it mildly, Congress understood the gravity of terminating federal funding based on an agency's finding of a civil rights violation. It cannot be the case that by saying *nothing* about enforcement in the refusal statutes, Congress meant to delegate HHS a *broader* power to terminate funding.[5]

Even beyond the civil rights context, the U.S. Code is replete with provisions showing that Congress is clear when it authorizes an agency to withhold funds for violating statutory requirements, and to calibrate how much funding can be withdrawn. For example, the Medicaid Act includes an express provision authorizing HHS to withhold funds for certain violations, after notice and a hearing. 42 U.S.C. § 1396a. Likewise, the famous Spending Clause case of *South Dakota v. Dole* concerned a statutory directive "to withhold a *percentage* of federal highway funds" to states that do not set their drinking age at 21. 483 U.S. 203, 205 (1987) (emphasis added).[6] The refusal statutes, by contrast, are simply not written the way Congress writes withholding-of-funding statutes. Again, it would be remarkable to infer that Congress, by saying *nothing* about enforcement, implicitly authorized HHS to terminate *100 percent* of Department funding.

---

[5] Other civil rights statutes contain comparable protections. *See, e.g.*, 20 U.S.C. § 1682 (Title IX) (very similar to Title VI); 42 U.S.C. § 6104 (Age Discrimination Act) (same); 29 U.S.C. § 794 (Rehabilitation Act of 1973) (incorporating "[t]he remedies, procedures, and rights set forth in title VI"); 42 U.S.C. § 18116(a) (Section 1557 of the ACA) ("enforcement mechanisms provided for and available under . . . title VI, title IX, section 794, or [the] Age Discrimination Act shall apply . . . [to] violations of this subsection.").

[6] *See also* 34 U.S.C. § 60105(c)(2) (authorizing up to 10 percent funding reduction for jurisdictions that violate the Death in Custody Reporting Act); *id.* § 40914(b)(1) (authorizing 3–4 percent reduction for jurisdictions that do not comply with the National Instant Criminal Background Check System); *id.* § 30307(e)(2) (mandating 5 percent reduction for States that do not comply with the Prison Rape Elimination Act); *id.* § 20927(a) (mandating 10 percent reduction for States that fail to substantially implement the Sex Offender Registration and Notification Act).

HHS's argument of last resort is to turn to hyperbole: without the particular enforcement mechanism created by the Rule (or a private right of action), people would be "stripp[ed] of conscience protections." HHS Br. 28. But of course those protections were not dead letters over the decades they were on the books without this Rule. And this case does not challenge HHS's ability to "evaluate compliance" with the federal refusal statutes as provided for in the 2011 Rule, Regulation for the Enforcement of Federal Health Care Provider Conscience Protection Laws, 76 Fed. Reg. 9,968, 9,976–77 (Feb. 23 2011); Providers' PI Br. 15. It is certainly not necessary to imply a delegation of sweeping and draconian enforcement power in order to save the refusal statutes from irrelevance.

## II.  The Rule Is Contrary to Law in Violation of the APA

Even assuming that HHS had authority to issue this Rule, the Rule is contrary to the underlying refusal statutes as well as other federal laws. It is thus "not in accordance with law" and must be set aside on this basis as well. 5 U.S.C. § 706(2)(A).

### A.  The Rule Impermissibly Expands the Narrow Underlying Statutes

As set forth previously, *see* Providers' PI Br. 27–31; Mem. Law Supp. Pls.' Mot. Prelim. Inj. ("States' PI Br.") 25–30, ECF No. 45 (No. 1:19-cv-4676), the Rule impermissibly expands the underlying statutes by defining key terms far beyond what Congress permitted. Plaintiffs focus below on four terms that HHS defined in the Rule in ways that unlawfully revise the statutes they purport to interpret: (1) "discriminate" or "discrimination"; (2) "assist in the performance"; (3) "referral" or "refer for"; and (4) "health care entity".

First, contrary to HHS's assertion, Plaintiffs have never acknowledged that the agency's claims are entitled to deference under *Chevron, U.S.A., Inc. v Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). HHS Br. 28. Plaintiffs have consistently maintained that HHS lacks authority to promulgate this Rule at all. *See supra* Part I. At a minimum, the reasons given above

preclude *Chevron* deference: HHS calls its interpretations of the refusal statutes (which HHS is not charged with administering) mere "housekeeping," HHS Br. 23, so it cannot simultaneously demand the deference that flows from a delegation "to make rules carrying the force of law." *Mead Corp.*, 533 U.S. at 226–27. *Chevron* deference, moreover, is not warranted where the regulation is procedurally defective, and Plaintiffs have cataloged numerous such defects.

Second, even if this Court were to accord *Chevron* deference, HHS's interpretations of key terms in the statutes fail. Under *Chevron*, the first step is to determine "whether Congress has directly spoken to the precise question at issue." *Chauffeur's Training Sch., Inc. v. Spellings*, 478 F.3d 117, 125 (2d Cir. 2007) (quoting *Chevron*, 467 U.S. at 842–43). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* In evaluating whether Congress has directly spoken to the question, a court employs traditional tools of statutory construction, examining the statutory text, structure, and purpose, including as reflected in its legislative history. *Catskill Mountains Chapter of Trout Unlimited, Inc. v. Envtl. Prot. Agency*, 846 F.3d 492, 512 (2d Cir. 2017), *cert. denied sub nom. New York v. EPA*, 138 S. Ct. 1164 (2018), and *cert. denied sub nom. Riverkeeper, Inc. v. EPA*, 138 S. Ct. 1165 (2018). Even if Congress's intent is not clear after applying all traditional tools of interpretation, an interpretation fails at the second step under *Chevron* if it is unreasonable. *See Chen v. Bd. of Immigration Appeals*, 164 F. Supp. 3d 612, 620 (S.D.N.Y. 2016).

## 1. "Discriminate" or "Discrimination"

The Final Rule's definition of "discriminate" or "discrimination" sweeps well beyond any reasonable understanding of that term. According to HHS, there is no limit to what an employer must do to accommodate employees unwilling to perform functions central to their job, even if that means serious burdens on the employer's mission or threats to patient health. For example,

HHS refused to state that an employer is not *obligated* to hire someone for a job with primary responsibilities that the employee is unwilling to do, *see* 84 Fed. Reg. at 23,192; nor can employers avoid liability by offering reasonable accommodations, such as reassigning an employee to a position with responsibilities they are willing to perform, unless the employee voluntarily accepts them, *see* 45 C.F.R. § 88.2(4) ("Discriminate or Discrimination").[7]

This is not remotely what Congress could have meant by saying generally, without further elaboration, that an employer may not "discriminate" on the basis of religious or moral beliefs. Indeed, whereas HHS considers reassignment of job functions to accommodate an employee's objections to be "discrimination," the D.C. Circuit has held, in addressing the Weldon Amendment, that it would be "anomalous" to "equat[e] . . . reassignment with discrimination." *Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 829–30 (D.C. Cir. 2006) (noting federal government has never "treated the reassignment of a caregiver who refuses to provide abortion counseling as 'discrimination' against that caregiver" under the Coats Amendment, and that the Weldon Amendment had not "transform[ed] an accommodating agency's reassignment [of employee who refused to provide abortion counseling] into an act of discrimination").

---

[7] Defendants-Intervenors state that the Rule "specifically allows an employer to ask a prospective employee about his or her religious objections if there is a persuasive justification' for the question." Mem. Law Defs.-Intervenors Dr. Regina Frost Christian Medical Dental Associations Supp. Mot. Summ. J. Opp'n Pls.' Mots. Prelim. Inj. ("Def.-Int. Br.") 16, ECF No. 150 (No. 1:19-cv-4676). But the Rule does not explain what qualifies as a "persuasive justification." *See* 84 Fed. Reg. at 23,263. Moreover, even if a health care employer were willing to take the risk and ask a prospective employee about any potential objections to providing health services because the employer believed it had a "persuasive justification" to ask, neither Defendants-Intervenors nor HHS dispute that the Rule still requires a health care employer to hire and keep on staff individuals who notify an employer about a refusal to provide certain health services. This is true regardless of the hardship it imposes on the health care employer's ability to serve its patients. In addition, neither dispute (nor could they given the terms in the Rule) that objecting employees are given the right to refuse reasonable accommodations offered by an employer.

More generally, and consistent with the D.C. Circuit's narrower interpretation of "discriminate" as used in the refusal statutes, in its ordinary meaning the word is sensitive to context and circumstance. "Discriminate" is defined as the "failure to treat all persons equally when no *reasonable* distinction can be found between those favored and those not favored." *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 286 (2011) (emphasis added) (quoting Black's Law Dictionary 534 (9th ed. 2009)). And in the employment context, it has been understood for more than fifty years that an employee does not experience discrimination on the basis of religion when the employee's religiously-motivated objections cannot reasonably be accommodated. *See* 42 U.S.C. §§ 2000e(j), 2000e-2(a); 29 C.F.R. § 1605.2. It would have been unprecedented for Congress to impose an absolute duty on employers to accommodate employees' religious beliefs *irrespective* of the unreasonableness of the accommodation or the severity of the burden on the employer. Had Congress meant to upend the law of religious accommodation the way HHS believes, surely it would have said more than "do not discriminate."

Moreover, the agency's interpretation of "discrimination" creates an absolute duty to accommodate that operates as a "command[] that . . . religious concerns automatically control over all secular interests at the workplace." *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 709 (1985). Such a command would violate the Establishment Clause, *see infra* Part II.V, but at a minimum it creates serious constitutional concerns, requiring an interpretation that avoids that problem. *See, e.g.*, *Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702, 711 (D.C. Cir. 2008) ("the canon of constitutional avoidance . . . trumps *Chevron* deference").

Defendants and Defendants-Intervenors have no convincing defense for the Rule's sweeping definition of "discrimination." <u>First</u>, Defendants make the circular claim that because the definition states that it only includes actions "applicable to, and to the extent permitted by the

applicable statute," it therefore cannot exceed the statute. HHS Br. 35. But that is precisely the problem: despite this purported disclaimer, the definition goes on to define the term in ways that are unprecedented, unconstitutional, and in excess of statutory authority. HHS's robust defense of the definition in this litigation confirms that the agency sees no conflict between the broad sweep of its definition and "the applicable statutes."

Second, HHS argues that it "declined to adopt Title VII's 'undue hardship' exception because 'Congress chose not to place that limitation on the protections set forth in the [later-in-time] Federal conscience and antidiscrimination laws.'" HHS Br. 59 (alteration in original) (citing 84 Fed. Reg. at 23,191). The Supreme Court has squarely rejected the type of inference HHS seeks to draw in comparing two different discrimination statutes. In *Jackson v. Birmingham Board of Education*, 544 U.S. 167, 174–75 (2005), the Supreme Court rejected a lower court's reasoning that since Title VII prohibits retaliation and Title IX does not mention it, retaliation must not be addressed by Title IX. *Id.* at 174. As the Supreme Court explained,

> Congress certainly could have mentioned retaliation in Title IX expressly, as it did in [Title VII] . . . Title VII, however, is a vastly different statute from Title IX, and the comparison . . . is therefore of limited use . . . . Title IX is a broadly written general prohibition on discrimination . . . . By contrast, Title VII spells out in greater detail the conduct that constitutes discrimination in violation of that statute. Because Congress did not list *any* specific discriminatory practices when it wrote Title IX, its failure to mention one such practice does not tell us anything about whether it intended that practice to be covered.

*Id.* at 175. Similarly, here, the generic non-discrimination language of the refusal statutes can hardly be construed as congressional abandonment of the longstanding principle that an employer's duty to accommodate employees' religious beliefs is not limitless.

What is more, it is difficult to credit HHS's argument when, in virtually the same breath that it rejects the undue hardship exception, it purports to borrow other aspects of Title VII that are not expressly written into the refusal statutes. Despite its rejection of an undue hardship exception,

HHS explained in the Rule that it "believes components of [Title VII's] approach are appropriate in this context and is therefore adding a new paragraph (4) to the definition of 'discriminate or discrimination' to properly recognize that the voluntary acceptance of an effective accommodation . . . will not, by itself, constitute discrimination." 84 Fed. Reg. 23,191. HHS reasoned that "it is *generally consistent* with the text and intent of Federal conscience and anti-discrimination laws to respect objections based on religious beliefs by accommodating them." *Id.* (emphasis added). But the refusal statutes are just as silent on the subject of "accommodations" as they are on the subject of the "undue hardship" exception; the latter is just as "generally consistent with the text and intent of Federal conscience and anti-discrimination laws," *id.*, as the former. Indeed, as far as federal anti-discrimination law goes, the concepts have always existed hand-in-hand. *See* 42 U.S.C. §§ 2000e(j), 2000e-2(a); 29 C.F.R. § 1605.2. HHS cannot now argue that Congress *intended* the refusal statutes to—*sub silentio*—borrow and modify Title VII's accommodation requirement, while jettisoning its undue hardship exception.

### 2.  "Assist in the performance"

In the Church Amendments, Congress used the phrase "assist in the performance" far less capaciously than HHS does in the Rule.[8] As Plaintiffs previously explained, *see* Providers' PI Br. 27–28; States' PI Br. 26–28, to "assist" is "to give support or aid," and a "performance" is "the execution of an action"; put together, "assist in the performance" means to give support or aid to the execution of an action. By limiting an objection to a particular "*performance*," Congress demonstrated that this "support or aid" must be closely and directly related to the "action."

---

[8] For context, Church (c)(1), for example, prohibits entities receiving specified federal funding from discriminating, in employment and in the extension of staff privileges, against "any physician or other health care personnel[] because" they "refused to perform or assist in the performance of such a procedure or abortion on the grounds that his performance or assistance in the performance of the procedure or abortion would be contrary to his religious beliefs or moral convictions . . . ." 42 U.S.C. § 300a-7(c)(1).

Although HHS purports to adopt the same definitions, *see* HHS Br. 30, the Rule empties them of their actual meaning. The Rule states that "assist in the performance" means:

> [t]o take an action that has a specific, reasonable, and articulable connection to furthering a procedure or a part of a health service program or research activity undertaken by or with another person or entity. This may include counseling, referral, training, or otherwise making arrangements for the procedure or a part of a health service program or research activity, depending on whether aid is provided by such actions.

84 Fed. Reg. at 23,263 (to be codified at 45 C.F.R. § 88.2). However, whereas Congress was focused on the actual performance, i.e. *execution*, of an abortion or sterilization procedure—whether directly or in assistance thereof—the Rule speaks merely of "furthering," or providing "aid," regardless of whether and when a procedure is actually performed. For example, by incorporating the definition of "referral" (also defined broadly, *see infra*), according to HHS, even providing information that could in some way inform a patient's decision whether to have an abortion, such as telling a patient that abortion is an option, would fall under its definition of "assist in the performance" of an abortion. *Id.* at 23,188.

As a matter of ordinary meaning, no one would think that informing a patient of all options, including those they may never pursue, constitutes assisting in the *performance* of a procedure. Because the agency has strayed from the ordinary meaning of the terms in the statute in order to advance a wholly different agenda than the one Congress intended, *see infra*, the Rule impermissibly expands the meaning of "assist in the performance."[9]

The history of the Church Amendments underscores that HHS has exceeded its authority. They were enacted in direct response to a single event: a district court opinion that enjoined a

---

[9] In the preamble to the Rule, HHS claims that this definition "preclude[s] vague or attenuated allegations that do not support a claim of assisting in a procedure or health service program or research activity." 84 Fed. Reg. at 23,187, but as Plaintiffs have explained—and HHS's own examples establish—that is precisely what the definition allows.

religiously-affiliated hospital from prohibiting the performance of sterilization procedures, on the basis that the hospital had acted "under the color of state law" because it received federal funds. *See, e.g.*, *Taylor v. St. Vincent's Hosp.*, 523 F.2d 75, 76 (9th Cir. 1975); *see also Watkins v. Mercy Med. Ctr.*, 364 F. Supp. 799, 801 n.6 (D. Idaho 1973), *aff'd*, 520 F.2d 894 (9th Cir. 1975) (recognizing that the "background" for the Church Amendment "is an injunction issued in November 1972 by the United States District Court for the District of Montana in *Taylor v. St. Vincent's Hospital* . . . enjoin[ing] [the hospital] from prohibiting Mrs. Taylor's physician from performing in that a hospital a sterilization procedure on her"). In other words, the purpose was to prevent the receipt of federal funds from being used as the justification for coercing the actual performance of one of the objected-to procedures. As Senator Church, the Amendments' sponsor, explained, "[t]here is no intention here to permit a frivolous objection from someone unconnected with the procedure to be the basis for a refusal to perform what would otherwise be a legal operation." 119 Cong. Rec. 9,597 (1973) (statement of Sen. Church).[10]

Yet even if there is some ambiguity in the statutory phrase, *but see supra*, and even if HHS had been delegated authority to resolve such ambiguity, *but see supra*, its interpretation fails at *Chevron* Step Two. Twisting the statute as enacted by Congress to allow refusal to perform job duties having no close nexus to the *performance* of an abortion is not a reasonable interpretation that the agency is entitled to adopt.

---

[10] Defendants argue that courts should only look to a sponsor's statements "when the legislation lacks an accompanying committee report." HHS Br. 31–32. This misreads the case law. "[A]s those of the sponsor of the language ultimately enacted," Senator Church's statements "are an authoritative guide to the statute's construction." *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 526–27 (1982); *see also Disabled in Action of Metro. N.Y. v. Hammons*, 202 F.3d 110, 124 (2d Cir. 2000) ("We focus on the most authoritative and reliable materials of legislative history, including: the conference committee report, committee reports, sponsor/floor manager statement and floor and hearing colloquy.").

### 3.   "Referral" or "Refer for"

HHS's definition of **"referral"** or **"refer for"** is also so broad that it defies plain meaning and must be set aside. HHS defines "referral" or "refer for" to include the provision of

> information in oral, written, or electronic form (including names, addresses, phone numbers, email or web addresses, directions, instructions, descriptions, or other information resources), where the purpose or reasonably foreseeable outcome of provision of the information is to assist a person in receiving funding or financing for, training in, obtaining, or performing a particular health care service, program, activity, or procedure.

84 Fed. Reg. at 23,264. This extremely broad definition does not comport with the common understanding of these terms and, as such, with the refusal statutes. An example demonstrates the unduly broad quality of this definition: under the Final Rule, if a patient learns she is pregnant and asks a nurse or counselor whether abortion is legal in her state, the nurse or counselor could invoke the Rule and refuse to answer the question on the grounds that doing so constitutes a "referral" for abortion. Defendants do not dispute that their definition would protect such conduct, despite that, as many commenters explained,[11] defining "referral" or "refer for" in this manner is contrary to principles of informed consent and medical ethics. By permitting any individual working in the health care setting to impede a patient's access to care and information, the expansive definition of "referral" defies the ordinary understanding of the term. Defendants can point to no evidence in the statutes or their legislative histories that indicates that Congress used these terms with anything other than their commonly understood meanings in mind.[12]

---

[11] *See, e.g.,* AR 000138106 (Comment, NFPRHA, ECF No. 180-23 (Ex. 89)), AR 000147753 (Comment, ACLU, ECF No. 180-34 (Ex. 100)), AR 000160756 (Comment, PPFA, ECF No. 180-47 (Ex. 113)).

[12] For much the same reasons, and also for the reasons explained above, *see supra* Part II.A.2, HHS's inclusion of the term "referral" within its definition of "assist in the performance" drastically and improperly expands the Church Amendments. Neither the plain language of Church nor the legislative history supports an interpretation of the statute that equates providing essentially any information in any form about abortion to a pregnant person as directly "assisting in the

Indeed, the expansive definition of "referral" in the Rule does not even comport with HHS's *own* statements about the term, as evidenced by its position in other litigation. *See* Appellants' Opening Brief at 26, *Washington v. Azar*, No. 19-35394 (9th Cir. May 31, 2019) ("In this program *and in general*, counseling [including information] and referrals are distinct. '[P]regnancy counseling' involves providing information about medical options, which is different from referring a patient to a specific doctor for a specific form of medical care." (emphasis added)). Thus, as HHS has conceded elsewhere, the ordinary understanding of what it means for someone to provide a "referral" or to "refer for" is not so expansive as to encompass merely providing a patient information (in essentially any form) regardless of how limited the information.

### 4. "Health care entity"

HHS likewise substantively amends the Coats-Snowe and Weldon Amendments by altering—and expanding—the definition of "health care entity."

<u>First</u>, in Coats-Snowe, Congress defined "health care entity" to include "an individual physician, a postgraduate physician training program, and a participant in a program of training in the health professions." 42 U.S.C. § 238n(c)(2). Of relevance here, Coats-Snowe prohibits the federal government, and state and local governments that receive federal funding, from discriminating against "any health care entity . . . on the basis that" the entity "refuses to undergo training in the performance of induced abortions, to require or provide such training, to perform such abortions, or to provide referrals for such training or such abortions," 42 U.S.C. § 238n(a)(1), or "refuses to make arrangements" for any such activities, *id.* § 238n(a)(2).

---

performance" of an abortion. Defendants state only that "not all referrals constitute assisting in the performance," since the Rule states that "assist in the performance . . . *may* include counseling [or] referral." HHS Br. 33 (quoting 84 Fed. Reg. at 23,263). Yet, it is entirely unclear how a covered entity will know when action that falls under the definition of "referral" will not be considered by HHS to be "assisting in the performance."

Congress chose to focus on a select group of individuals involved in the abortion training context in its definition of "health care entity" in Coats-Snowe.[13] Specifically, Senator Coats, one of the sponsors, stated that what he "was trying to do with [the Coats] [A]mendment was simply address the question of training for induced abortions." 142 Cong. Rec. 5,158 (1996) (statement of Sen. Coats); *see also* 142 Cong. Rec. 4,926 (1996) (statement of Sen. Coats) ("We are simply saying that if [ACGME] did not accredit because a hospital . . . decided not to mandate the requirement of teaching their residents abortion procedures, that they will not be in a position of losing their funds."). Similarly, Senator Snowe referred to the Amendment as affecting individuals who are participating in medical training programs and institutions that refuse to provide abortion training. 142 Cong. Rec. 5,171, 5,172 (2006). The amendment passed and was titled "Abortion-related discrimination in governmental activities regarding training and licensing *of physicians*." 42 U.S.C. § 238n (emphasis added).

Despite the limited purpose of Coats-Snowe, HHS now seeks to greatly expand the statute by redefining "health care entity" to also include, *inter alia*: "other health care professionals, including a pharmacist"; "health care personnel"; or "any other health care provider or health care

---

[13] Coats-Snowe was enacted in response to a newly-adopted standard of the Accreditation Council for Graduate Medical Education ("ACGME") that required all obstetrics and gynecology programs to provide training in induced abortions *See* Accreditation Council for Graduate Med. Educ., Program Requirements for Residency Education in Obstetrics and Gynecology, 1996–1997 Graduate Medical Education Directory 131, 135 (1996), https://www.acgme.org/Portals/0/PDFs/1996-97.pdf (last visited June 11, 2019). Although the new standard stated that "no program or resident with a religious or moral objection [would] be required to provide training in or perform induced abortions," Senator Coats found the exemption inadequate because it did not exempt secular hospitals, most of which—as he believed—did not require mandated abortion training. According to Senator Coats, that was "the essence of the amendment." 142 Cong. Rec. 4,926 (1996); *see also id.* ("[T]he language . . . offered in the bill . . . basically said that . . . it is [not] right that the Federal Government could discriminate against hospitals or ob/gyn residents simply because they choose, on a voluntary basis, not to perform abortions or receive abortion training, for whatever reason.").

facility," and "[a]s applicable, components of State or local governments." 84 Fed. Reg. at 23,264 (to be codified at 45 C.F.R. § 88.2). The inclusion of these additional individuals and entities far exceeds Congress' intent as they could have nothing to do with ob-gyn resident training.

Second, as explained above, the Weldon Amendment provides that no funds may accrue "to a Federal agency or program, or to a State or local government," if the recipient "subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions." Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. No. 115-245, 132 Stat. 2981, 3118 (2018). Congress crafted a definition of "health care entity" that "includes an individual physician or other health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization, or plan." 132 Stat. at 3118(b). The Weldon Amendment's sponsor made clear that it was meant to apply to this limited group of "*physicians, nurses, clinics, hospitals, medical centers, and even health insurance providers*." 150 Cong. Rec. H10,090 (Nov. 20, 2004) (statement of Rep. Weldon) (emphasis added).

HHS now seeks to expand the reach of Weldon by redefining health care entity to further include, among a long list of terms, "a plan sponsor or third-party administrator." 84 Fed. Reg. at 23,264 (to be codified at 45 C.F.R. § 88.2). But neither of these entities fall under the categories Weldon intended to cover, as evidenced by the narrow list Congress created (and Senator Weldon's own statement).[14]

---

[14] The Rule also includes under the definition of "health care entity" for Weldon terms such as "a participant in a program of training in the health professions;" "an applicant for training or study in the health professions;" "a postgraduate physician training program;" and "an entity engaging

Defendants and Defendants-Intervenors argue that, because Congress used the term "include" in its definition for Coats-Snowe and Weldon, what follows must be non-exhaustive. HHS Br. 38; Def.-Int. Br. 13. But the term "include" does not turn the statute into a free-for-all. *See Wojchowski v. Daines*, 498 F.3d 99, 108 (2d Cir. 2007) (a term must be "construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words" (quoting *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003))). Not even the "catch-all phrases" to which Defendants point, HHS Br. 38, are broad enough to encompass HHS's expansion. For example, while Coats-Snowe refers to "a participant in a program of training in the health professions," neither a "pharmacist," a "pharmacy," a "medical laboratory," nor "an entity engaging in biomedical or behavioral research" would be a participant in such training programs. But HHS seeks to extend Coats-Snowe to include these terms. Similarly, while Weldon refers to "other health care professional" and "any other kind of health care facility, organization, or plan," HHS is now trying to put under those umbrellas (a) a "plan sponsor," which reaches employers with no connection to health care other than the provision of employee benefits, and (b) a "third-party administrator," which simply processes benefit claims. This stretches Weldon far beyond its intended reach.

## B. The Rule Conflicts with EMTALA

HHS does not meaningfully dispute that, as Provider Plaintiffs have explained, *see* Providers' PI Br. 31–34, the Rule would allow for refusals of care that conflict with the mandates of the Emergency Medical Treatment and Labor Act ("EMTALA"). *See* HHS Br. 47 (stating only

---

in biomedical or behavioral research." These terms are found in the Church and Coats-Snowe Amendments but were excluded in Weldon. Congress' use of these terms in other related statutes makes clear that Congress knew how to draft legislation that would cover these entities but chose not to in Weldon. HHS has no authority to redefine a statutory term in a manner that Congress chose to forgo.

that "HHS *generally* agrees . . . that fulfilling the requirements of EMTALA would not conflict" with the Rule (emphasis added)). Indeed, faced with concerns by commenters, HHS responded that "where EMTALA might apply in a particular case, the Department would apply both EMTALA and the relevant law under this rule harmoniously *to the extent possible*." 84 Fed. Reg. at 23,188 (emphasis added).[15] But the plain language of EMTALA is not optional, allowing for the withholding of statutorily mandated emergency care on a case-by-case basis. *See* Providers' PI Br. 33. Rather than address this conflict, HHS asks this Court to ignore the Rule's undeniable consequence of allowing individuals and institutions to withhold emergency care in at least some instances, and to simply assume that those individuals and institutions will not exercise the rights that the Rule purports to give them. HHS Br. 47–48. Particularly in light of the administrative record, which is replete with examples of religiously-motivated refusals to provide emergency care, this is plainly insufficient to save the Rule from its inconsistency with EMTALA.

EMTALA requires hospitals with an emergency room to provide medical screening and stabilizing treatment, or a medically beneficial transfer, to any individual experiencing an

---

[15] For example, HHS explicitly refused to answer whether an emergency medical technician or paramedic would be required to transport a person with an ectopic pregnancy for an emergency abortion, claiming it "would depend on the facts and circumstances." 84 Fed. Reg. at 23,188. Defendants-Intervenors posit that an EMT may not deny emergency treatment in this circumstance because "the Rule does not allow EMTs to deny transportation services if they merely suspect 'that an objected-to service or procedure may occur.'" Def.-Int. Br. 20 (citing 84 Fed. Reg. at 23,188). But an abortion is the typical course of treatment for an ectopic pregnancy. *See* Angel M. Foster, Amanda Dennis & Fiona Smith, *Do Religious Restrictions Influence Ectopic Pregnancy Management? A National Qualitative Study*, 21 Women's Health Issues 104 (2011), https://www.ncbi.nlm.nih.gov/pubmed/21353977 (cited at, *e.g.,* AR 000071478 (Comment, Health Care for All, ECF No. 180-11 (Ex. 77)), AR 000071571 (Comment, Consumer Health First, ECF No. 180-12 (Ex. 78)), AR 000071752 (Comment, LHI-Houston, ECF No. 180-13 (Ex. 79)), AR 000137859 (Comment, New Voices for Reprod. Justice, ECF No. 180-19 (Ex. 85)), AR 000138090 (Comment, Cmty. Catalyst, ECF No. 180-22 (Ex. 88))); *see also* Decl. of Stephen Todd Chasen (Chasen Decl.) ¶¶ 8–9, 21–29, attached as Ex. F to Providers' PI Br. And, in any event, Defendants-Intervenors cannot refute HHS's own admission that such a denial of care could be permissible under the Rule.

emergency medical condition. *See* 42 U.S.C. § 1395dd(a)–(c). In addition, EMTALA imposes civil penalties against hospitals and individual physicians who violate its terms and creates a private right of action against hospitals for any individual who "suffers personal harm as a direct result of a participating hospital's violation of [EMTALA]." *Id.* § 1395dd(d)(2)(A). The plain language of EMTALA allows for no exceptions for abortions or for religiously-motivated refusals of emergency care. Defendants do not attempt to suggest otherwise, nor do Defendants dispute that the legislative history of the refusal statutes makes plain that those statutes were never intended to allow for the denial of appropriate treatment to people in need of emergency abortions. *See* States' PI Br. 34 (quoting Rep. Weldon); *see also* Providers' PI Br. 34 (quoting Rep. Weldon and Sen. Church). In fact, despite numerous assertions that the Rule does nothing more than faithfully implement the refusal statutes, HHS conveniently fails to mention a court's holding that "[t]here is no clear indication, either from the express language of the Weldon Amendment or from a federal official or agency" that requiring emergency abortion services would *ever* violate the Weldon Amendment. *California v. United States*, No. C05-00328, 2008 WL 744840, at *4 (N.D. Cal. Mar. 18, 2008).

HHS's sole response to this claim—that the conflict between the Rule and EMTALA is a mere "hypothetical" that "rests on the untenable assumption that, in the event of an emergency, there will be no provider who is willing to assist a patient with an emergency medical condition," *see* HHS Br. 47—is demonstrably false.[16] But Defendants' characterization of the problem is

---

[16] As such, Defendants' reliance on *Reno v. Flores*, 507 U.S. 292, 309 (1993), is misplaced. *See* HHS Br. 47. In *Flores*, a constitutional challenge to certain immigration procedures, the Supreme Court refused to assume that "an excessive delay [would] invariably ensue" under regulations that did not "set a time period within which the immigration-judge hearing, if requested, must be held" because "there [was] no evidence of such delay, *even in isolated instances*." 507 U.S. at 309 (emphasis added). In other words, in the face of ambiguity, the Court refused to assume that a constitutional violation would occur. Here, by contrast, ample evidence exists to support the Rule's

wildly overbroad—the record is clear that objections from just one member on a team or ambulance crew can disrupt the provision of care. Indeed, contrary to what Defendants argue, the Rule's very definition of "discriminate" will prevent hospitals "from making staffing and scheduling decisions necessary to ensure that patients facing emergencies receive treatment," HHS Br. 48, thereby contributing to this conflict. As discussed above, the Rule imposes an absolute accommodation requirement on employers without taking into account the burden on employers and patients. Thus, a hospital can only "use alternate staff or methods to provide or further any objected-to conduct," HHS Br. 48, if those alternatives are "voluntarily accept[ed]" by the objecting employee, 84 Fed. Reg. at 23,263 (to be codified at 45 C.F.R. § 88.2).

One example from the case law suffices to show what this would mean for emergencies. In *Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 222–23 (3d Cir. 2000), the Third Circuit considered a Title VII claim by a nurse (Shelton) who was fired after multiple refusals to assist in emergency procedures involving pregnant patients. In one case, Shelton refused to assist in a cesarean section delivery to "treat an[] emergency patient [experiencing placenta previa] . . . who was 'standing in a pool of blood,'" even though the patient's condition was "life-threatening," because Shelton considered the premature delivery of the fetus to be an abortion. *Shelton*, 223 F.3d at 223. Shelton's refusal delayed the life-saving procedure for thirty minutes until another nurse could be assigned to the procedure. *Id.* Because staffing constraints made it impossible to guarantee that there would always be another staff member to cover for her, and because Shelton's actions put patients at risk, the hospital offered, among other solutions, to accommodate Shelton's religious beliefs by offering a lateral transfer to the Newborn Intensive Care Unit. *Id.* Shelton

---

textual and factual conflict with EMTALA, and none of Defendants' or Defendants-Intervenors' arguments to the contrary withstand scrutiny.

refused the transfer, was terminated, and sued. *Id.* The Third Circuit affirmed the district court's finding that the hospital did not violate Title VII, recognizing that "we believe public trust and confidence requires that a public hospital's health care practitioners—with professional ethical obligations to care for the sick and injured—will provide treatment in time of emergency." *Id.* at 228. Under the Rule, however, the hospital would have been forced to permit Shelton to categorically refuse to provide emergency abortion care or face termination of *all* its federal funding by the Department—risking serious harm to patients. *See* 84 Fed. Reg. at 23,271–72 (to be codified at 45 C.F.R. § 88.7(i)).

It is no answer to this significant public health threat to suggest that Plaintiffs should "double certain staff positions" in order to mitigate the EMTALA violations caused by the Rule. HHS Br. 48. As the American College of Emergency Physicians noted in its public comments to the Rule, patients with life-threatening injuries and illnesses often cannot wait for another physician to treat them if their current provider refuses to provide care. AR 000147981–85 (Comment, Am. Coll. of Emergency Physicians, ECF No. 180-40 (Ex. 106)). Moreover, emergency departments "operate on tight budgets" and so "do not have the staffing capacity to have additional personnel on hand 24 hours a day, 7 days a week to respond to different types of emergency situations that might arise involving patients with different backgrounds, sexual orientations, gender identities, or religious or cultural beliefs." AR 000147982 (Comment, Am. Coll. of Emergency Physicians, ECF No. 180-40 (Ex. 106)). Yet the Rule demands that emergency departments "anticipate every possible basis for a religious or moral objection" and staff accordingly—an impossible standard to meet. *Id.*; *see also* AR 000139746 (Comment, Alameda Cty., ECF No. 180-27 (Ex. 93)).

Further examples put the lie to HHS's claim that it is not aware of any instance where "every single available member of the hospital staff, or every member of an ambulance team, will object on religious or moral grounds to providing care and to transferring the patient to another facility." HHS Br. 47. As Plaintiffs previously noted, Providers' PI Br. 32 n.20, HHS highlighted the case of Tamesha Means who was turned away from the only hospital in her area three times when her water broke at 18 weeks of pregnancy, causing her to develop a life-threatening infection. Because of its religious affiliation, the hospital did not inform Ms. Means that terminating her pregnancy was the safest course for her condition, putting her health at risk. Moreover, multiple commenters pointed HHS to further examples in which entire religiously affiliated hospitals refused to provide women with life-saving miscarriage management, including journal articles describing this serious issue.[17] In situations like these, the Rule would conflict with EMTALA by

---

[17] *See, e.g.*, Lori R. Freedman, Uta Landy & Jody Steinauer, *When There's a Heartbeat: Miscarriage Management in Catholic-Owned Hospitals*, 98 Am. J. Public Health 1774 (2008), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2636458/ ("Our interviews with US obstetrician–gynecologists working in Catholic-owned hospitals revealed that they are also restricted in managing miscarriages.") (produced at AR 000548500–504, ECF No. 180-68 (Ex. 134); cited at, *e.g.*, AR 000008429 (Comment, Nat'l Ass'n of Councils on Developmental Disabilities, ECF No. 180-9 (Ex. 75)), AR 000135569 (Comment, Ky. Voices for Health, ECF No. 180-16 (Ex. 82))); *see also Refusals to Provide Health Care Threaten the Health and Lives of Patients Nationwide*, Nat'l Women's Law Center (2017), https://nwlc.org/resources/refusals-to-provide-health-care-threaten-the-health-and-lives-of-patients-nationwide/ ("A patient in an urban northeastern Catholic hospital experiencing a miscarriage nearly died because of the hospital's refusal to treat her. The patient's physician recalled that the 'woman [wa]s dying before our eyes,' but the hospital's religious directives forbid appropriate treatment.") (cited at, *e.g.*, AR 000055623 (Comment, Or. Found. for Reprod. Health, ECF No. 180-3 (Ex. 69)), AR 000066546 (Comment, Raising Women's Voices, ECF No. 180-5 (Ex. 71)), AR 000067668 (Comment, In Our Own Voice: Nat'l Black Women's Reprod. Agenda, ECF No. 180-8 (Ex. 74))). In the preamble to the Rule, HHS discounts the Freedman study—which was a peer-reviewed and IRB-approved research study—because it relies on what HHS inaccurately terms "anecdotal" evidence, *see* 84 Fed. Reg. at 23,247 ("Anecdotal accounts of such a limited nature do not provide the Department with a robust basis for estimating the rule's impact on the management of miscarriages."), and yet in the same breath HHS explains that it promulgated the Rule because of "significant anecdotal evidence of violations of the very conscience laws that Congress has enacted to protect such providers," *id.*; *see also* HHS Br. 54 ("HHS's policy determination relied on its own analysis, the

allowing refusals to provide pregnant people suffering emergency medical conditions with abortions necessary to stabilize them in accordance with the standard of care. And, as HHS is also well aware, Catholic hospitals have in the past relied on institutional policies or directives to object to such services as treatment for ectopic pregnancies—an issue raised repeatedly in the public comments to the Rule.[18] While Defendants-Intervenors protest that they would not object to providing care for miscarriage management or ectopic pregnancies, *see* Def.-Int. Br. 8–9, 19; Decl. of David Stevens Supp. Mot. Summ. J. Opp'n Pls.' Mots. Prelim. Inj. ("Stevens Decl.") ¶¶ 20, 22–24, ECF No. 151 (No. 1:19-cv-4676); Decl. of Regina Renee Frost Supp. Intervenors' Mot. Summ. J. Opp'n Pls.' Mots. Prelim. Inj. ("Frost Decl.") ¶ 14–16, ECF No. 152 (No. 1:19-cv-4676),[19] the Rule's application extends beyond CMDA and its members.

---

comments it received in response to the NPRM, *anecdotal evidence*, and, yes, the 2009 poll." (emphasis added)).

[18] *See, e.g.*, Angel M. Foster et al., *supra* note 15 (cited at, *e.g.,* AR 000071478 (Comment, Health Care for All, ECF No. 180-11 (Ex. 77)), AR 000071571 (Comment, Consumer Health First, ECF No. 180-12 (Ex. 78)), AR 000071752 (Comment, LHI-Houston, ECF No. 180-13 (Ex. 79)), AR 000137859 (Comment, New Voices for Reprod. Justice, ECF No. 180-19 (Ex. 85)), AR 000138090 (Comment, Cmty. Catalyst, ECF No. 180-22 (Ex. 88))); *see also* Rob Stein, *Religious Hospitals' Restrictions Sparking Conflicts, Scrutiny*, Wash. Post, Jan. 3, 2011, https://www.washingtonpost.com/health-environment-science/religious-hospitals-restrictions-sparking-conflicts-scrutiny/2011/01/03/ABVVxmD_story.html (cited at, *e.g.,* AR 000055624 (Comment, Or. Found. for Reprod. Health, ECF No. 180-3 (Ex. 69)), AR 000066547 (Comment, Raising Women's Voices, ECF No. 180-5 (Ex. 71)), AR 000071478 (Comment, Health Care for All, ECF No. 180-11 (Ex. 77)), AR 000071571 (Comment, Consumer Health First, ECF No. 180-12 (Ex. 78)), AR 000071752 (Comment, LHI-Houston, ECF No. 180-13 (Ex. 79)), AR 000137859 (Comment, New Voices for Reprod. Justice, ECF No. 180-19 (Ex. 85)), AR 000138090 (Comment, Cmty. Catalyst, ECF No. 180-22 (Ex. 88))).

[19] To the extent Defendants-Intervenors seek to rely upon the portions of David Stevens' declaration in which he "reviewed the statements of faith of other major denominations and confirmed that other religious traditions allow healthcare providers to treat ectopic pregnancies," Def.-Int. Br. 8–9 (citing Stevens Decl. ¶¶ 20, 22), or his conclusion that there is no "faith tradition that teaches that providing care for a woman going through a miscarriage is religiously objectionable," *id.* at 9 (citing Stevens Decl. ¶ 24), this evidence is inadmissible both because it falls outside the record and because Mr. Stevens was not proffered to the Court as an expert on world religions.

A federal agency cannot order third parties to violate a federal statute. Because the Rule conflicts with EMTALA, it is contrary to law and exceeds HHS's authority.

### C.  The Rule Conflicts with Title X

As Plaintiffs explained in their preliminary injunction brief, Providers' PI Br. 34–37, since 1996, Congress has annually mandated that within the Title X program "all pregnancy counseling shall be *nondirective*." *See* 132 Stat. at 3070–71 (emphasis added). This mandate requires that Title X providers' pregnancy counseling must offer pregnant patients neutral information about all their options, including abortion, and address the option(s) in which the patient is interested. The Rule directly conflicts with Title X's plain statutory text and clear Congressional mandates by purporting to establish an absolute right for individuals and entities, even if funded through Title X and providing pregnancy counseling, to refuse to provide any information about abortion to Title X patients.

A regulation cannot override a statute, and HHS concedes that under its view, the Final Rule trumps Title X's statutory mandate that all counseling be nondirective. According to HHS, "Title X providers are free to ensure that patients receive the full range of available Title X services—they simply must do so while also accounting for the protections provided under the Federal Conscience Statutes." HHS Br. 49. But under the Rule, a Title X provider is not free to ensure that patients continue to receive nondirective options counseling. Rather, under the Rule, a Title X provider is required to keep on staff an employee who refuses to provide certain family planning services or even information about a patient's pregnancy options, and must do so at all costs—even if it means a Title X provider must double-staff its centers and even if it means a patient may not receive the care Congress stated Title X patients are entitled to receive.

HHS next mistakenly suggests that Plaintiffs' argument rests on a finding that Congress implicitly "repealed" the refusal statutes. *Id.* at 51. HHS is again attempting to deflect attention

away from the unlawful Rule and back to the refusal statutes, which have coexisted with the nondirective options mandate for years. *See* AR 000147758–59 (Comment, ACLU, ECF No. 180-34 (Ex. 100)). "Implied repeal" simply is not at issue here. Rather, it is the Final Rule that directly conflicts with Title X and therefore is invalid under the APA.

### D. The Rule Conflicts with Section 1554 of the Affordable Care Act

The Refusal Rule directly conflicts with Section 1554 of the Affordable Care Act ("ACA"), which prohibits HHS from promulgating any regulation that

> (1) creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care; (2) impedes timely access to health care services; (3) interferes with communications regarding a full range of treatment options between the patient and the provider; (4) restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decision; (5) violates the principles of informed consent and the ethical standards of health care professionals; or (6) limits the availability of health care treatment for the full duration of a patient's medical needs.

42 U.S.C. § 18114. Indeed, the Rule violates *each* of these provisions. Providers' PI Br. 37–38; States' PI Br. 30–32.

None of HHS's responses are persuasive. First, HHS argues that the Rule does not violate Section 1554 because that section only prohibits "*denial*[s] of information or services" and the Rule "denies nothing." HHS Br. 43. This mischaracterizes both Section 1554 and the Rule. To the contrary, Section 1554 goes well beyond prohibiting outright *denials* of services and information—it prohibits regulations that, among other things, "*create[]* . . . *barriers* to," "*impede*[] . . . access to," "*interfere*[] with," "*restrict*," and "*limit*" healthcare and related information.

The Rule plainly violates those provisions. *See* Providers' PI Br. 37–38. For example, the Rule's expansive definitions allow individuals to refuse to take "any action that has a specific, reasonable, and articulable connection to furthering" an abortion, including "making

36

arrangements." 84 Fed. Reg. at 23,263. Contrary to medical ethics, the Rule also allows individuals to refuse to even inform patients that abortion is the standard of care for treating ectopic pregnancies, which can be a life-threatening condition. *See supra* Part II.B; Providers' PI Br. 28–29, 32. As HHS readily admits, this means that a strikingly broad range of individuals—from receptionists to medical staff—may prevent patients from accessing care by withholding this information.

These are not abstract hypotheticals. For instance, the Rule could force Plaintiff Public Health Solutions to hire a nurse for its home nursing program who will refuse to answer a patient's questions about abortion[20] or force a public hospital in New York to hire a front-desk worker who will refuse to schedule an abortion[21]—and then prevent either from transferring, reassigning, or rescheduling those employees *unless* the employee agrees—despite the hardship it will cause for the employer.[22] In other words, the Rule forces health care employers regulated by the Rule to hire individuals who will not perform core job functions and then affords those individuals full veto power over any steps an employer might take to ensure that the objected-to information or service can still be provided. Quite plainly, the Rule creates a barrier, impediment, interference, restriction or limitation—and a denial—of services or information.

---

[20] *See* First David Decl. ¶ 31; *see also* 84 Fed. Reg. at 23,263 (Stating that a covered entity may not "require a protected entity to inform it of objections to performing, referring for, participating in, or assisting in the performance of specific procedures . . . counseling, or treatments" until "after . . . hiring" the protected entity).

[21] *See* Decl. of Dr. Machelle Allen ¶¶ 26–29, ECF No. 43-5 (No. 1:19-cv-4676) (listing staff, including registration clerks, who could refuse service under the rule); Decl. of Michael Lucchessi, M.D. ¶¶ 19–21, ECF No. 43-29 (No. 1:19-cv-4676) (same); 84 Fed. Reg. at 23,264 (clarifying that individuals may refuse to "schedule[e] an abortion").

[22] *See* 84 Fed. Reg. at 23,191 (explaining that, under the Rule, "the *voluntary acceptance* of an effective accommodation of protected conduct, religious beliefs, or moral convictions, will not, by itself, constitute discrimination," but rejecting the "concept of an 'undue hardship' exception for reasonable accommodations").

HHS's summary attempt to reframe the Rule—arguing that it does not "impede . . . anything," but "simply limits what the government chooses to fund," HHS Br. 44 n.5—is misleading and unresponsive. The vast majority of the provisions within the refusal statutes—such as Church (c)(1), Church (c)(2), Coats-Snowe (a), and Weldon—are not limited to constraining what a recipient can do with government funds; rather, they impose obligations that extend to activities that are *not* funded by the government.[23] And in any event, HHS provides no explanation for the surprising proposition that Section 1554 is flatly inapplicable when HHS regulates government-funded programs, many of which are vital to public health. Nothing in the text of Section 1554—which prohibits HHS from promulgating "any" regulation with the prohibited effects—suggests that Congress intended that provision to be so anemic. HHS is barred from issuing regulations that have particular *effects*, like "creat[ing]" barriers, "imped[ing] timely access," and "interfer[ing]" with communications. The Rule has exactly those effects, and its violation of Section 1554 is not altered by the fact that the Rule is "only" enforced by the threat of a massive loss of funding.

    <u>Second</u>, HHS argues that Section 1554 only limits regulations promulgated under the ACA. This has absolutely no grounding in the statute. Again, the statute says that HHS "shall not promulgate *any* regulation" that has the prohibited effects. 42 U.S.C. § 18114 (emphasis added). Moreover, Congress knows how to limit the applicability of a restriction when it wants to do so, as demonstrated by the immediately preceding section of the statute. *See* 42 U.S.C. § 18113 ("[A]ny State or local government or health care provider that receives Federal financial assistance

---

[23] 42 U.S.C. §§ 300a-7(c)(1), (2); 42 U.S.C. § 238n(a); Pub. L. 115–245, Div. B, sec. 507(d). This is made clear when contrasted with Church(d), which "Congress narrowly focused" to apply only to "health service programs funded under a program administered by the Secretary," but not to "medical treatments and services performed by [recipients] [that] are not 'part of' a health service program receiving funding from HHS." 84 Fed. Reg. at 23,189.

*under this Act* . . . or any health plan created *under this Act* . . . , may not subject an individual or institutional health care entity to discrimination on the basis that the entity does not provide any" health care item or service for use in assisted suicide (emphasis added)).

This reading is not undermined by Section 1554's "notwithstanding" clause, which HHS wrongly reads as limiting the statute's applicability. "A 'notwithstanding' clause does not naturally give rise to . . . [the negative] inference" drawn by HHS here; "it just shows which of two or more provisions prevails in the event of a conflict." *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 940 (2017).[24] The "notwithstanding" clause here simply "signals the drafter's intention that the provisions" of Section 1554 "override conflicting provisions of any other section" of the ACA. *Conyers v. Rossides*, 558 F.3d 137, 145 (2d Cir. 2009) (quoting *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993)). It does *not*, however, limit Section 1554's applicability. "Had Congress intended" to do that, "it could easily have chosen clearer language." *SW Gen., Inc.*, 137 S. Ct. at 939.

HHS's other arguments also fail. Invoking the principle that Congress does not "hide elephants in mouseholes," HHS asserts that the Court should not adopt "Plaintiffs' argument . . . that Congress essentially abrogated the [refusal] [s]tatutes through Section 1554." HHS Br. 43–44. But HHS again misconstrues Plaintiffs' position, which does *not* read Section 1554 to abrogate the refusal statutes. Indeed, Plaintiffs' argument is that the Final Rule's expansive interpretation—not its underlying statutes—violates Section 1554. HHS nevertheless seems determined to

---

[24] Justice Roberts provides a helpful analogy: "Suppose a radio station announces: 'We play your favorite hits from the '60s, '70s, and '80s. Notwithstanding the fact that we play hits from the '60s, we do not play music by British bands.' You would not tune in expecting to hear the 1970s British band 'The Clash' any more than the 1960s 'Beatles.' The station, after all, has announced that 'we do not play music by British bands.' The 'notwithstanding' clause just establishes that this applies even to music from the '60s, when British bands were prominently featured on the charts. No one, however, would think the station singled out the '60s to convey implicitly that its categorical statement 'we do not play music by British bands' actually did not apply to the '70s and '80s." *SW Gen., Inc.*, 137 S. Ct. at 940.

misrepresent Plaintiffs' position, asserting that "Plaintiffs' objection is not so much to the Rule as to the [refusal] [s]tatutes that the Rule interprets." HHS Br. 43.[25] This assertion is not surprising as it is grounded in the agency's incorrect contention that the Rule is a faithful interpretation of the refusal statutes. HHS Br. 2, 43. This is simply not true—the Rule dramatically and impermissibly expands the scope of refusal rights beyond those provided in statute. *See supra* Part II.A; Providers' PI Br. 27–31. While such unfettered rights to refuse care *do* conflict with Section 1554, those rights stem, not from the refusal statutes, but from HHS's unlawful Rule. *Id.* It is HHS's policy choice to issue a Rule with these extreme interpretations that causes the effects prohibited by Section 1554. Accordingly, the Court may find that the Rule violates Section 1554 without "gutt[ing]" the underlying statutes.

HHS's argument that Section 1554 "must give way to" to the refusal statutes under the general versus specific canon fails for similar reasons. As HHS notes, that canon is "applied to statutes when a general permission or prohibition is contradicted by a specific prohibition or permission." HHS Br. 46 (citations omitted). But, as just explained, there is no conflict between Section 1554 and the refusal statutes.[26]

---

[25] HHS also asserts that "[u]nder Plaintiffs' theory, any time a . . . health care entit[y] declines to provide a service to which it objects, HHS would violate Section 1554[.]" HHS Br. 43. Again, this is incorrect. The Rule creates unprecedented rights for health care providers to withhold access to services and information while, at the same time, making it difficult, if not impossible, for their employers to ensure alternative means of providing those services and information. *That* is what violates Section 1554.

[26] HHS's final defense—which half-heartedly suggests that a regulation's compliance with Section 1554 might be unreviewable—fares no better. That "very narrow" exception to APA review—applicable only "in those rare instances" where "there is no law to apply"—does not apply here. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 104–05 (1977). Section 1554 is in fact *more* specific than many other statutes found subject to judicial review. *See, e.g.*, *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2567–69 (2019) (rejecting challenge to the reviewability of agency action taken under the Census Act, which directs the Commerce Secretary to take "a decennial census of the population" in "such form and content as he may determine" (quoting 13 U.S.C. § 141)); *Nat.*

### E. The Rule Violates the Establishment Clause

#### 1. The Rule Impermissibly Advances Religious Beliefs in Violation of the Establishment Clause.

The Supreme Court has long recognized that "[t]he First Amendment . . . gives no one the right to insist that in pursuit of their own interests others must conform their conduct to his own religious necessities." *Thornton*, 472 U.S. at 710 (alteration in original) (quoting *Otten v. Balt. & O.R. Co.*, 205 F.2d 58, 61 (2d Cir. 1953)). Yet the Rule's categorical requirement that Plaintiffs accommodate any employee who refuses to perform a given medical procedure and/or take any action that has a "specific, reasonable, and articulable connection" to "furthering" a lawful medical procedure or service performed by someone else—even where these actions may be "the primary or substantial majority of the duties of the position," 84 Fed. Reg. at 23,192—"imposes on employers and employees an absolute duty to conform their business practices to the particular religious practices of the employee." *Thornton*, 472 U.S. at 709. Thus, as Plaintiffs' set forth previously, Providers' PI Br. 39–42, this case is controlled by *Thornton*, which held that a law that provided employees with an unqualified right to refuse to work for religious reasons violated the Establishment Clause.

Defendants' attempts to distinguish *Thornton* are unavailing. <u>First</u>, HHS's argument that the Rule does not impose an "absolute obligation" to accommodate religious beliefs in violation of the Establishment Clause because an entity can simply refuse federal funding is readily dismissed.[27] HHS Br. 69–70. It is well-settled that "even though a person has no 'right' to a

---

*Res. Def. Council v. U.S. Dep't of Energy*, 362 F. Supp. 3d 126, 144–45 (S.D.N.Y. 2019) (rejecting challenge to the reviewability of a stay under 5 U.S.C. § 705, which permits agencies to issue stays "when justice so requires"). Far from an "open-ended" standard, Section 1554 identifies six particular ways in which HHS regulations may not interfere with patient care.

[27] By that logic, the law in *Thornton* did not impose any absolute obligation either—a business owner could just choose not to operate their business on Sabbath days and then there would be no need to "adjust hiring plans, training, or schedules . . . to avoid discriminating against [employees]

valuable government benefit and even though the government may deny him the benefit for any number of reasons . . . [i]t may not deny a benefit to a person on a basis that infringes his constitutionally protected interests." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *see also Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 612 (2013) ("A predicate for any unconstitutional conditions claim is that the government could not have constitutionally ordered the person asserting the claim to do what it attempted to pressure that person into doing." (citing *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 59–60 (2006))).

Second, in arguing that the Supreme Court precludes consideration of the burdens imposed by religious accommodations, *see* HHS Br. 70; Def.-Int. Br. 29, Defendants misapprehend the Supreme Court's ruling in *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327 (1987). In *Amos*, the Supreme Court upheld an exemption to Title VII that allowed religious entities to discriminate on the basis of religion in employment— in short, allowing the Church of Jesus Christ of Latter-Day Saints to fire an employee because he was not a church member. 483 U.S. at 329. However, nothing about this ruling explicitly or implicitly conflicts with *Thornton*. To the contrary, whereas *Amos* recognizes that "[a] law is not unconstitutional simply because it *allows* churches to advance religion, which is their very purpose," 483 U.S. at 337, *Thornton* recognizes that the Constitution prohibits forcing nonreligious entities, such as Plaintiffs, "to conform their [secular] business practices to the particular religious practices of the[ir] employees," *Thornton*, 472 U.S. at 709. The Rule clearly has nothing to do with the former, and squarely runs afoul of the latter.[28]

---

with conscience objections" to working on their Sabbath. HHS Br. 70. But the Court nonetheless struck down the law.

[28] Defendants-Intervenors' reliance on *Hosanna-Tabor Evangelical Lutheran Church and School v. Equal Employment Opportunity Commission*, 565 U.S. 171 (2012), *see* Def.-Int. Br. 29, is likewise misplaced, because it also applies to religious institutions and their conduct toward

Further, far from holding that the burdens imposed by such accommodations of religious belief are irrelevant to the constitutional analysis, the *Amos* Court acknowledged that, "[a]t some point, accommodation may devolve into 'an unlawful fostering of religion.'" *Amos*, 483 U.S. at 334–35 (quoting *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 145 (1987)); *see also Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005) (holding that "courts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries"); *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 706 (1994) ("accommodation is not a principle without limits"). In short, *Amos* affirmed that a burden posed by the accommodation of religion can violate the Establishment Clause, even if not every burden posed by an accommodation meets that standard.

<u>Third</u>, as in *Thornton*, *see* 472 U.S. at 708, the Rule's plain language and the record amply demonstrate the Rule advances religious interests. *See, e.g.*, 84 Fed. Reg. at 23,176 & n.27 (citing lawsuits against religiously-affiliated hospitals as reason for the Rule); *id.* at 23,246–47 & n.322 (prioritizing interests of faith-based health care providers); *id.* at 23,175, 23,246, 23,247, 23,253 (relying on 2009 survey of "members of faith-based medical associations"); Notice of Proposed Rulemaking, Protecting Statutory Conscience Rights in Health Care; Delegations of Authority, 83 Fed. Reg. 3,881 (Jan. 26, 2018) (proposing HHS Refusal Rule "in keeping with the Attorney General's religious liberty guidance," which ''protects not just the right to believe or the right to worship; it protects the right to perform or abstain from performing certain physical acts in accordance with one's beliefs'' (Memorandum from the Attorney General, Federal Law Protections for Religious Liberty at 2 (Oct. 6, 2017))). The Rule likewise states that it "furthers a

---

ministerial employees, which is subject to First Amendment protection due to "the interest of religious groups in choosing who will preach their beliefs, teach their faith, and carry out their mission." *Id.* at 196.

presidential priority" (84 Fed. Reg. at 23,227) expressed in Executive Order 13798, which provides that "[i]t shall be the policy of the executive branch to vigorously enforce Federal law's robust protections for religious freedom," Promoting Free Speech and Religious Liberty, 82 Fed. Reg. 21,675, 21,675 (May 4, 2017). Even Defendants-Intervenors hasten to emphasize that "HHS issued the Conscience Rule to . . . protect the religious liberty of healthcare professionals." Def.-Int. Br. 11. That the Rule also protects certain moral convictions does not give the federal government a free pass to impose particular religious practices and beliefs on Plaintiffs, their employees, and their patients.[29]

Finally, despite Defendants' repeated arguments to the contrary, see e.g., HHS Br. 67–68; Def.-Int. Br. 29, Plaintiffs' challenge is not to the underlying federal refusal statutes, but to the Rule itself. Prohibiting discrimination on the basis of religion does not, in itself, violate the Establishment Clause. See, e.g., 42 U.S.C. § 2000e-2(a) (Title VII). Likewise, Defendants' reference to Sherbert v. Verner, 374 U.S. 398 (1963), see HHS Br. 68, supports only the principle that accommodations are acceptable where they do not "serve to abridge any other person's religious liberties." Sherbert, 374 U.S. at 409. However, per the Supreme Court, imposing on employers an "absolute duty" to accommodate religious refusals does. Thornton, 472 U.S. at 709. As Plaintiffs argue, supra Part II.A.1, this "absolute duty" is completely untethered to the plain language and history of the refusal statutes and is entirely the unauthorized creation of the Rule. This Court should therefore reject Defendants' invitation to construe those statutes to require precisely what the Supreme Court held unconstitutional in Thornton.

---

[29] Indeed, as the Supreme Court has recognized "deeply and sincerely [held] beliefs that are purely ethical or moral in source and content but that nevertheless impose upon [an individual] a duty of conscience" may not be meaningfully distinguishable from religious beliefs. Welsh v. United States, 398 U.S. 333, 340 (1970); see also id. at 343–44.

### 2. Plaintiffs' Establishment Clause Claim Is Ripe

"[A] substantive rule which as a practical matter requires the plaintiff to adjust his conduct immediately" is ripe for judicial review. *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (quoting *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 891 (1990)). HHS's argument that this claim is not ripe unless and until Plaintiffs are subject to a "specific enforcement action" is simply wrong on the facts and the law. HHS Br. 18.

<u>First</u>, if permitted to take effect, the Rule will immediately require Plaintiffs to modify their conduct to comply with the Rule's absolute accommodation requirements. The Rule acknowledges that the goal of the regulations is to incentivize "covered persons and entities to institute proactive measures." 84 Fed. Reg. 23,228; *see also id.* at 23,227 (final rule "incentivizes the desired behavior"). As just one example, Plaintiffs are interviewing for open positions on an ongoing basis, First David Decl. ¶¶ 29–31; Second David Decl. ¶ 12; Decl. of Kimberly Custer Supp. Pls.' Mot. Prelim. Inj. ("First Custer Decl.") ¶¶ 39–40, ECF No. 21-2 (No. 1:19-cv-5433); Decl. of Meagan Gallagher Supp. Pls.' Mot. Prelim. Inj. ("First Gallagher Decl.") ¶ 17, ECF No. 21-3 (No. 1:19-cv-5433). Plaintiffs currently discuss essential job functions with applicants to ensure that they are willing and able to perform those functions, and are not hostile to Plaintiffs' mission, as Plaintiffs are routinely subject to attempts at sabotage. First Custer Decl. ¶¶ 56–57; First Gallagher Decl. ¶¶ 44, 45–48; First Coleman Decl. ¶¶ 53–60; Second Coleman Decl. ¶ 13; First David Decl. ¶¶ 30–41; Second David Decl. ¶ 12. However, under the Rule they would be barred from asking applicants or employees whether they are willing to perform the essential functions of the job, and, even then, can only ask employees "once per calendar year," unless Plaintiffs can demonstrate "persuasive justification."[30] 84 Fed. Reg. at 23,263 (to be codified at 45 CFR § 88.2(6)). In

---

[30] The Rule does not define what qualifies as "persuasive justification," leaving it entirely up to the discretion of HHS, which offers no guidance as to when it will be persuaded that asking or

addition, Plaintiffs would have to review and alter their current policies, including the way staff are supervised, retrain staff, and otherwise change the way they do business to ensure they become and remain in compliance with the Rule—long before any refusal arises. *See* First Coleman Decl. ¶¶ 71–80; Second Coleman Decl. ¶ 13; First Custer Decl. ¶¶ 38, 62–67; First David Decl. ¶¶ 44–49; Second David Decl. ¶¶ 12–13; First Gallagher Decl. ¶¶ 55–56.[31] Contrary to what HHS suggests in their brief, *see* HHS Br. 19, HHS does not have to wait for a specific alleged violation of the Rule to investigate whether Plaintiffs are in compliance with the Rule. HHS can commence a "compliance review" of any entity any time HHS "suspect[s]" noncompliance with the Rule, *see* 84 Fed. Reg. 23,270 (to be codified at 45 CFR § 88.7(c)), at which point Plaintiffs must be able to provide "complete and accurate records evidencing compliance," *id.* (to be codified at 45 CFR § 88.6(b)), with the Rule.

Second, as set forth *supra*, even absent any charge of discrimination, the Rule is a final agency action that will have a concrete and immediate effect on Plaintiffs.[32] More importantly, Defendants do not contest Plaintiffs' standing to challenge the Rule and "a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging"—including in pre-enforcement challenges. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (internal

---

repeating the question is justified and does not, therefore, constitute unlawful discrimination. *See also supra* note 7.

[31] This requires a significant change in conduct, as the Rule diverges completely from the prevailing legal regime under Title VII, *see* 84 Fed. Reg. at 23,191, which requires accommodations only when they do not impose undue hardship on the employer's operations, *see* 42 U.S.C. §§ 2000e-2(a), 2000e(j). Under the Rule, by contrast, Plaintiffs are prohibited from taking any steps to protect patient access to medical services and information, even in emergencies, unless those steps are "voluntarily accept[ed]" by the objecting employee, do not require any "additional action" from the objecting employee, or do not otherwise constitute an "adverse action" (undefined) against the employee, 84 Fed. Reg. at 23,263.

[32] That Defendants sought to postpone the effective date of the Rule rather than have to brief a preliminary injunction on an expedited schedule, *see* ECF Nos. 79, 87, can hardly be said to render the Rule not ripe for judicial review, *see* HHS Br. 18.

quotation marks omitted). Denying prompt judicial review in this matter would impose a substantial hardship on Plaintiffs, forcing them to choose between being subject to an unconstitutional Rule on the one hand, or violating the law in order to trigger enforcement proceedings and risking critical federal funding and consuming administrative proceedings on the other. *See id.* at 167–68; *see also Sharkey v. Quarantillo*, 541 F.3d 75, 90 (2d Cir. 2008) ("[T]he mere opportunity . . . to [later] submit to the *discretion* of the agency . . . would not relieve the hardship caused by our withholding court consideration of [plaintiff's] claim").[33] Further, the gravamen of Plaintiffs' claim is not that HHS *may* in the future enforce the Rule in a manner that violates the Establishment Clause, but that the Rule, as written, violates binding Supreme Court precedent prohibiting the government from imposing an "absolute duty" to accommodate an employee's religious objections to performing their job.[34]

As such, even in the absence of a threatened enforcement action, this case presents a "concrete factual situation," HHS Br. 20, that is more than sufficient to establish "the fitness of the issues for judicial decision," and the "hardship to [Plaintiffs] of withholding court consideration." *Sharkey*, 541 F.3d at 89 (quoting *Nat'l Park,* 538 U.S. at 808); *see also N.Y. Civil Liberties Union v. Grandeau,* 528 F.3d 122, 134 (2d Cir. 2008) (holding "hardship" prong of ripeness satisfied where agency action "creates a direct and immediate dilemma for the parties"

---

[33] As Plaintiffs have already set forth in detail in their Preliminary Injunction brief, losing their federal funding would irreparably damage Plaintiffs' ability to provide health care to their patients, and could force them to stop providing services. Providers' PI Br. 46–47; First Coleman Decl. ¶¶ 76–78; Second Coleman Decl. ¶¶ 12–15; First Custer Decl. ¶ 68; Second Custer Decl. ¶ 11–12; First David Decl. ¶¶ 26, 52; Second David Decl. ¶¶ 6, 13; First Gallagher Decl. ¶ 40; Second Gallagher Decl. ¶¶ 9–12.

[34] For these reasons, *California v. United States*, No. C 05-00328 JSW, 2008 WL 744840 (N.D. Cal. Mar. 18, 2008), and *Marchi v. Board of Cooperative Educational Services of Albany*, 173 F.3d 469 (2d Cir. 1999) are inapposite. *See* HHS Br. 21–23. In both cases, the courts held plaintiffs' claims were not ripe because the threatened harms were contingent on a series of future events that may never occur. *See California*, 2008 WL 744840, at *5; *Marchi*, 173 F.3d at 478–79.

(quoting *Marchi v. Bd. of Coop. Educ. Servs. of Albany,* 173 F.3d 469, 478 (2d Cir. 1999))); *Nat.*

*Res. Def. Council, Inc. v. U.S. Dep't of the Interior*, No. 18-CV-4596, 2019 WL 3456886, at \*13–

14 (S.D.N.Y. July 31, 2019) (finding agency action ripe for review where it "definitively resolved"

what constitutes prohibited conduct).[35] Where, as here, the "impact of the regulation" will "be felt

immediately by those subject to it in conducting their day-to-day affairs" causing adverse

consequences if judicial review is delayed, the administrative action is ripe for review. *Nat'l Park*,

538 U.S. at 810 (quoting *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 164 (1967)).

## III. The Rule Is Arbitrary and Capricious

For all the reasons outlined in the State Plaintiffs' brief, the Rule is arbitrary and capricious

and should be set aside. 5 U.S.C. § 706(2)(A).

## IV. HHS's Definition of "Discrimination" in the Final Rule Is Not a Logical Outgrowth of the Proposed Rule

The Final Rule makes radical changes to the definition of discrimination that were not

subject to notice and comment and therefore are not a "logical outgrowth" of the Proposed Rule.

*See* Providers' PI Br. 24–26. A final rule is a logical outgrowth of a proposed rule if the agency

"expressly ask[s] for comments on a particular issue or otherwise ma[kes] clear that the agency

[is] contemplating a particular change." *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076,

1081 (D.C. Cir. 2009). But a rule is not a logical outgrowth if "interested parties would have had

to divine [the agency's] unspoken thoughts, because the final rule was surprisingly distant from

the proposed rule." *Idaho Conservation League v. Wheeler*, 930 F.3d 494, 508 (D.C. Cir. 2019)

(alteration in original) (quoting *CSX Transp., Inc.*, 584 F.3d at 1080); *see also Nat'l Black Media*

---

[35] Even if there were some question as to the fitness of the issues or hardship to the parties, which there is not, pre-enforcement First Amendment claims are assessed under somewhat relaxed ripeness rules. *See Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2013); *Grandeau*, 528 F.3d at 134.

*Coal. v. FCC*, 791 F.2d 1016, 1022 (2d Cir. 1986) ("While a final rule need not be an exact replica of the [proposed] rule . . . , the final rule must be a 'logical outgrowth' of the rule proposed . . . [such that] 'affected parties . . . [have] notice and an opportunity to respond.'" (quoting *AFL-CIO v. Donovan*, 757 F.2d 330, 338 (D.C. Cir. 1985))).

Here, the Final Rule's definition of discrimination adds a series of provisions that fundamentally alter the legal obligations of covered entities in ways wholly unprecedented in federal law, *see, e.g.*, 84 Fed. Reg. at 23,190–92 (discussing Title VII and addition of ¶¶ 4–6 to definition of "*Discriminate or Discrimination*"); *id.* at 23,263, and that were not included or even hinted at in the Proposed Rule. For example, subsection (5) of the definition states that employers may only inquire about an employee's willingness to perform an essential job function *after* being hired and only once per calendar year thereafter, absent a "persuasive justification" to ask again within the same year. *See* 84 Fed. Reg. at 23,191, 23,263 (to be codified at 45 CFR § 88.2 ("*Discriminate or Discrimination*" ¶ 5)). Nothing in the language of the Proposed Rule foreshadowed such an unusual set of ground rules for employers—*e.g.*, making it an act of unlawful discrimination for employers to ensure that they hire applicants who are willing to perform the core functions of the job. Had it done so, it would have provided commenters with "their first occasion to offer new and different criticisms that the agency might find convincing." *Fertilizer Inst. v. U.S. EPA*, 935 F.2d 1303, 1311 (D.C. Cir. 1991) (quoting *United Steelworkers of Am., AFL-CIO-CLC v. Marshall*, 647 F.2d 1189, 1225 (D.C. Cir. 1980)); *see also Small Refiner Lead Phase–Down Task Force v. U.S. EPA*, 705 F.2d 506, 550 (D.C. Cir. 1983) ("We do not know, of course, how EPA would have responded to these comments. But whether or not notice would have led to a different rule, it would have permitted EPA to get its facts straight."). In addition, subsections (4) and (6) of the Final Rule's definition of discrimination replace Title VII's

"reasonable accommodation" standard with a "voluntarily acceptance accommodation" standard (which the Rule coins an "effective accommodation") and reject Title VII's "undue hardship" standard altogether. *See* 84 Fed. Reg. at 23,190–92; *see also id*. at 23,263.[36] As described above, this effectively imposes an absolute duty on employers to accommodate religious refusals to perform essential job functions.

However, the Proposed Rule did not discuss or even mention Title VII or its anti-discrimination provisions that the Final Rule purports to borrow.[37] Rather, in proposing the definition of "discriminate," the Proposed Rule repeatedly invoked Title VI, stating that "HHS believes it appropriate to apply the general principles of nondiscrimination enshrined in Title VI with full force to discrimination on the basis of religious belief or moral conviction," and expressly "solicit[ed] comment on whether [a] disparate impact analysis is . . . appropriately included in the definition of discrimination, and, if so, how [a] disparate impact analysis would be best performed in th[is] context." 83 Fed. Reg. at 3,892–93; *see also id.* at 3,892 (stating that "discrimination" against conscientious objectors "parallels the type of discrimination typically prohibited with respect to other protected characteristics such as race, color, or national origin"). But even Title

---

[36] For example, under the Final Rule, a health care employer would only be able to use "alternate staff or methods to provide or further an objected-to conduct . . . if such entity does not require any additional action by, or does not take any adverse action against, the objecting protected entity (including individuals or health care entities), and if such methods do not exclude protected entities from fields of practice on the basis of their protected objections." *Id.* Health care employers may be able to inform patients of the "availability of alternate staff or methods to provide or further the objected-to conduct," but only if the manner of doing so is not viewed as an "adverse or retaliatory action" against the refusing entity. *Id.*

[37] Indeed, to the extent that the framework of Title VII could somehow be divined from the Proposed Rule, it might have suggested that the "undue burden" exception *would* apply to conscience protections. *See* 83 Fed. Reg. at 3,917 (referring to HHS's stated goal of striking "the appropriate *balance* between the Administration's goal of robust enforcement of existing Federal statutory protections for conscience in the health care field without *unduly burdening* entities in that field." (emphasis added)).

VI's disparate impact analysis incorporates Title VII's burden-shifting framework insofar as it permits an employer to refute a discrimination claim by demonstrating the existence of "a substantial legitimate justification" for the allegedly discriminatory practice. *See, e.g.*, *N.Y.C. Envtl. Justice All. v. Giuliani*, 214 F.3d 65, 72 (2d Cir. 2000); *N.Y. Urban League, Inc. v. New York*, 71 F.3d 1031, 1036 (2d Cir. 1995) (citing cases). The Final Rule allows nothing of the sort; to the contrary, it expressly prohibits it. No notice of such a framework was provided in the Proposed Rule, thus depriving any entity from commenting on it.[38]

As such, subsections (4)–(6) of the definition simply are not "garden variety" exceptions, HHS Br. 36, to the definition of discrimination HHS initially proposed. The Final Rule's absolute duty to accommodate an employee's refusals to perform even core aspects of his or her job, regardless of the hardships it imposes on employers or their patients, simply has no parallel in Title VI or any other civil rights statute discussed in the Proposed Rule, and thus provided no opportunity for public comment. In *National Black Media*, the Second Circuit invalidated the FCC's departure from its minority preference policy in new rules governing the issuance of broadcast licenses. *Nat'l Black Media Coal.*, 791 F.2d at 1020–23. The proposed rule purported to adopt licensing criteria substantially the same as FCC's prior criteria, but because the published rule omitted an important criterion, the court held "parties had no opportunity to comment on [the agency's] methodology or conclusions," *id*. at 1023, and the FCC thus violated the notice and comment requirements of the APA.

---

[38] Plaintiffs are not arguing that an agency is required to "lay out every detail of a proposed rule for comment." Def.-Int. Br. 26. However, like HHS, Defendants-Intervenors fail to explain how, for example, the Proposed Rule provided *any* notice that HHS was going to gag employers from asking applicants whether they are willing to perform core job functions or asking employees whether they have any religious objections to performing their core job functions more than once a year.

Moreover, HHS's claim that Plaintiffs fail "to explain why the definition is an impermissible construction of the statutes" misses the point. HHS Br. 37. This is a procedural APA claim, not a substantive one. *See Shell Oil Co. v. EPA*, 950 F.2d 741, 759 (D.C. Cir. 1991) ("[W]hen a final rule bears little resemblance to the one proposed, the parties are deprived of their APA rights to notice and comment. When a final rule is a logical outgrowth of the proposal, on the other hand, the APA's notice-and-comment provisions are satisfied, and procedural challenges based thereon must fail." (citations omitted)). Thus, even if the Final Rule's definition were a permissible construction of the statutes (which it is not, *see supra* Part II.A.1), HHS was still required to give proper notice and seek comments on the new definition. Finally, HHS also suggests that these definitions necessarily satisfy the logical outgrowth standard because they "were added in response to specific comments submitted in response to the proposed rule's broader definition." HHS Br. 36. But case law is clear that an agency "cannot bootstrap notice from a comment." *Shell Oil Co.*, 950 F.2d at 760–61 (quoting *Small Refiner*, 705 F.2d at 549). As the D.C. Circuit has explained, to hold otherwise "would turn notice into an elaborate treasure hunt, in which interested parties, assisted by high-priced guides (called 'lawyers'), must search the record for the buried treasure of a possibly relevant comment." *Small Refiner,* 705 F.2d at 550. As HHS is well aware, when comments submitted in response to a proposed rule raise new issues not addressed in the proposed rulemaking, the proper course of action is to reopen the notice and comment period. *See, e.g.*, Standards of Compliance for Abortion-Related Services in Family Planning Service Projects, 58 Fed. Reg. 34,024 (June 23, 1993) ("The Public Health Service is reopening for 45 days the public comment period on the rules proposed to establish compliance standards for abortion-related services provided by family planning projects funded under [T]itle X of the Public Health Service Act . . . . DHHS is taking this action in response to requests from

52

the public for further information on prior policies and to obtain more helpful public comment on the proposed rules.").[39]

## V. In the Alternative, Plaintiffs Are Entitled to a Preliminary Injunction

In the event this Court is unable to decide the motions for summary judgment in advance of the Rule's effective date, Plaintiffs are entitled to a preliminary injunction. For all of the reasons stated in the preceding argument sections and in prior briefing, Plaintiffs are likely to succeed on the merits of their claims. Moreover, Plaintiffs also readily meet the remaining preliminary injunction factors. Defendants' arguments to the contrary are unavailing.

### A. Irreparable Harm Will Ensue if the Rule Is Allowed to Take Effect

As established in Plaintiffs' Motion for Preliminary Injunction, Plaintiffs will experience significant and irreparable harm, including *per se* irreparable harm flowing from the violation of constitutional rights, if the Rule is permitted to take effect. Providers' PI Br. 42–49. HHS does not meaningfully address, let alone rebut this showing.

<u>First</u>, HHS has no response to Plaintiffs' undisputed evidence that the Rule will cause irreparable harm to Plaintiffs' organizational reputations and missions and would force Plaintiffs to open their doors to and keep on staff those who have a strong and dangerous opposition to the services Plaintiffs provide, *see* Providers' PI Br. 43–44, 46, 48 (citing declarations), effectively conceding the points. Indeed, rather than contend with any of the evidence of harm that the Rule's unprecedented and expansive interpretation of the underlying statutes would inflict on health care providers, HHS relies on conclusory assertions that the concrete harms set forth in Plaintiffs' affidavits may never happen, *see e.g.*, HHS Br. 74–75. This argument can hardly be credited when

---

[39] Provider Plaintiffs included a vagueness claim and a privacy and liberty claim under the Fifth Amendment to the U.S. Constitution in their complaints. *See* Compl. Declaratory Injunctive Relief ¶¶ 148–52, ECF No. 1 (No. 1:19-cv-5433); Compl. Declaratory Injunctive Relief ¶¶ 154, 156–57, ECF No. 1 (No. 1:19-cv-5435). Provider Plaintiffs no longer seek relief on these claims.

the very purpose of the Rule is to authorize the denials of care—and, indeed, to force Plaintiffs to hire and employ individuals who will withhold information and services—that, as Plaintiffs have detailed, will inflict this harm.[40] Nor can HHS credibly assert Plaintiffs face no threat from expanded enforcement authority when HHS has justified the Rule precisely because it felt its existing enforcement authority did not go far enough.

Second, in response to Plaintiffs' showing that the costs of compliance with the Rule will force them to divert substantial resources from patient care, harming Plaintiffs' patients and restricting overall access to care, Providers' PI Br. 44–46, HHS says merely that "ordinary compliance costs are typically insufficient to constitute irreparable harm," HHS Br. 75; *see also* Def.-Int. Br. 5 (making a similar argument). This argument misses the point. As Plaintiffs have explained, to provide the unqualified accommodations that the Rule demands—namely, to hire and compensate employees who refuse to do their jobs, or even pose security risks—will force radical changes to Plaintiffs' operations that will divert funds, staffing, and other resources away from patient services. *See* Providers' PI Br. 44–46. This, in turn, will harm not only Plaintiffs' ability to care for their patients, *see id.* at 43, 46, but their reputations as well and lead to loss of goodwill with their patients and the communities in which they operate, *see Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (finding irreparable harm where defendant's "actions would cause [plaintiff] irreparable harm through loss of reputation" and "good will"); *cf. Abbott Labs. v. Gardner*, 387 U.S. 136, 153 (1967) (recognizing "petitioners deal in a sensitive industry,

---

[40] For example, HHS's brief ignores that the Rule only permits "accommodations" that are "voluntarily acceptable" and that "do[] not require any additional action by the objecting individual or health care entity" and "do not exclude individuals from areas or fields of practice." 84 Fed. Reg. at 23,191–92. HHS also ignores the evidence that for many clinics such accommodations are "cost prohibitive" and reshuffling or hiring additional staff to accommodate an objecting employee is an impossibility and would cause many of Plaintiffs' health clinics to cut services or turn away patients altogether.

in which public confidence is . . . especially important"). These harms are irreparable *per se* since they cannot be remedied through money damages collected from the government. *Id.*

Third, HHS contends that the Court cannot consider these harms in determining whether a preliminary injunction should issue because they relate to "third-parties not before the Court," i.e. Plaintiffs' patients. HHS Br. 76. Once again, HHS is mistaken. As an initial matter, Plaintiffs' patients' denial of care and information is directly linked to the harm the Rule would inflict on Plaintiffs' mission—to provide nonjudgmental comprehensive health care to patients—and reputation described above. Moreover, courts routinely consider harms to third-party patients in actions for injunctive relief brought by healthcare providers. *See, e.g., N.Y. State Nat'l Org. for Women v. Terry,* 886 F.2d 1339, 1362 (2d Cir. 1989) (affirming permanent injunction in action brought by healthcare providers because "women patients will suffer irreparable harm from delayed access to clinics"); *accord Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 555 F. App'x 730, 732 (9th Cir. 2014) (affirming finding of irreparable harm in action filed by healthcare provider based on patients' loss of needed medical procedures); *Sharp Healthcare v. Leavitt*, No. 08-CV-0170 W(POR), 2008 WL 962628, at *5 (S.D. Cal. Apr. 8, 2008) (finding irreparable harm in action filed by healthcare entity because entity's loss of Medicaid funding would force patients to find alternate care).[41] This Court can and should consider the devastating harms to Plaintiffs' patients, including increased risk of injury or death from untreated medical emergencies, loss of

---

[41] HHS's reliance on *Warth v. Seldin*, 422 U.S. 490 (1975) is unavailing. The plaintiffs in *Warth* were individuals with low incomes who alleged they had been adversely impacted by a zoning law. The *Warth* court held the plaintiffs lacked Article III injury because, in effect, they were raising a "generalized grievance" on behalf of all low-income citizens. *Warth* did not concern health care providers seeking injunctive relief in order to maintain the status quo and prevent well-documented harms to their patients. *Cf. Singleton v. Wulff*, 428 U.S. 106, 114 (1976).

access to critical reproductive services, and increased prevalence of sexual transmitted infections, undetected cancers, and unwanted pregnancies. *See* Providers' PI Br. 31–33, 46–47.

<u>Finally</u>, though HHS is wrong that the Rule does not violate the Establishment Clause, HHS does not dispute that the violation of constitutional rights inflicts *per se* irreparable harm.

*        *        *

In short, the irreparable harms Plaintiffs face from enforcement are inextricably tied to the purpose and intended effect of the Rule itself and HHS's arguments to the contrary necessarily fail.

### B. The Balance of the Equities and Public Interest Favor an Injunction.

Plaintiffs have shown that their constitutional rights have been violated, *see supra* Part II.E, which alone tips the balance of equities in their favor. *See J.S.R., by and through J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 743 (D. Conn. 2018). In addition, Plaintiffs have demonstrated the Rule violates the APA and conflicts with other federal statutes, *see supra* Parts II–IV, and there is generally no public interest in the perpetuation of unlawful agency action, *see New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 676 (S.D.N.Y. 2019), *aff'd in part and rev'd in part*, 139 S. Ct. 2551 (2019).

On the other side, HHS cannot credibly claim that a preliminary injunction would cause harm given that shortly after finalizing the Rule, HHS agreed to postpone its effective date due to this litigation. *See* Stipulated Req. Order Postpone Rule's Effective Date [5 U.S.C. § 705], ECF No. 87-1; *see also* Order, ECF No. 91. There is no reasoned explanation for the arbitrary postponement date HHS picked. Should the Court find that it needs additional time to issue its decision on summary judgment, there is no evidence that any harm will ensue during that period. HHS also claims it is harmed by any injunction against "effectuating statutes," HHS Br. 76, but Plaintiffs seek only to enjoin Defendants' unlawful attempt at expanding those statutes. "[T]here

is generally no public interest in the perpetuation of unlawful agency action." *See* Providers' PI Br. 50 (citing *New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d at 676); *see also Doe v. Trump*, 284 F. Supp. 3d 1172, 1179 (W.D. Wash. 2018) ("Where the Government's actions thwart Congressional intent and undermine Congressionally-enacted statutes, the public interest is best served by curtailing those actions."). Indeed, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d at 676 (quoting *League of Women Voters of U.S. v. Newby,* 838 F.3d 1, 12 (D.C. Cir. 2016)). HHS cannot claim harm where, as here, the enjoined government action would undermine, rather than give effect to, congressionally-enacted statutes. *Doe*, 284 F. Supp. at 1178.

Defendant provides no other explanation for why the equities fall in its favor. As explained in the State Plaintiffs' brief filed today, Part II.C (ECF No. 182), the record reveals no evidence that the refusal statutes and Title VII are insufficient to protect the religious beliefs of health care providers. And HHS has not addressed the most critical harms that Plaintiffs will suffer if an injunction is not issued—namely, that the Rule would limit access to essential health care services and information and imperil the existence of health care providers who rely on federal funding to provide much-needed health care to underserved populations. *See supra* Part V.A; Providers' PI Br. 43–49.

Defendants-Intervenors have also failed to demonstrate that an injunction would harm them. They recognize that they are already statutorily protected to exercise their conscience-based objectives and have shown no evidence that these laws have been inadequate. Defendants-Intervenors have not provided a single instance in which a medical care provider has been subject to discrimination that could have or would have been prevented under the Rule, or even the refusal

statutes themselves, because existing protections have proven inadequate.[42] The recent survey conducted by Defendants-Intervenors of their members does not show otherwise. *See* Def.-Int. Br. 11; Decl. of Erin Norman Supp. Mot. Summ. J. Opp'n Pls.' Mot. Prelim. Inj., ECF No. 153. Statements in the survey regarding their members' general support for "conscience protection for medical professionals" and experience with "discrimination" do not demonstrate that preliminarily enjoining *this* Rule would harm their interests; nothing about the survey questions or results are about the provisions in the Rule at issue here.

Because an injunction will "preserve the relative positions of the parties" while Plaintiffs' significant concerns are addressed, *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37–38 (2d Cir. 2018) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)), and because there is no evidence that longstanding existing statutory protections are inadequate, HHS cannot show that the balance of equities and public interest weigh in favor of *changing*— rather than maintaining—the status quo.

## VI. Scope of Relief

For all of the reasons stated in the State Plaintiffs' brief, the Plaintiffs are entitled to vacatur of the Rule, as well as declaratory and nationwide injunctive relief to remedy defendants' violations of the APA and the Constitution. In addition, HHS's fixation on facial relief is misplaced. *See, e.g.*, HHS Br. 3, 17, 77–78. First, the relief contemplated by the APA is by its very nature facial, *see* 5 U.S.C. § 706(2)(A) (authorizing a court to "set aside and vacate the Final Rule"), and thus the distinction between facial and as applied relief does not apply to Plaintiffs'

---

[42] Though Defendants-Intervenors argue that Dr. Frost has "suffered discrimination on account of their religious beliefs," Def.-Int. Br. 1, Dr. Frost herself admits that she has never been the subject of religious discrimination, *see* Frost Decl. ¶ 13, and that she is currently employed by a faith-based health organization, *see id.* ¶ 4; Pls.' Joint Mem. Law Opp'n Mot. Intervene Dr. Regina Frost CMDA ("Intervention Opp'n") 6–7, ECF No. 109. Accordingly, Dr. Frost has not provided more than highly speculative claims of potential harm. Intervention Opp'n 6–7.

APA claims. Second, and more fundamentally, HHS's arguments betray a basic misunderstanding of the doctrine:

> [T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge . . . it goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint.

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). Thus, even if HHS were correct that facial relief as to Plaintiffs' constitutional claim is inappropriate (which it is not because there are no scenarios under which it is constitutionally permissible to impose an *absolute* duty on employers to accommodate their employees' religious beliefs, *see supra*), that would not insulate the Final Rule from judicial review.[43] Finally, HHS conflates whether an injunction will benefit non-parties (nationwide relief) with whether the Rule would be enjoined in whole or in part. As Plaintiffs have already explained, Providers' PI Br. 50–51, and is explained further in the State Plaintiffs' Brief, nationwide relief is appropriate here.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court grant summary judgment to Plaintiffs, deny Defendants' motion for summary judgment, and vacate and set aside the Final Rule, or, in the alternative, enter provisional relief enjoining implementation and enforcement of the Rule pending resolution of Plaintiffs' claims on the merits.

---

[43] Indeed, in *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 328 (2005), the Supreme Court rejected the argument that just because a statute may only be unconstitutional as applied to a small percentage of individuals, a plaintiff is entitled to no relief at all. 546 U.S. at 328. Rather, the Supreme Court recognized, that for every wrong there must be a remedy and it is the role of the court, *after* having found a statute to operate unlawfully, to determine the scope of the relief. *Id.* at 328–331; *see also id.* at 331 (pleading for any relief "just and proper" is sufficient to ensure narrowly-crafted relief where facial relief is inappropriate).

Dated: September 5, 2019

Respectfully submitted,

*/s/ Sarah Mac Dougall*

Diana Salgado*
Planned Parenthood Federation of America, Inc.
1110 Vermont Ave., NW Ste. 300
Washington, D.C. 20005
Tel.:  (202) 973-4800
Fax:  (202) 296-3480
diana.salgado@ppfa.org

Sarah Mac Dougall
Cristina Alvarez**
Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018-1405
Tel:  (212) 841-1000
Fax:  (212) 841-1010
smacdougall@cov.com
calvarez@cov.com

Hana Bajramovic
Planned Parenthood Federation of America, Inc.
123 William St., 9th Floor
New York, NY 10038
Tel.:  (212) 541-7800
Fax:  (212) 247-6811
hana.bajramovic@ppfa.org

Kurt G. Calia*
Marina Dalia-Hunt**
Covington & Burling LLP
3000 El Camino Real, 5 Palo Alto Square
Palo Alto, CA 94306-2112
Tel:  (650) 632-4717
Fax:  (650) 632-4800
kcalia@cov.com
mdaliahunt@cov.com

Michelle Banker
Sunu Chandy
National Women's Law Center
11 Dupont Circle, NW #800
Washington DC 20036
Tel:  (202) 588-5180
Fax:  (202) 588-5185
mbanker@nwlc.org
schandy@nwlc.org

Ryan Weinstein
Paulina Slagter**
Covington & Burling LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
Tel:  (424) 332-4800
Fax:  (424) 332-4749
rweinstein@cov.com
pslagter@cov.com

Robin F. Thurston**
Kristen Miller*
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
Tel:  (202) 448-9090
rthurston@democracyforward.org
kmiller@democracyforward.org

David M. Zionts*
Covington & Burling LLP
One CityCenter
850 10th Street, NW
Washington, DC 200001
Tel: (202)662-6000
dzionts@cov.com

*Counsel for Plaintiffs PPFA and PPNNE*

*Counsel for Plaintiffs PPFA and PPNNE*

* Admitted *Pro hac vice*
**Pro hac vice* motion forthcoming

* Admitted *Pro hac vice*
**Pro hac vice* motion forthcoming

/s/*Alexa Kolbi-Molinas*
Alexa Kolbi-Molinas
Lindsey Kaley
Brigitte Amiri
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2633
Fax: (212) 549-2652
akolbi-molinas@aclu.org
lkaley@aclu.org
bamiri@aclu.org

Daniel Mach*
American Civil Liberties Union Foundation
915 15th Street NW
Washington, DC 20005
Phone: (202) 675-2330
Fax: (202) 546-0738
dmach@aclu.org

*Attorneys for Plaintiffs NFPRHA and PHS*

* Admitted *Pro hac vice*

Elizabeth O. Gill*
American Civil Liberties Union
Foundation of Northern California, Inc.
39 Drumm Street
San Francisco, CA 94111
Phone: (415) 621-2493
Fax: (415) 255-8437
egill@aclunc.org

Christopher Dunn
Erin Beth Harrist
Donna Lieberman
New York Civil Liberties Union
Foundation
125 Broad Street, 19th Floor
New York, NY 10004
Phone: (212) 607-2298
cdunn@nyclu.org
eharrist@nyclu.org
dlieberman@nyclu.org

*Attorneys for Plaintiffs NFPRHA and PHS*

* Admitted *Pro hac vice*